IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on November 18, 2022

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| SIM HYON-SOP, | : | 18 U.S.C. §§ 1344, 1349 (Conspiracy to |
| | : | Commit Bank Fraud) |
| JIN GUANGHUA, | : | |
| a/k/a Guanghua Jin, GH Kim, | : | 50 U.S.C. § 1705(a) (Conspiracy to |
| GH Jin, Jimmy, | : | Violate and Violations of International |
| | : | Emergency Economic Powers Act |
| QIN GUOMING, | : | Violations) |
| | : | |
| and | : | 31 C.F.R. Part 510 (North Korean |
| | : | Sanctions Regulations) |
| HAN LINLIN, | : | |
| a/k/a Henry Han, James Han, | : | 18 U.S.C. § 1956(h) (Conspiracy to |
| | : | Launder Monetary Instruments) |
| Defendants. | : | |
| | : | 18 U.S.C. § 1956(a)(2)(A) (Laundering |
| | : | Monetary Instruments) |
| | : | |
| | : | 18 U.S.C. § 2 (Aiding and Abetting) |

## INDICTMENT

The Grand Jury charges that, at times material to this Indictment:

## COUNT ONE
(Conspiracy to Commit Bank Fraud)

### INTRODUCTION

1.     These charges arise from an illicit scheme by the Democratic People's Republic of Korea ("North Korea"), through its state-owned companies, to generate revenue for North Korea and its Weapons of Mass Destruction ("WMD") proliferation programs, through the purchase and sale of tobacco and other products.

2.     These purchases were financed by North Korean banks, specifically the Foreign Trade Bank ("FTB") and the Korea Kwangson Banking Corp. ("KKBC"). FTB and KKBC have been designated by the U.S. Department of the Treasury for funding North Korea's WMD proliferation, and FTB has been sanctioned by the United Nations Security Council due to North Korea's nuclear and ballistic missile activity. To avoid these sanctions, FTB and KKBC used Chinese front companies to conduct U.S. dollar financial transactions, in their effort to funnel U.S. dollar funds to and from North Korea through the U.S. financial system.

3.     Defendant SIM HYON-SOP ("SIM"), a North Korean FTB employee based in Dubai, United Arab Emirates ("UAE"), effected transfers in furtherance of the scheme from North Korea to "the ENTITIES." SIM funded certain of these transactions through transfers from various financial accounts and associates.

4.     "The ENTITIES" were a group of companies run by Chinese nationals, Defendants JIN GUANGHUA ("JIN"), QIN GUOMING ("QIN"), and HAN LINLIN ("HAN"). These Defendants founded at least eight companies in Dubai and elsewhere using variations of the same business name, to act as middlemen and facilitators for North Korean entities.

5.     Through the ENTITIES, JIN, QIN, and HAN facilitated purchases of tobacco that were ultimately made by and for the benefit of two North Korean Tobacco Companies, "NKTC1" and "NKTC2." These tobacco companies were owned by the North Korean military and government. North Korea, through these and other tobacco companies, purchased bulk tobacco to engage in the manufacture and trafficking in cigarettes—particularly counterfeit cigarettes—to generate hard currency revenue. That revenue supported North Korea's WMD proliferation programs, in contravention of United Nations and U.S. prohibitions on such activity. For reasons of national security, U.S. federal law barred the use of the U.S. financial system to facilitate trade

2

with North Korea, including trade in tobacco. Moreover, U.S. federal law required U.S. financial institutions to conduct investigations into the transactions they process to ensure that the monies are not being transferred for illicit means.

6.      Notwithstanding these proscriptions, between in or around February 2009 and in or around March 2019, SIM, JIN, QIN, and HAN engaged in a multi-year scheme to assist North Korean entities to acquire raw tobacco and other products on the international market and to illegally access the U.S. financial system to pay for the same in U.S. dollars. Regarding the tobacco procurement, the ENTITIES would contact international producers of raw tobacco, arrange for the purchase of the tobacco and its shipment to their clients in North Korea, and arrange for the invoices for the purchases to be paid in U.S. dollars through the U.S. financial system. The Defendants effected this scheme by using Chinese front companies, false shipping records, and other means of deception to make it appear to U.S. financial institutions and others that the raw tobacco was being shipped to China, not to North Korea, and that payments for the tobacco were being made in furtherance of legitimate trade with China, not prohibited trade with North Korea.

7.      As a result of this fraud, U.S. financial institutions processed at least 310 transactions worth approximately $74 million that they otherwise would have frozen, blocked, investigated, and/or declined, had they known that the transactions were being conducted in furtherance of trade with North Korea. The transactions resulted in an estimated nearly $700 million in revenue for NKTC1 and NKTC2, and ultimately for the government of North Korea.

8.      In engaging in this conduct, Defendants SIM, JIN, QIN, and HAN also evaded, assisted others in evading, and caused the evasion of U.S. sanctions against North Korea and caused the export of financial services by U.S. financial institutions for the benefit of North Korea without a license.

## BACKGROUND

### A. Bank Secrecy Act and Correspondent Banking

9. Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

10. According to the Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all substantial U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

11. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to finance terrorism or to avoid sanctions programs administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").

12. The Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, in furtherance of its mission to safeguard the U.S. financial system. Under the Bank Secrecy Act,

4

financial institutions are required to assist U.S. government agencies in detecting and preventing money laundering, including reporting suspicious activity that might signal criminal activity (*e.g.*, money laundering or tax evasion). Additionally, an amendment to the Bank Secrecy Act incorporates provisions of the USA PATRIOT Act, which requires every bank to adopt a customer identification program (*i.e.*, Know Your Customer) as part of its Bank Secrecy Act compliance program. 12 C.F.R. §§ 21.11, 21.21.

13.    In June 2016, FinCEN determined that the entire North Korean financial sector was a "primary money laundering concern." 81 Fed. Reg. 35,665 (31 C.F.R. Pt. 1010). On November 9, 2016, FinCEN implemented a special measure barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. A second special measure required U.S. financial institutions to exercise "enhanced due diligence" and take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent banking in the United States.

14.    During the relevant times, as a result of the U.S. sanctions against North Korea, the FinCEN special measures, and overall risk management, correspondent banks would freeze, block, investigate, and/or decline to knowingly process any U.S. dollar wire transactions involving entities in North Korea. Failure to comply with the sanctions and special measures resulted in civil and criminal penalties for U.S. financial institutions.

### B. *United Nations Sanctions Against North Korea*

15. In December 1985, North Korea ratified the Nuclear Non-Proliferation Treaty ("NPT"). On January 10, 2003, North Korea withdrew from the NPT. On October 14, 2006, the United Nations ("UN") Security Council passed Resolution 1718 condemning North Korea's first nuclear test and imposed sanctions on North Korea, including barring the supply of heavy weapons and select luxury goods. After successive nuclear tests by North Korea, the UN Security Council strengthened or imposed additional sanctions, including in 2009, 2013, 2016, and 2017.

16. On August 5, 2017, the UN Security Council adopted Resolution 2371 expanding financial sanctions to include FTB, in response to North Korea's nuclear and ballistic missile testing.

### C. *U.S. Sanctions Against North Korea*

17. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50 U.S.C. § 1701 *et seq.*, enacted in 1977, authorized the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

18. The U.S. Departments of the Treasury, State, and Commerce enforce and administer economic sanctions under their respective authorities, to accomplish U.S. foreign policy and national security goals. In particular, the Department of the Treasury publishes a publicly-available list of individuals and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S. economic sanctions. SDNs' property and interests in property, subject to U.S. jurisdiction, or in the possession and control of U.S. persons are blocked

when they are placed on the SDN list. U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with SDNs and their property and interests in property.

19. Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating WMD. On November 14, 1994, the President issued Executive Order ("EO") 12938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

20. On June 28, 2005, the President, in order to take additional steps with respect to the national emergency described and declared in EO 12938, issued EO 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters"), targeting proliferators of WMD and their support networks, and to deny designated proliferators access to the U.S. financial and commercial systems. EO 13382 authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq.* EO 13382 and the Weapons of Mass Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities placed on the SDN list, unless exempt or authorized by OFAC, which was located in Washington, D.C.

21. On August 11, 2009, the Department of the Treasury designated the North Korean bank Korea Kwangson Banking Corp. ("KKBC") under EO 13382 for providing financial services

in support of both Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, both of which were previously identified by the President as WMD proliferators. All three entities had been designated by the UN pursuant to UN Security Council Resolution 1718 for their roles in North Korea's WMD and missile programs. At the time of the designation, the Department of the Treasury Under Secretary for Terrorism and Financial Intelligence stated, "North Korea's use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit." Pursuant to this authority, U.S. financial institutions were barred from providing correspondent banking services to KKBC.

22.     On March 11, 2013, the Department of the Treasury designated the Foreign Trade Bank ("FTB"), North Korea's state-owned foreign exchange bank, pursuant to EO 13382, for providing financial services that assisted in the proliferating of WMD. In the designation, the Department of the Treasury stated, "North Korea uses FTB to facilitate transactions on behalf of actors linked to its proliferation network, which is under increasing pressure from recent international sanctions. . . . By designating FTB, the Treasury Department is targeting a key financial node in North Korea's WMD apparatus and cutting it off from the U.S. financial system." Pursuant to this authority, U.S. financial institutions were barred from providing correspondent banking services to FTB.

23.     Most significantly, on March 15, 2016, the United States imposed country-wide sanctions on North Korea. On that date, the President, in order to take additional steps with respect to the previously described national emergency, issued EO 13722, addressing the Government of North Korea's continuing pursuit of its nuclear and missile programs. EO 13722 prohibited the export and reexport, directly or indirectly, of goods, services, and technology to North Korea from

8

the United States or by a U.S. person, wherever located, including financial services, unless exempt or authorized by OFAC. Pursuant to this authority, U.S. financial institutions were barred from providing correspondent banking services to or on behalf of any North Korea individuals or entities.

24.    On September 26, 2016, OFAC designated Dandong Hongxiang Industrial Development ("DHID"), a Chinese company, pursuant to EO 13382, due to DHID's actions on behalf of KKBC and ties to the Government of North Korea's proliferation of WMD.

25.    On June 1, 2017, OFAC designated the Ministry of People's Armed Forces ("MPAF") pursuant to EO 13722 as agencies, instrumentalities, or controlled entities of the Government of North Korea, due to its assistance in helping North Korea develop a WMD program.

26.    EO 13466 and 13722 and the North Korea Sanctions Regulations, 31 C.F.R. § 510.101 *et seq.*, prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these orders or regulations.

### D. North Korean Banking and Use of Front Companies

27.    The North Korean financial sector was comprised of state-controlled banks that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions," as found by FinCEN in setting the special measures against North Korea. *See* 81 Fed. Reg. at 78,715 (31 C.F.R. Pt. 1010). These front companies were subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism controls." *Id.*

28.    A 2017 United Nations Security Council report found that North Korea was "flouting" sanctions, in part through the use of "designated entities and banks" that used "agents

who [we]re highly experienced and well trained in moving money, people and goods, including arms and related materiel, across borders. These agents use[d] non-nationals of the Democratic People's Republic of Korea as facilitators, and rely on numerous front companies." The report further stated that when North Korea registered a front company without overt links to the country through the assistance of foreign nationals, it became significantly easier for the front company to pass rudimentary due diligence checks by financial institutions and open and maintain bank accounts with banks outside of North Korea. These "numerous front companies" left "no paper trail that leads to the Democratic People's Republic of Korea." Thus, North Korea was able "to conceal financial activity by using foreign nationals and entities allows them to continue to transact through top global financial centres."

29.    North Korean entities have historically used front companies to pay their counterparties in U.S. dollars. According to the same 2017 United Nations Security Council report, "the business conducted by some of these networks generates significant revenue for the Democratic People's Republic of Korea. Most of the financial activity investigated . . . was denominated in United States dollars," as well as two other currencies.

30.    The use of front companies and stripping material information, such as the true counterparties to the transaction, from wire transfer instructions and other documents influences the decision making of the correspondent banks, causing them to process transactions that they otherwise would normally freeze, block, investigate, and/or decline.

E.    *North Korean Tobacco Market*

31.    Trafficking in tobacco products generates revenue for advancing North Korea's WMD programs. According to United Nations' statistical data, North Korea has a population of approximately 26 million people and a gross domestic product of $16.331 billion in 2021, putting

it well below the GDP of every U.S. state according to U.S. government reporting. Yet, North Korea has been developing and testing nuclear weapons since at least 2006, despite a lack of significant income.

32. North Korea had been engaged in the production and trafficking of counterfeit cigarettes. According to a 2008 Congressional Research Service report, sources "have charged the DPRK with producing counterfeit cigarettes for export of seemingly genuine Japanese brand cigarettes (Mild Seven) and U.S. brands such as Marlboro. . . . U.S. authorities seized more than a billion of the 'fake smokes' in California in 2005. Millions more packs of fake Marlboros, Mild Sevens, and other cigarettes made in North Korea have been seized in Taiwan, the Philippines, Vietnam, and Belize." The same report noted North Korea counterfeit cigarette "production capacity as being in the range of more than two billion packs a year, making Pyongyang one of the largest producers of such contraband in the world."

33. According to a 2015 U.S. Department of State report, cigarette smuggling "fuels transnational crime, corruption, and terrorism." Cigarettes—especially counterfeit cigarettes—are one of North Korea's largest single sources of hard currency revenue. Testimony by government experts to the U.S. Senate Homeland Security and Governmental Affairs Committee in 2006, explained that counterfeit cigarettes were "[a] major source of income to the [North Korean] regime" and was a "potentially enormously lucrative business." "[C]igarette counterfeiting . . . may be the single most lucrative item in [the North Korean] portfolio," and such funds likely "support[] weapons of mass destruction development and otherwise support[] a tottering regime and the leadership elite of [North Korea.]"

34. North Korea's cigarettes sales have proved extremely lucrative. Reports from 2017, including one authored by a former U.S. Department of State official, stated that smuggled tobacco

11

could be resold to garner revenue as much as $20 on every $1 spent on leaf tobacco, through the manufacture and sales of cigarettes, including counterfeit cigarettes.

35. The North Korean tobacco companies discussed herein were owned by and operated for the benefit of the North Korean government. According to the 2008 Congressional Research Service report, profits generated by North Korean tobacco sales flow back to the North Korean government, including to "slush funds designed to sustain the loyalty of a core of party elite and to underwrite weapons development programs."

## THE CO-CONSPIRATORS

36. Defendant SIM HYON-SOP was a North Korean national employed by FTB to act as its representative in Dubai, UAE.

37. North Korea Tobacco Company 1 ("NKTC1") was a tobacco company owned by North Korea's Ministry of People's Armed Forces ("MPAF"), which was designated by OFAC in June 2017.

38. North Korea Tobacco Company 2 ("NKTC2") was a North Korean state-owned tobacco company, headquartered in Pyongyang, North Korea.

39. Defendant JIN GUANGHUA was a Chinese national from Liaoning Province in China, and resident of Australia. JIN was the President of the ENTITIES.

40. Defendant QIN GUOMING was a Chinese national from Liaoning Province in China, and resident of China. QIN was an owner and senior executive of the ENTITIES.

41. Defendant HAN LINLIN was a Chinese national from Liaoning Province in China, and resident of China. HAN was employed by the ENTITIES.

42. During the relevant times, SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, and HAN LINLIN knew that the financial transactions with which they were engaged were for the

12

benefit of North Korea and intended to deceive U.S. financial intuitions and others with respect to the same.

43.    The ENTITIES included eight corporate entities operated by JIN, QIN, and HAN, most of which were registered under variations all involving the same name.

a.    Entity 1 was registered in New Zealand in 2008. According to bank records, the majority of Entity 1's incoming U.S. dollar wire transfers were from North Korean front companies. Between in or around February 2009 and in or around December 2017, approximately 85% of Entity 1's outgoing U.S. dollar correspondent account wire payments related to purchasing tobacco from Company 1, as described further herein.

b.    Entity 2 was registered in the United Kingdom in 2013. According to bank records, Entity 2 began sending and receiving U.S. dollar correspondent account wire transfers in 2013, using addresses in China, Hong Kong, and the United Kingdom as part of these transactions. The Hong Kong address used by Entity 2 matched an address previously used by Entity 1. As with Entity 1, the majority of Entity 2's incoming U.S. dollar wire transfers were from North Korean front companies. The majority of Entity 2's outgoing U.S. dollar wire transfers were to Company 1 for tobacco purchases.

c.    Entity 3 was registered in China in 2013. According to bank records, Entity 3 was used on a limited basis, but also received U.S. dollar correspondent account wire transfers from at least one North Korean front company.

d.    Entity 4 was registered in UAE in 2017, and changed its name in 2019 to become Entity 6.

e. Entity 5 was registered in UAE in 2017, and changed its name in 2019 to become Entity 7.

f. Entity 6 was registered in the UAE in 2019 as a successor to Entity 4.

g. Entity 7 was registered in the UAE in 2019 as a successor to Entity 5.

h. Entity 8 was registered in Ganzhou, China in 2017.

44. Dandong Hongxiang Industrial Development ("DHID") was a Chinese front company that between in or about August 2009 and in or about August 2016 laundered hundreds of millions of dollars, in U.S. currency, for KKBC after KKBC's designation in August 2009. DHID and its related entities received goods, such as coal, from North Korea. In lieu of paying North Korea for these goods, KKBC directed DHID to pay third parties in U.S. dollars for commodities that North Korea wanted to obtain. As stated, DHID was designated by OFAC on September 26, 2016, for operating on behalf of KKBC.

## JURISDICTION AND VENUE

45. Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia. Pursuant to Title 18, United States Code, Section 3237, venue is proper in the District of Columbia.

46. Additionally, certain of the offenses alleged herein were begun and committed outside of the jurisdiction of any particular state or district of the United States. For those offenses, pursuant to Title 18, United States Code, Section 3238, venue is proper in the District of Columbia.

## THE CONSPIRACY

47. Between at least in or around February 2009 and in or around March 2019 ("the relevant time period"), SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, HAN LINLIN, and others known and unknown to the Grand Jury ("the co-conspirators"), within the venue of the

14

United States District Court for the District of Columbia, knowingly engaged in a conspiracy to execute a scheme or artifice (i) to defraud a financial institution, as defined in 18 U.S.C. § 20; and (ii) to obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of, a financial institution as defined in 18 U.S.C. § 20, by means of false and fraudulent pretenses, representations, and promises, *to wit*, by concealing from a financial institution that it was engaged in financial transactions for the benefit of North Korea and North Korean entities and through use of Chinese front companies.

### *Manner and Means*

48.     It was further a part of the conspiracy that the co-conspirators used the following manner and means, among others, to achieve the goals of the conspiracy:

a.   The co-conspirators and others caused payments to be sent by Chinese front companies to obfuscate North Korea's nexus to the transactions.

b.   The co-conspirators and others split large payments so as to avoid bank oversight.

c.   The co-conspirators and others listed and caused to be listed false information on bills of lading and other transaction-related documents, including the names and locations of Chinese front companies, to hide North Korea's connection to those transactions.

d.   The co-conspirators and others transmitted and caused to be transmitted to U.S. financial institutions false information, including the involvement of Chinese front companies, about U.S. dollar transactions that were actually made on behalf of North Korea and North Korean entities.

e.   The co-conspirators caused goods to be shipped to Dalian, China, a point of smuggling for goods to North Korea, and onward to North Korea.

| k. | 2/26/10 | DHID Front Company 1 | Entity 1 | $63,919.00 |
|---|---|---|---|---|
| l. | 3/2/10 | DHID Front Company 1 | Entity 1 | $101,317.00 |
| m. | 03/18/10 | DHID Front Company 1 | Entity 1 | $602,568.00 |
| n. | 6/1/10 | DHID Front Company 1 | Entity 1 | $113,920.00 |
| o. | 8/23/10 | DHID Front Company 2 | Entity 1 | $51,958.00 |
| p. | 10/21/10 | DHID Front Company 2 | Entity 1 | $818,986.50 |
| q. | 4/23/12 | DHID | Entity 1 | $1,607,534.00 |
| r. | 6/13/12 | DHID | Entity 1 | $1,132,871.00 |
| s. | 4/25/13 | DHID | Entity 1 | $1,838,712.00 |
| t. | 6/3/13 | DHID | Entity 1 | $1,499,984.20 |
| u. | 6/7/13 | DHID | Entity 1 | $1,006,538.00 |
| v. | 11/1/13 | DHID Front Company 3 | Entity 2 | $999,998.00 |
| w. | 11/4/13 | DHID Front Company 3 | Entity 2 | $546,532.00 |
| x. | 2/25/14 | DHID | Entity 2 | $2,693,825.00 |
| y. | 5/19/14 | DHID | Entity 1 | $799,994.00 |
| z. | 8/12/14 | DHID Front Company 4 | Entity 1 | $5,200.00 |
| aa. | 11/5/14 | DHID Front Company 4 | Entity 1 | $33,082.00 |
| bb. | 1/21/15 | DHID Front Company 4 | Entity 1 | $41,952.00 |
| cc. | 4/28/15 | DHID Front Company 5 | Entity 1 | $57,238.00 |
| dd. | 5/20/15 | DHID Front Company 4 | Entity 1 | $29,854.00 |
| ee. | 9/29/15 | DHID Front Company 5 | Entity 1 | $209,982.00 |
| ff. | 10/22/15 | DHID Front Company 4 | Entity 1 | $49,797.00 |
| gg. | 1/11/16 | DHID Front Company 4 | Entity 3 | $619,982.00 |

### *North Korean Payments by FTB & Its Employee, SIM*

51.     During the relevant time period, North Korea funded the ENTITIES through U.S. dollar financial transactions made by FTB. SIM, as an employee of FTB, paid or caused to be paid to the ENTITIES approximately $2.9 million in U.S. dollars through U.S. financial institutions for the North Korean tobacco procurement done by the ENTITIES, including as follows:

a. On or about December 22, 2017, SIM sent an email to an unknown recipient, stating, "I can provide USD accounts overseas in some area such as Hong kong [sic] and Turkish, and also provide the documents such as invoice and contract, which are necessary for you to apply to the correspondent bank to transfer outside in USD."

The attachment to the email was a payment instruction for the recipient to send $772,793.00 to Bank Account A.

h.  On or about June 22, 2018, China Front Company B sent $389,232.09 to Bank Account A, which was processed by a U.S. financial institution.

i.  On or about June 26, 2018, China Front Company B sent $383,479.13 to Bank Account A, which was processed by a U.S. financial institution.

j.  On or about July 9, 2018, SIM sent an email to UR1, informing UR1 that SIM needed two payments made. SIM provided UR1 with wire transfer instructions for a $750,000 payment to one of the ENTITIES.

k.  Also on or about July 9, 2018, UR1 sent an email to SIM stating UR1 understood the payment method. UR1 went on to state it seemed "safe" to split the remittance for the payment twice. Shortly thereafter, SIM concurred and instructed UR1 to do the same.

l.  On or about July 10, 2018, "China Front Company C," a Chinese entity that had no connection to the ENTITIES or Company 1, sent $364,638.88 to Bank Account A, which was processed by a U.S. financial institution.

m.  On or about July 12, 2018, UR1 sent an email to SIM stating confirming the payment details.

n.  On or about July 12, 2018, "China Front Company D," a Chinese entity that had no connection to the ENTITIES or Company 1, sent $385,279.86 to Bank Account A, which was processed by a U.S. financial institution.

o.  On or about July 12, 2018, China Front Company C sent $357,308.88 to Bank Account A, which was processed by a U.S. financial institution.

19

p. On or about July 16, 2018, China Front Company D sent $336,190.50 to Bank Account A, which was processed by a U.S. financial institution.

q. In or around July 2018, SIM updated a spreadsheet that contained a detailed list of financial transactions made to the ENTITIES in 2018. SIM listed therein the July transfers, $385,320.98 and $364,680.00, which together totaled $750,000.98. The same spreadsheet also referred to the first name of NKTC1, stating that the company had "recalled the bal[a]nce" and listed the date of that action "12.10."

**B. The ENTITIES' Corporate Restructuring to Further the Scheme**

52. During the relevant times, JIN, QIN, and HAN repeatedly reincorporated their companies and changed the company names in order to avoid bank scrutiny, including as follows:

a. On or about February 28, 2013, Entity 2 was registered in the United Kingdom and began sending and receiving U.S. dollar correspondent wire transfers.

b. On or about January 29, 2013, Entity 3 was registered in China.

c. On or about November 9, 2017, Entity 4 was registered in UAE.

d. On or about July 10, 2017, Entity 5 was registered in UAE.

e. On September 15, 2017, Entity 2 wired $100,000 to Entity 5 to fund the Entity 5's bank account.

f. On or about September 16, 2019, Entity 4 changed its name and became Entity 6.

g. On or about August 15, 2019, Entity 5 changed its name and became Entity 7.

h. On or about February 7, 2017, Entity 8 was registered in Ganzhou, China.

i. On or about January 3, 2019, JIN received a copy of the ENTITIES "2018 work summary," which was addressed to JIN as "president." The document, written in Chinese, discussed a "challenging year for the development of trade with the DPRK."

20

It further noted that the ENTITIES had "respond[ed] to international sanctions" and the increase in shipping costs dating back to May 2018. The summary, as translated, concluded by praising "the wise decisions and correct leadership of the two leaders of the company [JIN and QIN]" and noting the business decisions that "gradually returned to the right track," including moving the operations to Dubai, UAE.

## C. The ENTITIES' Tobacco Procurement from Company 1 for North Korea

### *Purchases of Company 1's Tobacco Products & Use of False Documentation*

53. During the relevant time period, the ENTITIES, from their various accounts, paid Company 1, a tobacco company located outside of Asia, approximately $35 million for tobacco products destined for North Korea, NKTC1, and NKTC2, the payment for which was sent through 102 wire transactions, all of which were processed by U.S. financial institutions, including the following examples:

| Sub-¶ | Date | Amount (USD) |
|---|---|---|
| a. | 7/15/13 | $632,728.80 |
| b. | 9/29/14 | $1,047,103.20 |
| c. | 10/27/14 | $836,352.00 |
| d. | 10/8/15 | $651,024.00 |
| e. | 5/31/16 | $689,515.20 |
| f. | 7/6/16 | $942,796.80 |
| g. | 9/24/18 | $280,829.18 |
| h. | 10/10/18 | $494.208.00 |
| i. | 3/1/19 | $230,236.80 |

54. The ENTITIES also used Chinese front companies to facilitate the payments to Company 1, including as follows:

a. Between on or about February 25, 2013, and on or about June 13, 2013, Company 1 sent five shipments for DHID Front Company 6, located in Hong Kong, the shipping documents related to the same which contained (i) the Consignee listed as DHID Front

21

Company 6 with the word "Korea" in front of the company name and an address in Shenyang, China; (ii) the final destination of the goods listed as Dalian, China; and (iii) the total of the bills for the shipments was listed as $593,406.

b. Related to these same shipments, between on or about January 25, 2013, and on or about August 8, 2013, DHID Front Company 6 and DHID Front Company 7 made six payments to Company 1 totaling $593,370. DHID Front Companies 6 and 7 had no actual role in the tobacco transactions. Payments associated with these five shipments were processed by U.S. financial institutions, as follows:

| Sub-¶ | Date | Originator | Beneficiary | Amount (USD) |
|---|---|---|---|---|
| a. | 1/25/13 | DHID Front Company 6 | Company 1 | $35,604.36 |
| b. | 3/15/13 | DHID Front Company 7 | Company 1 | $83,058.84 |
| c. | 4/11/13 | DHID Front Company 6 | Company 1 | $118,681.20 |
| d. | 5/23/13 | DHID Front Company 7 | Company 1 | $118,663.20 |
| e. | 6/21/13 | DHID Front Company 6 | Company 1 | $118,681.20 |
| f. | 8/08/13 | DHID Front Company 6 | Company 1 | $118,681.20 |

c. The ENTITIES also used additional front companies to make payments to Company 1. "China Front Company E," a Chinese entity that had no connection to the ENTITIES or Company 1, made payments directly to Company 1 for tobacco purchases brokered by the Entity 8, as follows:

| Sub-¶ | Date | Originator | Beneficiary | Amount |
|---|---|---|---|---|
| a. | 09/7/17 | China Front Company E | Company 1 | $20,000.00 |
| b. | 10/24/17 | China Front Company E | Company 1 | $89,952.00 |
| c. | 11/3/17 | China Front Company E | Company 1 | $50,000.00 |
| d. | 11/10/17 | China Front Company E | Company 1 | $75,000.00 |
| e. | 11/16/17 | China Front Company E | Company 1 | $80,000.00 |

55.     On or about December 28, 2018, an employee of the ENTITIES' emailed JIN and attached four spreadsheets. One of these spreadsheets contained a six month ledger of NKTC1

58.   Between in or around May 2016 and in or around March 2019, HAN and the ENTITIES supplied false information to Company 1, in order to remove references to North Korea from shipping records related to Company 1's tobacco sales, all of which were in fact sales for North Korean tobacco companies NKTC1 and NKTC2, including the following examples:

a.   On or about August 1, 2016, Company 1 issued a bill of lading related to sales to the ENTITIES, which listed the customer as "China Consignee Company A," a Chinese logistics company in Dalian, and the port of destination as Dalian, China.

b.   On or about September 21, 2018, HAN emailed Company 1, stating that one of the ENTITIES, with an address in China, would itself serve as the consignee on the shipping records.

c.   On or about February 17, 2019, Company 1 issued a bill of lading related to sales to the ENTITIES, which listed the customer Entity 8, a Chinese "supply chain management" company in Ganzhou, and the port of destination as Dalian, China.

d.   On or about March 18 2019, Company 1 issued a bill of lading related to sales to the ENTITIES, which listed the customer "China Consignee Company B," a Chinese "international trade" company in Shenzhen, and the port of destination as Dalian, China.

59.   During the relevant time period, the ENTITIES listed Dalian, China, a point of smuggling for goods to North Korea, as the destination for Company 1's shipments, including the following examples:

a.   On or about September 17, 2014, a Company 1 bill of lading listed NKTC2 as a consignee, or buyer, and the destination as Dalian, China.

24

b. On or about February 11, 2015, a bill of lading for Company 1 products listed NKTC2, with an address in North Korea, as the consignee and the destination as Dalian, China.

c. On or about June 15, 2015, Company 1 issued a bill of lading for its products to NKTC2 and listed the delivery destination as Dalian, China.

60. On or about July 19, 2018, a Company 1 employee emailed HAN stating that Company 1's agent was concerned that the ENTITIES were using an agent in China that was "smuggling products into North Korea, among which are tobacco and weapons."

a. On or about July 19, 2018, HAN emailed a Company 1 employee, stating that Company 1 was "now on the UN blacklist" and encouraging Company 1 to substitute new entities on shipping documents.

b. On or about July 24, 2018, HAN emailed Company 1 stating that the ENTITIES were using "another shipping company" but noting that the consignee and notify party would remain "the same". The email included a consignee and notify party that were located in China, the latter of which was located in Dalian, China.

61. On or about December 24, 2018, an employee of the ENTITIES emailed JIN a set of attachments related to a shipment of goods from Dalian, China, to Nampo, North Korea. These documents included an invoice from the ENTITIES addressed to NKTC1 for $220,000 of goods that would sail on December 28, 2018, and showed the movement of tobacco from Dalian, China, to North Korea.

### Undercover Communications with the ENTITIES

62. At the request of law enforcement, Company 1 introduced an undercover agent ("UCA-1") into their communications with HAN and JIN, with UCA-1 posing as a Company 1

25

representative. Between in or around May 2019 and in or around July 2019, UCA-1 communicated directly with HAN and JIN on behalf of the ENTITIES and also met with them in person.

63.    On or about May 13, 2019, HAN telephonically discussed with UCA-1 a U.S. dollar financial transaction that had been frozen by a bank. HAN informed UCA-1 that his "cigarette company" had attempted to prepay Company 1 for tobacco but that the funds were stopped at the "intimidate bank" [sic]. HAN stated he was waiting for more than three months for his tobacco shipment from Company 1. HAN told UCA-1 that, in the future, the ENTITIES could use different companies related to the transactions.

64.    On or about May 16, 2019, HAN called UCA-1 and informed UCA-1 that his "boss," referring to JIN, was going to visit Company 1 in person in July to help resolve some of the problems Company 1 was having related to blocking of funds for the ENTITIES' transactions.

65.    On or about May 21, 2019, UCA-1 conducted a telephonic call with JIN, with a Chinese translator as JIN did not speak English. UCA-1 confronted JIN about his products going to North Korea, which had caused the bank freeze. JIN told UCA-1 that the ENTITIES had done business with North Korea for 10 years prior[1] but claimed that the ENTITIES had recently stopped doing business in North Korea. QIN joined the call later and introduced himself as the ENTITIES president.

66.    On or about July 11, 2019, UCA-1 met with JIN in the city where Company 1 is located. UCA-1 told JIN the aforementioned bank freeze prompted the in-person meeting. JIN responded (in Chinese), "No problem. Even though the account was frozen, if he [Company 1's executive] wants to do business with us we have a lot of ideas." Thereafter, JIN suggested that Company 1 could "register as a company and open a new account overseas such as in Dubai, Hong

---

[1] As stated, statements by JIN and QIN were translated from Chinse to English.

Kong or even Singapore." JIN continued, "These are the approaches we can do. It's not a problem." JIN further noted that, in such a scenario, Company 1 was "the ones committing fraud, I'm simply buying merchandise." JIN continued, "Don't you want to continue to do business with us? Then we can avoid the investigation by setting up another company in between."

### D. SIM and the ENTITIES' Helicopter Procurement for North Korea

67.     In or around March 2019, SIM and the ENTITIES procured a Russian helicopter for North Korean customers. On or about March 1, 2019, a Russian-based email address sent five documents to an intermediary.

68.     Also on or about March 1, 2019, the intermediary thereafter forwarded the documents to SIM's email.

69.     Also on or about March 1, 2019, SIM forwarded the documents to HAN approximately one hour later. The documents were all related to a helicopter purchase by the ENTITIES, including as follows:

a.  A sales contract, dated February 1, 2019, showed the helicopter was subsequently sold from Company 2 to Entity 5. The contract stated the helicopter was located in Khabarovsk, Russia, and would be delivered to a port in North Korea. The contract listed a price of $300,000 in U.S. dollars that would be paid in advanced. QIN was listed on the contract as the representative for Entity 5.

70.     On or about March 4, 2019, SIM's email received an e-mail with the subject line "FW: Sign contract." There was no content in the e-mail body, but attached were two pages of a loan contract.

a.  The first page showed that an individual was being named as a lender and that a law. firm located in Zimbabwe was listed as the borrower of funds. The amount of the loan

27

was $300,000 in U.S. dollars, which is the amount the helicopter was purchased for later that month. The lender agreed to move the funds to the Zimbabwe law firms' bank account.

b. The second page of the contract stated, "Upon receipt to above account, the Borrower transfer the designated amount after deducting 9.5% of deposited amount to the below account of the Lender within 24 hours." The account listed as the end destination of the funds belongs to Entity 5.

c. The loan contract was signed by both the lender and the borrower.

### E. The ENTITIES' Communications with Banks

71.    Between 2018 and 2019, HAN corresponded extensively with the ENTITIES' bank in UAE, Foreign Bank 1, to answer due diligence questions and provide supporting documentation for payments that the ENTITIES' account made or received, many of which were in U.S. dollars and processed by U.S. financial institutions. QIN, the ENTITIES' co-owner, was copied on most of these messages. QIN's email was the official "registered email" associated with the ENTITIES' account at Foreign Bank 1.

72.    On or about May 22, 2018, Foreign Bank 1 sent an email to HAN stating that it received a query from another bank related to a U.S. dollar wire transfer sent to the ENTITIES' account, and which according to HAN was related to "the purchase of tobacco" by the ENTITIES. Foreign Bank 1 asked HAN to answer several questions on behalf of the ENTITIES, including whether "this transaction has any connections directly / in-directly with any below sanction countries or any entity / person residing in such countries . . . North Korea." In response, HAN stated, "No connection."

28

73. On or about May 16, 2019, HAN sent a request to Foreign Bank 1, inquiring about the status of a payment made by one of the ENTITIES to a South Korean tobacco filter supplier, which had been frozen by a U.S. financial institution.

   a. In response, Foreign Bank 1 sent several follow-up messages, asking for supporting documentation relating to this payment and other historical payments made by the ENTITY. All of these messages were sent by Foreign Bank 1 to both QIN's and HAN's email accounts. In response, HAN provided several bills of lading and invoices, which identified Entity 8 as the consignee for the shipments.

   b. On or about May 27, 2019, Foreign Bank 1 informed HAN and QIN that the payment in question had been blocked by a U.S. financial institution in the United States and could be released only at the direction of OFAC. The bank representative directed HAN and QIN to seek a license with OFAC.

74. Shortly after this exchange, on or about June 14, 2019, ENTITIES started circulating documents to officially change the name of the Entity 4 to Entity 6, registering the new company in the name of JIN and QIN. The new name did not include the common name that had been used by every prior entity owned by JIN and QIN.

75. Separately, HAN discussed how to avoid U.S. financial institution due diligence with Company 1. On or about May 5, 2019, HAN sent an e-mail to Company 1, saying that the "payer" contacted HAN about an inquiry received from a U.S. financial institution related to payments involving Company 1.

   a. HAN wrote that the "payer" must respond within three days or else their bank account would be blocked. HAN stated he contacted Company 1 for information related to the inquiry but had not received a response from Company 1.

29

b. HAN further said that in order to solve the account problem of Company 1, all parties "must share and keep in close contact with each other and coordinate in order to successfully pass the bank enquiries."

c. HAN went on to say that the bank would independently ask Company 1 the same questions and compare answers in order to make sure both sides were responding in the same manner. HAN stated "[t]herefore, we need to fully know what bank inquiries and what you have responded, and coordinate other enquiries [sic] and upcoming responses before any submission to the bank. We hope that you can tell me the enquires & answers and documents which have been submitted to the bank so that the payer can provide consistent documents through the bank's enquiry [sic]." HAN then produced the list of questions the "payer" received from the bank.

(**Conspiracy to Commit Bank Fraud**, in violation of Title 18, United States Code, Sections 1344(1) & (2), 1349)

## COUNT TWO
(Conspiracy to Violate the International Emergency Economic Powers Act)

76. The allegations in Paragraphs 1 through 75 of this Indictment are incorporated and re-alleged by reference herein.

77. From on or about March 15, 2016, to in or around March 2019, SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, and HAN LINLIN knew that North Korea had been sanctioned by the U.S. Department of the Treasury, and as a result, that transactions by U.S. persons (including U.S. financial institutions) or in the United States for the benefit of North Korea or North Korean entities were prohibited without prior authorization from the United States.

78. From on or about March 15, 2016, to in or around March 2019, SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, HAN LINLIN, and others known and unknown to the Grand

30

Jury, within the District of Columbia and elsewhere, did conspire to knowingly and willfully export, and cause U.S. persons and entities, *to wit*, financial institutions located in the United States, to export goods and services, *to wit*, financial services, with and for the benefit of the Foreign Trade Bank, North Korea, and North Korean entities, without prior authorization or a license from the Department of the Treasury.

**(Conspiracy to Violate the International Emergency Economic Powers Act, in violation of Title 50, United States Code, Section 1705)**

**COUNTS THREE THROUGH SIX**
(International Emergency Economic Powers Act)

79.     The allegations in Paragraphs 1 through 77 of this Indictment are incorporated and re-alleged by reference herein.

80.     On or about the dates specified below, SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, and HAN LINLIN, and others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, did knowingly and willfully export, attempt to export, and cause U.S. persons and entities, *to wit*, financial institutions located in the United States, to export and attempt to export goods and services, *to wit*, financial services, with and for the benefit of the Foreign Trade Bank, North Korea, and North Korean entities, without prior authorization or a license from the Department of the Treasury, as follows:

| Count | On or About Date | Sender | Receiver | Approximate Amount (USD) |
|---|---|---|---|---|
| 3 | 6/20/18 | China Front Company B | ENTITY 4 | $342,029.07 |
| 4 | 6/20/18 | China Front Company A | ENTITY 4 | $357,889.07 |
| 5 | 7/12/18 | China Front Company D | ENTITY 4 | $385,279.86 |
| 6 | 3/1/19 | ENTITY 4 | Company 1 | $230,236.80 |

**(International Emergency Economic Powers Act, in violation of Title 50, United States Code, Section 1705)**

## COUNT SEVEN
(Conspiracy to Launder of Monetary Instruments)

81.    The allegations in Paragraphs 1 through 77 of this Indictment are incorporated and re-alleged by reference herein.

82.    Between at least in or around February 2009 and in or around March 2019, SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, and HAN LINLIN, and others known and unknown to the Grand Jury, within the venue of the United States District Court for the District of Columbia, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, *to wit*, transport, transmit, and transfer, and attempt to transport, transmit, and transfer, and cause the transportation, transmission, and transfer of a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, as described in Counts One through Six, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(**Conspiracy to Launder of Monetary Instruments**, in violation of Title 18, United States Code, Sections 1956(h))

## COUNTS EIGHT THROUGH TWELVE
(Laundering of Monetary Instruments)

83.    The allegations in Paragraphs 1 through 77 of this Indictment are incorporated and re-alleged by reference herein.

84.    On or about the dates specified below, SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, HAN LINLIN, and others known and unknown to the Grand Jury, within the venue of the United States District Court for the District of Columbia, did transport, transmit, and transfer,

32

and attempt to transport, transmit, and transfer, and cause the transportation, transmission, and transfer of a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, *to wit*, the export of services by U.S. persons, including U.S. financial institutions, and within the United States for the benefit of North Korea and North Korean entities without prior authorization or a license from the Department of the Treasury, as described in Counts One through Six, as follows:

| Count | On or About Date | Sender | Receiver | Approximate Amount (USD) |
|---|---|---|---|---|
| 8 | 6/22/18 | China Front Company B | ENTITY 4 | $389,232.09 |
| 9 | 6/26/18 | China Front Company B | ENTITY 4 | $383,479.13 |
| 10 | 7/16/18 | China Front Company D | ENTITY 4 | $336,190.50 |
| 11 | 9/24/18 | ENTITY 4 | Company 1 | $280,829.18 |
| 12 | 10/10/18 | ENTITY 4 | Company 1 | $494,208.00 |

(**Laundering of Monetary Instruments, Aiding and Abetting, Causing an Act to be Done**, in violation of Title 18, United States Code, Sections 1956(a)(2)(A), 2)

## FORFEITURE ALLEGATION

85.     The allegations contained in Counts One through Twelve of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

86.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of conspiracy to commit bank fraud, Title 18, United States Code, Sections 1344 & 1349, conspiracy to violate IEEPA, Title 50, United States Code, Section 1705, and violations of IEEPA, Title 50, United States Code, Section 1705, Defendants SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, and HAN LINLIN shall forfeit to the United States of America any property, real or personal, which constitutes or is

derived from proceeds traceable to said violation(s). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.

87. The allegations contained in Counts One through Twelve of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(1).

88. Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, Defendants SIM HYON-SOP, JIN GUANGHUA, QIN GUOMING, and HAN LINLIN shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense.

89. If any of the property described above, as a result of any act or omission of the Defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

Matthew M. Graves
Attorney of the United States in
and for the District of Columbia

35