**Exhibit 1**

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH FIVE ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY GOOGLE LLC<br>FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §<br>1956 AND 50 U.S.C. § 1705 | )<br>)<br>)<br>)<br>)<br>)    Case No. 19-sc-2409 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* INFORMATION ASSOCIATED WITH FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705  (See Attachment A, incorporated herein by reference.)

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ☐ contraband, fruits of crime, or other items illegally possessed;

    ☐ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705 | IEEPA |
| 18 U.S.C. § 1956 | Money Laundering |

The application is based on these facts:

    See attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

    ☐ Continued on the attached sheet.

    ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
    18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joy Gallante, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____  *(specify reliable electronic means).*

Date: _____ 12/10/2019 _____

2019.12.10 17:43:51 -05'00'

_____
*Judge's signature*

City and state:  District of Columbia

Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH FIVE ACCOUNTS<br>STORED AT PREMISES CONTROLLED BY GOOGLE LLC<br>FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §<br>1956 AND 50 U.S.C. § 1705 | )<br>)<br>)  Case No. 19-sc-2409<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the          Northern          District of          California
*(identify the person or describe the property to be searched and give its location)*:

INFORMATION ASSOCIATED WITH FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705
See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before          December 24, 2019          *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to          Robin M. Meriweather
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ❐ for          days *(not to exceed 30)*    ❐ until, the facts justifying, the later specific date of          .

Date and time issued:    12/10/2019

2019.12.10 17:44:07
-05'00'

*Judge's signature*

City and state:          District of Columbia          Robin M. Meriweather, U.S. Magistrate Judge

| Return | | |
|---|---|---|
| Case No.:<br>19-sc-2409 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information which is associated with the accounts identified by jinguanghua2014@gmail.com; henry.h.winneyfzco@gmail.com; henryhan517@gmail.com; hjery168@gmail.com; and kss800800@gmail.com (hereafter "the TARGET ACCOUNTS"), which are stored at premises controlled by Google LLC (hereafter "PROVIDER"), an electronic communications services provider and/or remote computing services provider located in Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.     Information to be disclosed by GOOGLE LLC ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C.

§ 2703(f), PROVIDER is required to disclose the following information to the government

corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period of January 1, 2014 to present:  The contents of all

communications and related transactional records for all PROVIDER services used by an

Account subscriber/user (such as email services, calendar services, file sharing or storage

services, photo sharing or storage services, remote computing services, instant messaging or chat

services, voice call services, or remote computing services), including but not limited to

incoming, outgoing, and draft emails, messages, calls, chats, and other electronic

communications; attachments to communications (including native files); source and destination

addresses and header or routing information for each communication (including originating IP

addresses of emails); the date, size, and length of each communication; and any user or device

identifiers linked to each communication (including cookies);[3]

---

[3] Here, PROVIDER's other services include electronic communication services such as Google
Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video
chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo
sharing), and YouTube (video sharing); web browsing and search tools such as Google Search
(internet searches), Web History (bookmarks and recorded browsing history), and Google
Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts,

b.     For the time period of January 1, 2014 to present: The contents of all other data and related transactional records for all of PROVIDERS' services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services, including all services referenced in paragraph (a)), including any information generated, modified, or stored by user(s) or PROVIDERS in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.     For the time period of January 1, 2014 to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.     For the time period of January 1, 2014 to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

---

Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

  e. All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

  f. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (Google Cloud Messaging ("GCM"));

  g. Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number),

3

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

    h.    For the time period of January 1, 2014 to present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

    i.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

    j.    For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

    k.    Within **14** days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or email to the following:

AUSA Zia M. Faruqui
c/o U.S. Attorney's Office
555 4ᵗʰ St., N.W., rm 4820
Washington, D.C. 20001
zia.faruqui@usdoj.gov

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 50 U.S.C. § 1701 *et seq.*, and 18 U.S.C. § 1956, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of violations of the above statutes; or (ii) communicated with the Account about matters relating to violations of the above statutes;

(c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e) Information that constitutes evidence concerning the amount and location of any U.S. dollar payments, monies, or funds transfers by any party located in North Korea, any party acting on behalf of, or in the interest of, an entity associated with North Korea, any U.S. of U.N. designated entity, any entity or person in or related to North Korea transacting or communicating with entities or persons in North

5

Korea, or entities or persons acting for the benefit of North Korea, and any front company for any of these above mentioned persons or entities;

(f) Evidence related to U.S. dollar transactions, banking, or financial information related to Winney International Trading Co. Ltd and Winney Trading, and the government, representatives, or beneficiaries of North Korea, any party located in North Korea, China, UAE, any party acting on behalf of, or in the interest of, an entity associated with North Korea, any U.S. of U.N. designated entity, any entity or person in or related to North Korea transacting or communicating with entities or persons in North Korea or entities or persons acting for the benefit of North Korea, and any front company for any of these above mentioned persons or entities;

(g) Evidence related to anti-money laundering controls, the Bank Secrecy Act, know your customer policies, and/or lists, names, persons, companies, and/or entities sanctioned or related to the Department of Treasury Office of Foreign Asset Control ("OFAC");

(h) Evidence related to front companies used by Winney International Trading Co. Ltd and Winney Trading, and the government, representatives, or beneficiaries of North Korea, including its practices, makeup, organizational structure, profits, and customers;

(i) Evidence related to sanctions, and practices undertaken to avoid sanctions;

(j) the transportation or transmission of funds that have been derived from a criminal offense;

6

(k) the transportation, transmission, or transfer of funds that are intended to be used
to promote, conceal, or support unlawful activity;

(l) Information that constitutes evidence concerning (i) the purchase, sale, and/or
export of U.S.-origin goods from the United States without a required license; and
(ii) the acquisition of goods from the United States and elsewhere to North Korea
(via third countries), as connected to a conspiracy to import goods for delivery to
customers in North Korea;

(m) Records and information related to (i) preparatory steps taken in furtherance of
the scheme, including internet searches for U.S.-origin goods and foreign-origin
goods (connected to the conspiracy to import U.S.-origin goods) for importation
to North Korea (via third countries), inquiries of vendors or sellers of the same,
and the like; (ii) purchases and sales such goods from vendors or online
purchasing sites (*e.g.* eBay); (iii) methods of payment with respect to such
purchases; (iv) shipping, delivery, and customs declarations with respect to such
purchases; (v) financial records (to include bank records, wire transfers, checks,
credit card statements, account information, and the like) with respect to such
purchases; (vi) identities of buyers, sellers, and end users of such goods; (vii)
planned use of such goods; and (viii) payments made by the end users of such
goods.

(n) Evidence indicating how and when the email account was accessed or used, to
determine the geographic and chronological context of account access, use, and
events relating to the crimes under investigation and to the email account owner;

(o) Evidence indicating the email account owner's state of mind as it relates to the criminal activities under investigation;

(p) The identity of the person(s) who created or used the Target Accounts or any associated user ID, including records that help reveal the whereabouts of such person(s)

(q) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses; and

(r) The identity of the person(s) who communicated with the Target Accounts or any associated user ID about matters relating to the laundering of funds to / from China, UAE, and North Korea, U.S. sanctions, and assisting customers in North Korea, including records that help reveal their whereabouts.

### III.   Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.    such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.    the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____

Date                                Signature

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FIVE ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 1956 AND 50 U.S.C. § 1705 | SC No. 19-2409  **Filed Under Seal** |

*Reference:*      *USAO Ref. #2019R02834; Subject Accounts: jinguanghua2014@gmail.com; henry.h.winneyfzco@gmail.com; henryhan517@gmail.com; hjery168@gmail.com; kss800800@gmail.com*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Joy Gallante, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information which is associated with **jinguanghua2014@gmail.com** (hereafter "TARGET ACCOUNT 1"), **henry.h.winneyfzco@gmail.com** (hereafter "TARGET ACCOUNT 2"), **henryhan517@gmail.com** (hereafter "TARGET ACCOUNT 3"), **hjery168@gmail.com** (hereafter "TARGET ACCOUNT 4"), and **kss800800@gmail.com** (hereafter "TARGET ACCOUNT 5"), which are stored at premises controlled by Google LLC (hereafter "the PROVIDER"), an electronic communications services provider and/or remote computing services provider which is located in Mountain View, California. The affidavit for the related search warrant contains an identical probable cause section to this affidavit. These five email accounts are collectively the TARGET ACCOUNTS.

2.      The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18

U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require the PROVIDERS to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

3.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the FBI Phoenix Field Office. I have been a Special Agent with the FBI since 2002. Since that time, I have been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, export violations, and counterproliferation. During my work with the FBI, I have executed, or participated in the execution of search warrants—including search warrants of e-mail accounts—and have seized evidence of criminal violations.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that evidence of violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.*, and money laundering, 18 U.S.C. § 1956, will be discovered in the TARGET ACCOUNTS. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, or fruits of these crimes further described in Attachment B.

2

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of
competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and
(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction
over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below,
acts or omissions in furtherance of the offenses under investigation occurred within Washington,
D.C. *See* 18 U.S.C. § 3237.

## STATUTORY FRAMEWORK

### The International Emergency Economic Powers Act

7.      This investigation relates to violations of IEEPA and its implementing executive
orders and regulations. IEEPA, enacted in 1977, granted the President of the United States
authority to deal with unusual and extraordinary threats to the national security and foreign policy
of the United States. Under IEEPA, the President may declare a national emergency through
Executive Orders that have the full force and effect of law.

8.      Title 50 U.S.C. § 1705(a) provides, in part, that "[i]t shall be unlawful for a person
to violate, attempt to violate, conspire to violate, or cause a violation of any license, order,
regulation, or prohibition issued under this title."

9.      Using the powers conferred by IEEPA, the President and Executive Branch
departments have issued orders and regulations governing and prohibiting certain transactions with
North Korea by U.S. persons or involving U.S. goods.

10.     By the authority vested in the President by IEEPA, on or about June 28, 2005, the
President signed E.O. 13382 blocking the property of persons engaged in proliferation activities
and their support networks and denying designated proliferators access to the U.S. financial and

3

commercial systems. This blocking program initially applied to eight organizations in North Korea, Iran, and Syria. The U.S. Department of the Treasury, together with the U.S. Department of State, is authorized to designate additional proliferators of WMD and their supporters under the authorities provided by E.O. 13382. Pursuant to that authority, on or about April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." 31 C.F.R. § 544.101 et seq.

11.     By the authority vested in the President by IEEPA, on or about June 26, 2008, the President signed E.O. 13466 declaring a national emergency to deal with the threat to the national security and foreign policy of the United States constituted by the existence and risk of the proliferation of weapons-usable fissile material on the Korean Peninsula, and continued certain restrictions with respect to North Korea that previously had been imposed under the authority of the Trading With the Enemy Act. Since 2008, the President has issued subsequent E.O.s, including E.O.s 13551, 13570, 13687, and 13722, expanding the 2008 national emergency and taking additional steps with respect to that emergency, including blocking the property of certain persons (individuals and entities) and prohibiting certain types of transactions.

12.     The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C., administers a number of sanctions programs to accomplish U.S. foreign-policy and national-security goals. OFAC accomplishes this by designating companies and individuals through different sanctions programs.

13.     Two of OFAC's active sanction programs are Non-Proliferation Sanctions and North Korea Sanctions. OFAC's current Non-Proliferation Sanctions program began in 2005 pursuant to E.O. 13382. OFAC's current North Korea Sanctions program began in 2008 pursuant to E.O. 13466. When OFAC designates persons (individuals and entities) under the Non-

4

Proliferation Sanctions and North Korea Sanctions programs, the persons are added to a list of Specially Designated Nationals (SDN). Among other things, entities added to the SDN list are prohibited from engaging in the use of the U.S. financial system for processing international wire transfers denominated in U.S. dollars originating from offshore U.S. dollar accounts at foreign financial institutions which utilize correspondent-banking services at U.S. financial institutions.

14.     Pursuant to E.O. 13382 and 31 C.F.R. § 544.101, a non-U.S. person could not cause the provision of financial or other services by a U.S. person for the benefit of a person or entity on the SDN list, expect as authorized or licensed by OFAC, 31 C.F.R. § 544.405.

## PROBABLE CAUSE

### I.    BACKGROUND

15.     The United States is investigating sanctioned North Korean banks' use of the U.S. financial system through shell companies after the Department of Treasury Office of Foreign Assets Control (OFAC) designated them. The investigation concerns possible violations of, *inter alia*, the International Economic Emergency Powers Act (IEEPA), in violation of 50 U.S.C. §§ 1701-1707, and money laundering statute, in violation of 18 U.S.C. § 1956.

16.     In May 2016, the U.S. Department of Treasury deemed the entire North Korean financial sector as a jurisdiction of primary money laundering concern. As a result, U.S. financial institutions are barred from engaging in correspondent banking transactions with North Korean financial institutions. This definition of financial institutions includes companies acting outside of their normal scope of business to move U.S. dollars.

17.     North Korea generates a significant share of the money it uses to fuel its nuclear and ballistic missile programs by mining natural resources and selling those resources abroad. In particular, coal trade has generated over $1 billion in revenue per year for North Korea, activity

which prompted the U.N. Security Council to seek to sharply curtail such exports in November 30, 2016, and then to fully ban them in August 5, 2017.

18.     Cooperating Company 1 is a company that sells unrefined tobacco products. Law enforcement is aware from prior investigations that cigarettes—especially counterfeit cigarettes—may be one of North Korea's largest single sources of hard currency revenue.

19.     Subpoena returns revealed that between 2009 and 2017, Cooperating Company 1 also conducted approximately $27 million in wire transactions with Winney International Trading Co. Ltd and Winney Trading (collectively "Winney"). Subsequent to U.S. correspondent banks freezing Cooperating Company 1's U.S. dollar transactions, Cooperating Company 1 agreed to meet with the government to account for these transactions.

20.     Cooperating Company 1 provided bills of lading and invoices from Winney. From 2013 to 2016, Winney's bills of lading stated the ultimate customer for these sales were companies in North Korea, including the official North Korean state-owned business that manufactures cigarettes. In 2016, Winney changed its bills of lading to falsely reference sales to China and non-North Korean locations/customers.

21.     Cooperating Company 1 further stated that Winney was represented by James Han and Jin Guanghua.

22.     Undercover agents posing as Cooperating Company 1 employees subsequently began communicating with Winney.

23.     In those conversations James Han (Han) and Jin Guanghua (Jin) discussed laundering payments via front companies.

24.     In one correspondence, Jin described himself as the General Manager of Winney. Other documents describe Han as the director of Winney.

6

25.    The investigation revealed that Winney exists solely as a front company that procures goods, primarily tobacco products, for North Korean customers.    Undercover communications with Jin and Han revealed that Winney has a primary office in China and a satellite office in Dubai, UAE.

## II.    ILLICIT FINANCIAL TRANSACTIONS

26.    Subpoena returns from U.S. Financial Institutions which process International Wires revealed U.S. dollar transactions between Winney and multiple entities sanctioned or linked to North Korean evasion of sanctions.

27.    The United States filed a complaint on September 26, 2016, to forfeit all funds contained in 25 bank accounts belonging to Dandong Hongxiang Industrial Development Company Ltd. ("DHID"), located in China, and its front companies. On a later date, the Department of Justice unsealed criminal charges against DHID and DHID's owner, Ma Xiaohong, and three other DHID executives. Also on September 26, 2016, OFAC designated DHID in September 2016 as a sanctioned entity pursuant to Executive Order 13382, targeting proliferators and their supporters. The designation noted DHID acted for or on behalf of Korea Kwangson Banking Corp. (KKBC), located in North Korea, which was previously designated by Treasury for providing financial services in support of WMD proliferators. DHID used an illicit network of front companies, financial facilitators to facilitate transactions on behalf of KKBC. Subpoena returns from financial institutions which process international U.S. dollar wires revealed numerous wire transfers from DHID to Winney from approximately April 2012 to June 2014 totaling approximately $10,579,458.20.

28.    On November 21, 2017, OFAC designated Sun Sidong (Sun) and his company, Dandong Dongyuan Industrial Co., Ltd. (Dongyuan), pursuant to E.O. 13810. According to

OFAC, Sun and Dongyuan were responsible for exporting over $28 million worth of goods to North Korea over several years, including motor vehicles, electrical machinery, radio navigational items, aluminum, iron, pipes, and items associated with nuclear reactors. Dongyuan has also been associated with front companies for weapons of mass destruction-related North Korean organizations. Subpoena returns from financial institutions which process international U.S. dollar wires revealed two wire transfers from Dongyuan to Winney in April and May 2015 totaling approximately $534,526.55.

29.    The investigation into the laundering of funds by a South East Asian-based agri-commodities company ("Company 1") revealed additional North Korean financial facilitators. Specifically, in 2018, law enforcement communicated with Company 1 officials. After first claiming that Company 1 did not transact with North Korean customers, law enforcement provided records of such transactions to Company 1 officials. Company 1 then relented and admitted the company's illegal conduct. Company 1 provided a copy of contract between Company 1 and a North Korean trading company which was its customer. Company 1 explained that due to sanctions and bank restrictions, the North Korean company used a series of front companies to launder payments to Company 1. Subpoena returns revealed that Company 1 has conducted at least $5 million of wires, which transited through the United States financial system, with known North Korean financial facilitators. One such front company identified by Company 1 was SDIC Jingmin (Putian) Industrial and Trading Co (Jingmin).

a.    These subpoena returns further revealed one wire transfer from Jingmin to Winney on October 24, 2016, totaling approximately $974,970.00.

b.    Subpoena returns further revealed that on that same date, Jingmin also made a single payment to Wee Tiong for $409,985.00. In October 2018, OFAC sanctioned Wee Tiong

for laundering money through the U.S. financial system for sanctioned North Korean entities. This payment to a subsequently designated entity corroborates Company 1's statements that Jingmin acted as a North Korean front company.

### III.   TARGET ACCOUNTS

30.     As part of the investigation, an undercover agent began communicate with Han and his related partners at Winney. Han communicated with the undercover agent via e-mail.

Target Account 1

31.     An undercover agent communicating with Winney asked Han for e-mail contact information for Jin, in order to have additional conversations about the illicit activity.

32.     Han provided Target Account 1 as the contact information for Jin.

33.     Prior 2703(d) returns revealed that Target Account 1 is subscribed to "GH Jin", whose account was established with an Internet Protocol (IP) address resolving to Shenyang, China. Undercover communications with Winney revealed that Jin operated out of Shenyang, China. The subscriber information appears to be a reference to his name.

34.     The 2703(d) returns further revealed that Jin used Target Account 1 to correspond with multiple accounts associated with Chinese-based domains.

35.     Specifically, Target Account 1 communicated at least ten times between December 2018 and June 2019 with an account on a Chinese-based domain, which e-mail account is publically listed by multiple Chinese companies as their contact address. One such company using this address is Dandong Xinlu International Freight Forwarding Co. Ltd. (Xinlu). According to its website, Xinlu is a freight and shipping company located in Dandong, China. Xinlu's website publically advertises "…the company's business is based in North Korea... It provides services for many countries and cities in North Korea... The company's main business

9

includes: North Korea, South Korea's import and export agent, transit cargo transport agent and trade, supervision of cargo transport… Our company has a special person in the railway to pick up the station, send the station, arrange goods from Dandong to Pyongyang railway express mail."

### Target Account 2

36.    Prior 2703(d) returns revealed that Target Account 2 is subscribed to "Henry Han." Target Account 2 is listed as the recovery e-mail address for Target Account 4.

37.    A search of the internet revealed a public LinkedIn profile for Winney. This LinkedIn account listed an interest in three tobacco companies. Subpoena returns from LinkedIn revealed that this account was originally opened in the name of Henry Han (which is a known alias used by James Han). The subpoena returns further revealed that this Winney LinkedIn account was registered using Target Account 2.

38.    Target Account 2 appears to be a reference to one of Han's anglicized pseudonyms, henry.h[an], and winneyfzco is a reference to Winney Free [Trade] Zone Company.

39.    The 2703(d) returns further revealed that Target Account 2 corresponded over 20 times between November 2017 and May 2019 with multiple accounts at Cooperating Company 2. In 2019, law enforcement interviewed representatives of Cooperating Company 2. Cooperating Company 2, which was represented by counsel, admitted at these interviews to conspiring with other companies to illicitly use the U.S. financial system to supply North Korea's state-operated company with tobacco products. Cooperating Company 2's information has been reliable and independently corroborated. Cooperating Company 2 informed the government that the co-conspirators communicated via email about this illegal scheme, including with representatives at Winney. The scheme involved the laundering of at least $250,000.00 by known North Korean

10

front companies.

40.    2703(d) results showed Target Account 2 also communicated with other UAE and
China-based tobacco companies, between April 2018 and May 2019.

Target Account 3

41.    Prior 2703(d) returns revealed that Target Account 3 is subscribed to "Henry Han",
and was created on October 22, 2017, with an IP address resolving to Dubai, UAE. Han appeared
to use a Virtual Private Network (VPN) when accessing this account. Specifically the IP logins
for this account resolved to U.S.A., Russia, Singapore, UAE, Brazil, and Argentina all within hours
and days of each other. Based on my training and experience, I know that this is a common practice
by persons attempting to conceal or obfuscate their location when engaging in illicit activity.

42.    Prior 2703(d) returns further revealed that Target Account 3 is linked by cookies to
Target Account 2 and Target Account 4.

43.    2703(d) returns for Target Account 3 reveal that Han uses it to correspond with
multiple tobacco production, freight shipping, chemical companies. For example:

a.    In April 2019, Han used Target Account 3 to correspond with a Turkey-based
tobacco distribution and production company, which produces tobacco for resale, as well as
cigarette filters, papers, and tubes. I am aware from a related investigation that North Korea has
targeted another Turkish tobacco manufacturer to procure tobacco.

b.    In April 2019, Han used Target Account 3 to correspond with a China-based
international chemical and technologies trading company. According to publically available
information, this company's employees are actively engaged in Iranian oil and gas business

11

groups, and use other linked e-mail accounts, aliases, and phone numbers to advertise on platforms such as Chinese-based marketplace, Alibaba.

    c. Between March 2019 and May 2019, Han used Target Account 3 to correspond at least ten times with multiple Russian based oil trading and production companies. One of these Russian companies is represented by an e-mail account from an individual whose account served as the listed contact for a Moscow based, Russian state-sponsored company, which trades, and sells oil, petroleum, and gold bars. Based on my training and experience, I know that sanctioned North Korean entities use front companies, such as Winney, to procure oil from Russia.

    d. Han used Target Account to correspond with multiple accounts which are linked to gold bar trading.

> i. Han corresponded with one such gold bar trading company, which used the same address to publically advertise the sale of 150kg of gold bars in exchange for U.S. dollars.
>
> ii. I know from my training and experience that gold is a commodity that is heavily mined in North Korea, and then sold for U.S. dollars to fund the sanctioned regime.
>
> iii. I know from a related investigation into the sanctioned bank that Winney operates on behalf of (i.e., KKBC), that KKBC engages in the sale of gold as a means to circumvent sanctions.

44.    Between May 2018 and July 2018, Han used Target Account to correspond with a U.S. bank, at least ten times. As noted above, Winney used the U.S. financial system to launder funds as a part of the illegal procurement scheme.

Target Account 4

12

45.     Prior 2703(d) returns revealed that Target Account 4 was subscribed in the name
of "Jery Han" (a known alias of James Han), whose account was established with an IP address
resolving to Dubai, UAE.

46.     Target Account 4 is linked by cookies to Target Account 3 and Target Account 5.

47.     Han used Target Account 4 to correspond with freight and shipping companies, as
well as UAE government agencies for customs and taxation entities from the listed account
address. For example:

   a. The 2703(d) returns further revealed that Target Account 4 corresponded with an
address at "danxing.cn," a domain which belongs to Chinese based, Danxing International
Logistic and Forwarding Co. Ltd. (Danxing).

            i. OFAC designated Liaoning Danxing International Freight Co., Ltd
               (Liaoning) for impermissibly operating in the transportation industry in
               North Korea. The designation of Liaoning noted that it routinely used
               deceptive practices that enabled North Korean procurement officials to
               operate and purchase items for the North Korean regime.

           ii. Based on my training and experience, I know that companies frequently
               rebrand themselves after OFAC designates them, in order to continue
               doing business under a new name.

          iii. Subsequent to the designation Liaoning changed its name to Danxing.
               Danxing uses the same website as Liaoning, and the both versions of the
               website provide similar contact information.

           iv. Danxing promotes itself on its website as a North Korean shipping
               agency, and claims to have established the first container shipping line

13

between Dalian, China and Nampo, North Korea.

Target Account 5

48.     Prior 2703(d) returns revealed that Target Account 5 is an account holder
identified as "ss kim" (a known alias of James Han), whose account was established on October
29, 2018, with an IP address resolving to Dubai, UAE.

49.     Target Account 5 is linked by cookies to Target Account 4 and Target Account 2.
Based on my training an experience, I know that because criminals who communicate via email
fear detection, they typically employ multiple fake identities, which is accomplished by creating
numerous free email accounts. Part of managing this vast number of accounts often leads to the
linking of accounts. This allows a single user the ability to access, as well as reset, passwords
for the multiple linked accounts. The tracking and detection of linked accounts is one way by
which a person and/or co-conspirators can be identified. Moreover, the linking of an account can
further demonstrate who has access and/or control of an account. Here the linking of the Target
Accounts reflects both Han's control of the accounts as well as Target Account 5's involvement
in the scheme.

50.     2703(d) results showed Han used Target Account 5 to send/receive what appears
to be two emails. Both emails were with UAE-based tobacco production company, Modern
Tobacco Corporation FZE, which is a cigarette manufacturer and distributor. Contacting other
tobacco companies is consistent with Winney's scheme to procure tobacco for its sole customer:
the sanctioned North Korean regime.

14

## BACKGROUND CONCERNING GOOGLE'S ACCOUNTS

51.     PROVIDER is the provider of the internet-based accounts identified as jinguanghua2014@gmail.com; henry.h.winneyfzco@gmail.com; henryhan517@gmail.com; hjery168@gmail.com; and kss800800@gmail.com.

52.     The PROVIDER provides their subscribers internet-based accounts that allow them to send, receive, and store emails online. The PROVIDER's accounts are typically identified by a single username, which serves as the subscriber's default email address, but which can also function as a subscriber's username for the PROVIDER's other services, such as instant messages and remote photo or file storage.

53.     Based on my training and experience, I know that the PROVIDER allows subscribers to obtain accounts by registering on the PROVIDER's website. During the registration process, the PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate email address for backup purposes, a phone number, and in some cases a means of payment. The PROVIDER typically does not verify subscriber names. However, the PROVIDER does verify the email address or phone number provided.

54.     Once a subscriber has registered an account, the PROVIDER provide email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. The PROVIDER's subscribers can also use that same username or account in connection with other services provided by the PROVIDER.[1]

---

[1] Here, PROVIDER's (Google's) other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging

15

55.     In general, user-generated content (such as email) that is written using, stored on,
sent from, or sent to the PROVIDER's account can be permanently stored in connection with
that account, unless the subscriber deletes the material. For example, if the subscriber does not
delete an email, the email can remain on the PROVIDER's servers indefinitely. Even if the
subscriber deletes the email, it may continue to exist on the PROVIDER's servers for a certain
period of time.

56.     Thus, a subscriber's PROVIDER account can be used not only for email but also
for other types of electronic communication, including instant messaging and photo and video
sharing; voice calls, video chats, SMS text messaging; and social networking. Depending on user
settings, user-generated content derived from many of these services is normally stored on the
PROVIDER's servers until deleted by the subscriber. Similar to emails, such user-generated
content can remain on the PROVIDER's servers indefinitely if not deleted by the subscriber, and
even after being deleted, it may continue to be available on the PROVIDER's servers for a certain
period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images,
videos, notes, documents, bookmarks, web searches, browsing history, and various other types of

---

and video chats), Google+ (social networking), Google Groups (group discussions), Google
Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as
Google Search (internet searches), Web History (bookmarks and recorded browsing history), and
Google Chrome (web browser); online productivity tools such as Google Calendar, Google
Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud
storage), Google Maps (maps with driving directions and local business search) and other
location services, and Language Tools (text translation); online tracking and advertising tools
such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user
targeting based on search queries); Pixel Phone (services which support a Google smartphone);
and Google Play (which allow users to purchase and download digital content, e.g.,
applications).

16

information on the PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

57.    Based on my training and experience, I know that providers such as the PROVIDER also collect and maintain information about their subscribers, including information about their use of the PROVIDER's services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as the PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as the PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER's services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

58.    Based on my training and experience, I know that providers such as the PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the

17

manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by the PROVIDER in order to track what devices are using the PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

59.    Based on my training and experience, I know that providers such as the PROVIDER use cookies and similar technologies to track users visiting the PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to the PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as the PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and

18

33

online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

60.    Based on my training and experience, I know that the PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

61.    Based on my training and experience, I know that subscribers can communicate directly with the PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as the PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

62.    In summary, based on my training and experience in this context, I believe that the computers of the PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and un-retrieved email for the PROVIDER's subscribers), as well as PROVIDER-generated information about its subscribers and their use of the PROVIDER's services and other online services. In my training and experience, all of that

19

information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide the PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

63.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the PROVIDER can show how and when the account was accessed or used. For example, providers such as the PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant

20

insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). [2]

## CONCLUSION

64.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.

---

[2] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

65.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on the PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Joy Gallante
Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on December 10, 2019.

 2019.12.10 17:44:29 -05'00'

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

22