**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 23-cr-91 (CKK)** |
| | : | |
| **v.** | : | |
| | : | |
| **JIN GUANGHUA,** | : | |
| | : | |
| **Defendant.** | : | |

**OPPOSITION TO DEFENDANTS' MOTION TO STRIKE SURPLUSAGE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its Memorandum in Opposition to Defendant's Motion to Strike Surplusage. *See* ECF 43. For the reasons set out below, the defendant's argument is both premature and without merit, and should be held in abeyance or denied.

**BACKGROUND**

The government incorporates by reference the statement of the facts and description of the Indictment from its Opposition to the Motion to Suppress (ECF 64).

The defendant moves to strike what he deems "surplusage" in the Indictment. The defendant categorized the information he seeks to strike as: "(1) references to North Korea's military, weapons programs, and U.S. national security; (2) references to any laws or policies (such as United Nations sanctions) that have no bearing on the charges in this case; and (3) references to other miscellaneous matters that are extraneous and inadmissible as a matter of law, and serve only to confuse and prejudice the jury." ECF 43 at 2.

**APPLICABLE LAW**

Although Federal Rule of Criminal Procedure 7(d) permits a court to strike surplusage from the indictment upon the defendant's motion, Fed. R. Crim. P. 7(d), it has long been the case that

1

"motions to strike surplusage from an indictment are highly disfavored in this Circuit." *United States v. Watt*, 911 F. Supp. 538, 554 (D.D.C. 1995); *see also id.* ("[O]nly rarely has surplusage been ordered stricken.") (internal citations omitted); *United States v. Jordan*, 626 F.2d 928, 930 n.1 (D.C. Cir. 1980) ("The standard under Rule 7(d) has been strictly construed against striking surplusage."). A motion to strike surplusage "'should be granted *only* if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.'" *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998) (*quoting* 1 Charles Alan Wright, Federal Practice and Procedure § 127, at 426 (1982)) (emphasis added). In other words, "The scope of a district court's discretion to strike material from an indictment is narrow[.]" *United States v. Oakar*, 111 F.3d 146, 157 (D.C. Cir. 1997).

An indictment need not be limited only to the bare elements of a crime. Rather, it can provide background or context to the charged criminal conduct and describe the circumstances, means, and methods of a scheme. *See United States v. Salahmand*, 08-CR-192 (CKK), 2009 WL 10680698, at *2 (D.D.C. May 12, 2009) ("Courts in this Circuit have consistently held that 'the government is not precluded from including information in the indictment used to place the defendant's actions in context and to establish the defendant's state of mind, intent and motives.'") (*quoting United States v. Trie*, 21 F. Supp. 2d 7, 19 (D.D.C. 1998)); *United States v. Watt*, 911 F. Supp. 538, 554 (D.D.C. 1995) (denying motion to strike language that "provides the background necessary for a jury to understand the full scope of defendant's activities, and to place defendant's conduct in the appropriate context"). Where the language has a meaningful purpose and is "information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989) (internal quotations and citation omitted);

*see also United States v. Poindexter*, 725 F. Supp. 13, 37 (D.D.C. 1989) (denying defendant's request to strike background paragraphs, even where such information was prejudicial, because it "would be difficult, if not impossible, for the jury to understand defendant's [crimes] without that background").

## <u>ARGUMENT</u>

### A. The Defendant's Motion Is Premature.

The defendant's motion to strike is premature and should be deferred until after the conclusion of the Government's case-in-chief or, at a minimum, until closer to trial, after the Court has ruled on motions in *limine* and other evidentiary matters. As it stands, the defendant has suffered no prejudice from the allegations he challenges. Rather, the defendant's argument amounts to speculation about *future* prejudice that he might suffer *at trial* if the jury were to learn of certain of the allegations in the Indictment. ECF 43 at 1. However, striking any such language prior to a single piece of evidence being admitted or even before a witness list has been provided to the defense would unnecessarily hobble the Government's case-in-chief more than five months before trial. Indeed, the defendant's motion is more akin to a premature motion in *limine* in the guise of a motion to strike. That is improper at this early stage. *See, e.g.*, *United States v. Quinn*, 401 F. Supp. 2d 80, 98 (D.D.C. 2005) (deferring ruling on the portions of the indictment discussing the history of statutes and regulations as premature).

Moreover, it is far from certain that the purported harm of which the defendant complains will occur, as it is unclear whether the Court will provide the jury with a copy of the Indictment prior to deliberations. *See Dallago v. United States*, 427 F.2d 546, 553 (D.C. Cir. 1969) ("[W]hether to permit the jury to have the indictment during deliberations is [a] decision committed to the [trial] court's discretion."). However, even if the Court does provide the jury with the Indictment, the

proper time to assess the relevance and/or prejudice of certain language in the Indictment is at the conclusion of the Government's case-in-chief, as it is difficult at this stage to predict what evidence will prove admissible, or how specific allegations relate to overall charges. *See United States v. Weinberger*, Case No. 92-Cr.-235, 1992 WL 294877, at *7 (D.D.C. Sept. 29, 1992) (reserving ruling on the lengthy indictment until closer to trial to determine how and whether the government intended to prove particular allegations); *see also United States v. Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004) ("There is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.").

At the conclusion of the Government's case, on the other hand—should the Court send the Indictment back to the jury—the parties can confer and seek to come to an agreement based on the "charges, allegations, and evidence that remain relevant in light of the entire trial."[1] *Butler*, 351 F. Supp. at 124; *see also Dallago*, 427 F.2d at 553 ("[W]here . . . portions of documentary evidence or of the indictment are to be shielded from the jury's view, defense counsel is entitled, prior to the jury's inspection, to the opportunity . . . to make certain that deletions essential to that end have been accomplished."). At that time, to the extent any conceivable undue prejudice might flow from any remaining allegations provided to the jury, any such prejudice can be mitigated by an appropriate jury instruction. *See, e.g.*, *United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000) (stating that the "jury is presumed to follow a trial court's instructions") (citing *United States v. Jackson*, 627 F.2d 1198, 1213 (D.C. Cir. 1980)); *United States v. Caglar*, Case No. 08-Cr.-232,

---

[1] Notably, at no time has counsel for the defense sought to confer with the Government about the language to which he objects in the Indictment. However, the Government is hopeful that, at the appropriate time—after presentation of the evidence—the parties will be able to reach an agreement as to what language, if any, should be presented to the jury.

4

2009 WL 2169232, at *2 (D. Ct. Jul. 20, 2009) (denying motion to strike; "at trial the Court can craft a limiting instruction to shield against possible prejudice")).

As the defendant's motion is both premature and speculative, the Government proposes that the Court's decision be held in abeyance.[2] In anticipation of the motion being raised at the appropriate juncture, the Government responds briefly to the defendant's substantive arguments below, and for each of the reasons discussed below, the defendant's motion should be denied in any event.

### B. The Language in the Indictment Is Not Inflammatory or Prejudicial, and It Is Relevant to the Alleged Conduct.

#### 1. References to North Korea's Military, Weapons Program, and U.S. National Security Are Inherent to the IEEPA Charges.

The defendant has moved to strike nearly all the language pertaining to the relevant statutes and executive orders ("E.O.s") that prohibit the conduct in which the defendant engaged. The defendant argues that the language relating to the statutes and executive orders is (i) irrelevant, and (ii) would deprive the defendant of a right to a fair trial. ECF 43 at 4. However, far from being irrelevant, the language the defendant objects to—language that merely parrots the applicable statutes and executive orders—provides the foundation for the jury to understand why the defendant's conduct was prohibited. Such language is essential to the Government's ability to prove the elements of the IEEPA charges in the Indictment. That the applicable executive orders

---

[2] Should the Court wish to address the matter prior to the conclusion of the Government's case-in-chief, the Government would propose that the matter could be addressed after the Court rules on motions in *limine*, at which time the contours of the Government's case will come into sharper focus.

relate to North Korea's WMD program is simply part and parcel of why the defendant's conduct was prohibited in the first place.

As discussed in the Indictment, the defendant's conspiracy was fueled by funds from sanctioned North Korean banks—specifically, the Korea Kwangson Banking Corp. ("KKBC") and the Foreign Trade Bank ("FTB")—which paid for the defendant's companies (the "Winney Entities") to purchase tobacco and other products to ship to North Korea. *See* ECF 13 at ¶¶ 2, 44, 51. As further discussed in the Indictment, KKBC and FTB were both designated by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") as Specially Designated Nationals and Blocked Persons ("SDNs") for funding North Korea's WMD proliferation. *Id.* at ¶¶ 21-22; *see also* "Treasury Designates Financial Institution Tied to North Korea's WMD Proliferation," (Aug. 11, 2009), *available at* https://home.treasury.gov/news/press-releases/tg260 (designating KKBC under EO 13382 for providing financial services to entities tied to North Korea's WMD and missile programs); "Treasury Sanctions Bank and Official Linked to North Korean Weapons of Mass Destruction Programs," (March 11, 2013), *available at* https://home.treasury.gov/news/press-releases/jl1876 (designating FTB under EO 13882). The Indictment also describes how KKBC and FTB created Chinese front companies to conduct U.S. dollar financial transactions that would otherwise have been blocked by U.S. financial institutions, thereby circumventing U.S. sanctions and generating revenue for a regime that is otherwise largely cut off from the international financial system. *See, e.g.*, ECF No. 13 at ¶¶ 1-8, 44. As a consequence of those sanctions, the defendant and his coconspirators received payments from KKBC and FTB through Chinese front companies and facilitated purchases for North Korea using those funds, in an effort to obfuscate North Korea's nexus to the transactions. *See, e.g., id.* at ¶ 44.

The defendant has moved to strike nearly all the above information in an effort to distance himself from the North Korean state-run enterprises that he collaborated with and whose money fueled his business for more than a decade. But the language the defendant moves to strike is both relevant and foundational to the IEEPA counts in the Indictment.

First, certain of the language the defendant moves to strike merely references the statute with which the defendant is charged. *See* ECF 43-1 ¶ 17. A description of the statute that forms the basis for a significant portion of the Indictment is plainly reasonable and not inflammatory. *See Watt*, 911 F. Supp. at 555 ("Courts have routinely denied challenges to the reasonable use of statutory terms in an indictment.").

Second, references to the multiple executive orders promulgated pursuant to IEEPA are also inherent in and essential to proving the IEEPA charges. For example, Counts Two through Six allege that the defendant and his coconspirators "did knowingly and willfully export, attempt to export, and cause U.S. persons and entities" to export financial services "with and for the benefit of the *Foreign Trade Bank*,[3] North Korea, and North Korean entities, without prior authorization or a license from the Department of the Treasury," ECF 13 at ¶¶ 78, 80 (emphasis added). Because the comprehensive North Korean trade embargo did not take effect until 2016, ECF 13 at ¶ 23, a significant number of the overt acts in the Indictment therefore relate to U.S. dollar financial transactions made by FTB and its subsidiary, KKBC. *Id.* ¶¶ 50-51. Thus, the *fact* that OFAC designated FTB and KKBC is an element that the Government must prove at trial. To prove that element, the Government must be able to introduce evidence regarding the executive orders and the designations of the relevant entities, one of which is titled, "Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters." E.O. 13382. Thus, far from being

---

[3] KKBC was a subsidiary of FTB.

prejudicial surplusage, the language the defendant seeks to strike is highly relevant and does nothing more than "describe[] the formal designation given to each entity." *United States v. Oseguera Gonzalez*, Case No. 20 Cr. 40, 2020 WL 6342948, at *8 (D.D.C. Oct. 29, 2020); *see also Rezaq*, 134 F.3d at 1134.

Although that should be the end of the inquiry, it is also significant that the language the defendant seeks to strike provides critical context that is necessary for the jury to understand the charges at issue. For example, it is relevant for the jury to understand that IEEPA authorizes the president to impose sanctions on otherwise seemingly innocuous conduct—like transacting in U.S. dollars—where such activities are determined to impact the "national security, foreign policy, or economy of the United States." ECF 13 at ¶ 17. Here, that KKBC and FTB were specifically designated as SDNs because of their ties to North Korea's WMD program will help the jury to understand where KKBC and FTB fall within the IEEPA framework, why the defendant's participation in the scheme ran afoul of U.S. sanctions laws, and why the defendant and his coconspirators went to the lengths they did to obfuscate their conduct to evade U.S. sanctions.[4] In other words, without the information on the nature of the sanctions and the background of the statutes at issue, it "would be difficult, if not impossible, for the jury to understand defendant's [crimes]," *Poindexter*, 725 F. Supp. at 37.[5]

The defendant's reliance on *United States v. Quinn*, 401 F. Supp. 2d 80 (D.D.C. 2005), is also misguided. ECF 43 at 3-4. In *Quinn,* the defendants were accused of collaborating to export

---

[4] The Government also notes that the mechanics of limiting testimony and evidence to the *fact* of the designations—without the designations themselves or with redacted designations—would likely run afoul of Fed. R. Evid. 403. For example, should the Government be limited to introducing a heavily redacted version of a particular designation, there is a significant risk of juror confusion.

[5] The Government does not object, in principle, to a limiting instruction to clarify to the jury that the defendant is not charged with being personally involved in North Korea's WMD program.

lift-truck parts from the United States to Iran in violation of the Iranian Trade Embargo. 401 F. Supp. 2d at 84. Although the indictment described Iran as "a country whose regime had for years been designated by the United States government as a supporter of international terrorism," *id*. at 98, the Court struck the references to terrorism, explaining that violating an embargo does not necessarily result in material support to terrorists. *Id*. at 99. Here, by contrast—as discussed above—the WMD references are inherent to the IEEPA charges. Indeed, the entities who (i) paid for the tobacco purchased by the defendant's companies; (ii) set up front companies to obfuscate the origin of the payments; and (iii) employed the defendant's co-conspirator, Sim Hyon Sop (Sim),[6] were all designated as SDNs because of their ties to North Korea's WMD program. Thus, this case is more analogous to *United States v. Watt*, where Judge Lamberth declined to strike an introduction section that "provid[ed] the background necessary for a jury to understand the full scope of defendant's activities, and to place defendant conduct in the appropriate context." 911 F. Supp. at 554. Judge Lamberth determined that the background information was particularly helpful given the "vast array of offenses charged and the complexity of the facts in [the] case." *Id.* Here, as in *Watt*, the Government has alleged a conspiracy spanning a decade with multiple international entities, individuals, statutes, regulations, and executive orders. The background information to which the defendant objects is necessary context, and unlike in *Quinn*, any "prejudicial effect of these references d[oes] not outweigh their relevance." *Rezaq*, 134 F.3d at 1134.

Similarly, each of the other cases to which the defendant cites—several of which are out of district cases that are not controlling—are distinguishable. *See* ECF 43 at 4-5. For example, in

---

[6] Indeed, that this is a multi-defendant Indictment with two co-conspirators still at large is highly relevant to whether language that plainly still pertains to the remaining co-conspirators should be struck.

*United States v. Espy*, 23 F. Supp. 2d 1, 11 (D.D.C. 1998), the defendant was charged with receiving illegal gratuities. The indictment in *Espy* used the term "prohibited source" to describe individuals, firms or entities from which the defendant allegedly received the illegal gratuities. *Id*. at 10. The court in *Espy* agreed to strike the term "prohibited source" in favor of a more neutral term because the term unfairly suggested that the defendant's receipt of gratuities from these entities constituted criminal conduct before he had an opportunity to defend himself. *Id*. at 10-11. Here, however, the WMD references are not an unfair characterization because KKBC and FTB were designated as SDNs due to their ties to North Korea's WMD program. Unlike the characterization at issue in *Espy*, here, the references to North Korea's WMD program are *facts* that cannot be more neutrally worded.[7]

For each of these reasons, the defendant's motion to strike references to statutory or contextual language must be denied.

### 2.  References to United Nations Sanctions Are Appropriate.

The defendant also moves to strike references to various United Nations ("UN") sanctions in the Indictment, stating that such references are "irrelevant to the *mens rea* the government must prove as to the charged offenses." ECF 43 at 5. The defendant ignores how broad UN sanctions, which were imposed beginning in 1985, and then again in 2009, 2013, 2016, and 2017, ECF 13 at ¶¶ 15-16, bear upon the defendant's willfulness as to the IEEPA charges. To be clear, as part of the IEEPA violations, the Government need not prove that the defendant also violated UN sanctions.

---

[7] The defendant's reliance on *United States v. Hubbard*, 474 F. Supp. 64 (D.D.C. 1979), fails for much the same reason. *See id*. at 83 (replacing "colorful words" with "less colorful and more accurate" words). Tellingly, the defendant has not suggested any "less colorful" or "more accurate words" to replace such references. Instead, the defendant suggests such facts be stricken in their entirety without substitution.

However, as with the executive orders discussed above, the UN sanctions provide necessary context and background on U.S. sanctions and also make the defendant's argument that he—a longtime international businessman—was unaware of U.S. or international sanctions on North Korea even more implausible, particularly when certain of those sanctions are nearly forty years old. Indeed, that the defendant and his businesses would have been operating in violation of the broad umbrella of UN sanctions even before the United States designated the relevant entities as SDNs or imposed its own nationwide sanctions on North Korea helps to explain many of the measures the defendant and the Winney Entities took during the course of their business engagements to obfuscate the nature and beneficiary of the transactions.[8] *See Salahmand*, 2009 WL 10680698, at *2 ("Courts in this Circuit have consistently held that the 'government is not precluded from including information in the indictment used to place the defendant's actions in context and to establish the defendant's state of mind, intent, and motives.'").[9]

---

[8] Courts have consistently held in IEEPA cases that circumstantial evidence of subjective knowledge, including efforts to conceal conduct, are sufficient to prove willfulness. *See United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 (2d Cir. 2004). Efforts to evade UN sanctions concurrently or prior to the imposition of U.S. sanctions provide further proof of the defendant's knowledge of the limitations on doing business with North Korea more generally and lend support to the Government's position that the defendant was aware of and took actions to evade U.S. sanctions.

[9] The majority of the cases on which the defendant relies are out of district cases that are not controlling here, and in one case, the Government agreed to strike the background section. *See* ECF 43 at 6; *United States v. Spalding*, No. 01-cr-152, 2002 WL 818129, at *5 (S.D. Ind. Apr. 24, 2002). The remaining two cases are distinguishable. In *United States v. Burden*, 934 F.3d 675 (D.C. Cir. 2019), the Court was concerned about a jury instruction that created the impression that there was "evidence of willfully unlawful conduct apart from the charged offenses." *Burden*, 934 F.3d at 692. Here, however, the jury has not even been selected yet, much less been presented with any evidence or jury instructions. Accordingly, any potential future concerns about jury confusion over discussion of UN sanctions can be alleviated through the formulation of a properly tailored jury or limiting instruction. *See United States v. Turoff*, 652 F. Supp. 707, 713-14 (E.D.N.Y. 1987) (denying motion to strike; "[T]he defendants will be entitled to request limiting instructions during the trial and before the court charges the jury. Such instructions will guarantee that the jury understands with what the defendants are and are not charged, but the defendants are not entitled

### 3.   Other Miscellaneous References Are Relevant and Appropriate.

Finally, the defendant also seeks to strike multiple "miscellaneous references" that the defendant describes as irrelevant to the charges, specifically (a) the role of cigarettes in North Korea's economy and (b) North Korea's use of front companies. ECF 43 at 6-7.[10] However, as with the information discussed above, the information to which the defendant objects is critical to the charges and/or provides vital context to the jury, without which, the defendant's motive and the *modus operandi* of the defendant, his coconspirators, and the entities at issue would not make sense.

First, the defendant's contention that North Korea's use of front companies is irrelevant borders on frivolous. The defendant and his coconspirators received payments from KKBC and FTB through Chinese front companies and facilitated purchases for North Korea using those funds, in an effort to obfuscate North Korea's nexus to the transactions. Without the ability to explain *how* North Korea's state-controlled banks (like KKBC and FTB) engage in financial transactions and participate in the world economy (*i.e.*, through the use of front companies such as Dandong Hongxiang Industrial Development ("DHID")), the manner in which the defendant received payments (through such front companies) and otherwise engaged in transactions would simply not

---

to preclude the government from pleading and proving conduct that is relevant to the defendants' alleged crimes.").

Similarly, in *United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998), the defendant objected to allegations that were incorporated by reference into multiple counts of the indictment. The court found that a particular allegation regarding whether the DNC had filed false campaign finance reports was only relevant to the conspiracy to defraud the United States (Count 1), but not to mail and wire fraud, and thus struck the offending language from those counts.

[10] Again, the defendant's argument that certain of these references are "nothing more than inadmissible hearsay" and/or irrelevant, is in effect an effort to turn his motion to strike surplusage into a premature motion *in limine*. ECF 43 at 7.

make sense. Relatedly, the fact that trafficking cigarettes generates significant revenue for North Korea explains why companies, such as the defendant's, went to great lengths to continue to engage with the North Korean front companies—because it was lucrative to provide North Korea with products they could not obtain on their own. This is precisely the kind of background and contextual information that Courts have declined to strike. *See, e.g.*, *Salahmand*, 2009 WL 10680698, at *2; *Watt*, 911 F. Supp. at 554; *Poindexter,* 725 F. Supp. at 37.[11]

The defendant's analogy to a case involving the history and statistics of gun violence is inapt. ECF 43 at 7. While a layman understands that firearms have a longstanding connotation with violence and can cause immediate harm, it is not readily apparent why seemingly innocuous products, such as tobacco and cigarettes, are significant to the North Korean regime and why IEEPA bars the transactions described in the Indictment. Accordingly, the defendant's gun analogy actually perfectly illustrates why the jury needs this narrative to understand the charged conspiracy.

---

[11] To be clear, the Government does not contend that a lengthy or in depth history of North Korean commerce is necessary during a trial in this matter. Instead we anticipate presenting merely context enough to allow the jury to understand the motivations and knowledge possessed by the defendant and his co-conspirators.

## <u>CONCLUSION</u>

For the reasons discussed above, the defendant's motion to strike surplusage is both premature and without merit. The defendant's motion should be denied.

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866

By:    /s/ Christina A. Clark
CHRISTINA A. CLARK
D.C. Bar # 995326
Trial Attorney
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

KAREN P. W. SEIFERT
N.Y. Bar No. 4742342
STEVEN B. WASSERMAN
D.C. Bar No. 453251
Assistant United States Attorneys
National Security Section
601 D Street, NW, 5th Floor
Washington, DC 20530
(o) 202-252-7719 (Wasserman)
(o) 202-252-7527 (Seifert)
Steve.wasserman@usdoj.gov
Karen.seifert@usdoj.gov