**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| | } | **Criminal No. 23-CR-91-CKK** |
| **v.** | } | |
| | } | |
| **GUANGHUA JIN,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| _____ | } | |

**DEFENDANT'S MOTION IN LIMINE TO ADMIT GOVERNMENT'S STATEMENTS**
**AS THE STATEMENTS OF A PARTY OPPONENT**

Jin Guanghua, through counsel, moves to admit certain statements by the government as the statements of a party opponent, under Fed. R. Evid. 801(d)(2).

**THE STATEMENTS TO BE ADMITTED**

Mr. Jin seeks to admit the following statements of the government under Fed. R. Evid. 801(d)(2), subject to establishing their relevancy at trial:

**Statements of the Government in its May 30, 2025 Letter to Defense Counsel.  (Exhibit 1)**

(1) "The format which in which we produced the CTJ materials to you (Production #1 on 10-1-24) was the format in which the records were received from CTJ. Accordingly, we are not in a position to provide these records to you in another format."  Ex. 1 at 1.

(2) "Additionally, we note that CTJ is a foreign corporation that is not subject to compulsory legal process nor do we have the ability to get documents through a Mutual Legal Assistance Request to Argentina."  *Id.*

(3) "CTJ is a foreign corporation and is not subject to compulsory legal process."  *Id.* at 2.

**Statements of the Government in its Response (ECF 64) to Mr. Jin's Motion to Suppress.**

(4) "During this period [between February 2009 and March 2019], as a result of United Nations ("UN") sanctions, U.S. sanctions against North Korea, and overall risk management concerns, correspondent banks would freeze, block, investigate, and/or decline to knowingly process any U.S. dollar wire transactions involving entities in North Korea." ECF 64 at 3.

(5) "The tobacco was procured from Company 1 (also referred to as "Cooperating Company 1"), a tobacco company located outside of Asia. Company 1 no longer does business with the Winney Entities, but was the sole supplier of tobacco related to this scheme." *Id*. at 5.

(6) "During the span of the charged conspiracy, the Winney Entities, from their various accounts, paid Company 1 approximately $35 million for tobacco products destined for North Korea which was sent through 102 wire transactions, all of which were processed by U.S. financial institutions.The investigation has also determined that Chinese front companies additionally made more than $1,000,000 in payments directly to Company 1 on behalf of the Winney Entities' procurement efforts. The payments from the Winney Entities and the Chinese front companies, all on behalf of NKTC1 and NKTC2, appear designed to conceal from U.S. financial institutions the involvement of a North Korean entity in these transactions." *Id*. at 5-6.

(7) "[T]he government disclosed the potential motive that Cooperating Company 1 had for making itself subject to the jurisdiction of the United States and cooperating with U.S. authorities after millions of dollars had been frozen by U.S. financial institutions." *Id*. at 11.

(8) "As noted by the employee during the interview on May 1, 2019, an individual named Ruben Gelmetti initiated the relationship with Winney and that Gelmetti left the company in 2013. Def. Ex. 2 at 3-4. During a subsequent interview with this employee, he advised that Gelmetti was responsible for managing the Winney account before he left in 2013, after which the account was handled by another employee of Cooperating Company 1." *Id*. at 12, n.3.

(9) "Put simply, there is no indication that the employee being interviewed made any false statements on behalf of Cooperating Company 1 during the interview or that the government intentionally omitted the same." *Id.* at 13.

(10)      "The government has confirmed through travel records that co-defendants Qin and Han were at the meeting referenced by the employee in the May 1, 2019 interview, thereby explaining the non-identification of Defendant Jin." *Id*. at 14, n.4.

**Statements of the Government in its Response (ECF 66) to Mr. Jin's Motion to Strike Surplusage.**

(11)      "UN sanctions, which were imposed beginning in 1985, and then again in 2009, 2013, 2016, and 2017, ECF 13 at ¶¶ 15-16, bear upon the defendant's willfulness as to the IEEPA charges."  ECF 66 at 10.

(12)      "Indeed, that the defendant and his businesses would have been operating in violation of the broad umbrella of UN sanctions even before the United States designated the relevant entities as SDNs or imposed its own nationwide sanctions on North Korea helps to explain many of the measures the defendant and the Winney Entities took during the course of their business engagements to obfuscate the nature and beneficiary of the transactions."  *Id*. at 11.

**Statement of the Government in its Response (ECF 71) to Mr. Jin's Motion to Compel.**

(13)      "The government submits that OFAC has not 'contributed significantly to the investigation' and is therefore not 'closely aligned with the prosecution.' *Id.* The only role OFAC had in the investigation of this matter was to perform a search to determine whether the defendant, co-defendants, and any associated entities had obtained a license pursuant to IEEPA and the NKSR to authorize the export of services related to the transactions charged in the indictment.4 As such, there is no basis to require the government to determine whether OFAC has any records relevant to the charged transactions."  ECF 71 at 10.

(14)      "The government is aware that Winney entities filed two separate applications for a license with OFAC in June 2019 for the release of funds after some of its funds were blocked. No licenses were ultimately issued by OFAC for the release of the funds. The government is in the process of obtaining those license applications from OFAC and will disclose them to the defendant once they are received." *Id*. at 11, n.4.

(15)      Relating to blocked May 2019 transaction: "Further, as discussed *supra*, the government is not obligated to conduct a search of OFAC records related to this transaction as OFAC was not involved in the investigation of this matter."  *Id*. at 12.

(16)      Regarding another blocked May 2019 transaction: "For the same reasons as discussed *supra,* the government is not obligated to search records controlled by OFAC for materials related to this transaction." *Id*.

(17)     Regarding March 2019 blocked transaction: "For the same reasons as discussed *supra,* the government is not obligated to search records controlled by OFAC for materials related to this transaction." *Id*. at 12-13.

(18)     In relation to bills of lading for the years 2009 through 2012: "The government has previously provided the defendant all such records that are in its possession, custody and control. The government does not possess the requested records from the years between 2009 and 2012." *Id*. at 13.

(19)     "The government relied primarily on machine translations of the emails and records that were in other languages, typically Chinese and Korean." *Id*. at 17.

**Statement of the Government in its Affidavit Seeking Mr. Jin's Extradition (Exhibit 2).**

(20)     Jin and co-conspirators registered the Winney Entities through four different countries—the United Arab Emirates ("UAE"), China, England, and New Zealand. The Winney Entities frequently recycled the same addresses further connecting the entities together. Additionally, bank records showed three of the eight corporations of the Winney Entities had received U.S. dollar correspondent account wire transfers from at least one documented North Korean front company and used the same address as a now-sanctioned North Korean front company in Dandong, China. Furthermore, records from an email account for one of the co-conspirator's [sic] revealed that two of the eight corporations were simply renamed but were the same entity.  Ex. 2 at 10-11.

**Statements from the Government in its Response (ECF 69) to Mr. Jin's Motion to Dismiss Count 1.**

(21)     "Had the defendant and his coconspirators used bags of cash…for their transactions, they might not have committed bank fraud."  ECF 69 at 14.

## ARGUMENT

Under Fed. R. Evid. 801(d)(2), the statement of a party-opponent may be offered into evidence against that party where:

*An Opposing Party's Statement* . The statement is offered against an opposing party and:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). *See also United States v. Brown*, 503 F. Supp. 2d 226, 227 (D.D.C. 2007) (admitting statements of a party-opponent against the government). Each of the statements sought to be admitted fall within the scope of Rule 801(d)(2). *Hanson v. Waller*, 888 F.2d 806, 814 (11th Cir. 1989) (admitting as an admission of a party opponent under Fed. R. Evid. 801(d)(2)(C) statements concerning factual allegations made in a letter by plaintiff's counsel to defense counsel as the statements were "made by [the] attorney[] in a representational capacity" and were "directly related to the management of litigation"). Likewise, assertions made by the government in the indictment and in its filings with the Court are statements of the government for purposes of Rule 801(d)(2). *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) (holding that a "court can appropriately treat statements in briefs as binding judicial admissions of fact," as there "can be little dispute [that] . . . counsel was acting in an authorized capacity when making the assertion"). Likewise, the statements by an informant to law enforcement, which the government later adopts, are admissible. *See Morgan*, 581 F.2d at 937-38 (holding that statements by an informant to a detective, which were included in the sworn affidavit submitted to the Court by the government to obtain a search warrant, qualified as statements of a party-opponent under Rule 801(d)(2)(B)).

The statements sought to be admitted all "bear[] on a matter that could be determinative of guilt or innocence." *United States v. Morgan*, 581 F.2d 933, 936 (D.C. Cir. 1978). They are directly relevant to the government's factual allegations against Mr. Jin, and/or the government's investigation of those allegations. To the extent that the relevance is questioned, such relevance will become apparent when these statements are introduced in the context of trial testimony,

consistent with the procedure proposed by the government in its position on statements admissible under Fed. R. Evid. 801(d)(2).

## CONCLUSION

For all of the foregoing reasons, the statements specified above are admissible against the government under Fed. R. Evid. 801(d)(2).   Furthermore, additional statements made by the government, the relevance of which may become apparent at trial or prior to trial, should likewise be admissible, for the same reasons.

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I served a copy of the foregoing motion via ECF which automatically sends a copy to all counsel of record.

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.