**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| | } | **Criminal No. 23-CR-91-CKK** |
| **v.** | } | |
| | } | |
| **GUANGHUA JIN,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| | } | |

### DEFENDANT'S MOTION TO EXCLUDE BUSINESS RECORDS

Mr. Jin, through undersigned counsel, hereby moves the Court to exclude Cooperativa de Tabacaleros de Jujuy's ("CTJ") business records, admitted at the first trial as Government's Exhibit 200.

## BACKGROUND

### I.    CTJ'S COOPERATION AGREEMENT.

In early 2019, the United States government froze CTJ's U.S. dollar transactions. Tr. 9/22/25 PM at 45. In response, CTJ sent its lawyers and Fernando Bartoletti, its business and finance manager, to meet with representatives from the United States Attorney's Office. *Id.* at 16, 45–46, 48. At the meeting, CTJ represented that it was facing extreme financial difficulties because the United States had frozen its funds, and that it would face default in the next two weeks. *Id.* at 48; Exhibit 1 - FD-302 meeting on 5-1-2019, at 2. Bartoletti estimated that $11 million was at

stake.[1] Ex. 1, at 2. The government explained that any release of funds would be conditioned upon CTJ's cooperation, which CTJ eventually agreed to do. *Id.*

CTJ benefited from its cooperation. The government released the frozen U.S. dollar transactions. *See, e.g.*, Exhibit 2 – Letter to Bank; Tr. 9/22/25 PM at 52. The government also declined to prosecute CTJ, in part because of its "extensive cooperation" with its investigation into Winney. Exhibit 3 – Declination Letter. And when Bartoletti traveled to the United States in 2022 to testify in front of the grand jury, the government eased his "nerves" by assuring him "safe passage" and freedom from arrest, so long as he did not commit any crimes, "including, but not limited to the crimes of false statements, perjury and contempt of court." Tr. 9/22/25 PM at 54; Exhibit 4 – Safe Passage Letter, at 1.

Though CTJ agreed to cooperate, Bartoletti repeatedly provided false information about the company's business in North Korea. Bartoletti made multiple misstatements about an exclusive North Korean sales agreement between CTJ and Winney. At the grand jury, he testified that the agreement "died very quickly" and "never even got to the consideration by [CTJ'] lawyers," even though the contract was negotiated over months, with CTJ's lawyers reviewing it multiple times. *See* ECF No. 182 at 4-6 (quoting relevant portions of Bartoletti's grand jury testimony). At trial, he testified that the contract was prospective and would only take effect if sanctions were lifted, even though the contract was slated to take effect immediately. Tr. 9/23/25 AM at 58.

Beyond Bartoletti's misstatements, CTJ leveraged its lawyers to disavow the cooperative's business. At the initial 2019 meeting with the government, Bartoletti and CTJ's lawyers represented that CTJ had not had business in North Korea and that freezing funds was a "mistake."

---

[1] "Of that $11 million, approximately $3 million had already been blocked by DOJ, while CTJ was waiting on remittances of $8 million more which had not been made in anticipation they would be blocked." Ex. 1, at 2.

Tr. 9/22/25 PM at 48–49; Ex. 1, at 4. In 2021, CTJ, through its attorney, again tried to hide its North Korean business, asking the government to sign off on a letter to U.S. banks distancing the cooperative from North Korea. The government refused based on the CTJ's "extensive historical DPRK business." Exhibit 5 – Anglin letter, at 1.

## II.    CTJ'S BUSINESS RECORDS.

In preparation for its 2019 meeting with the government, CTJ provided the roughly 4,000 pages of documents at issue, some of which were admitted as Government's Exhibit 200 at the first trial. Tr. 9/22/25 PM at 46–47. The documents included, among other things, bills of lading, invoices, and emails between CTJ and Winney employees. *Id.* at 49; Tr. 9/22/25 PM at 22. Before trial, Bartoletti certified these documents as CTJ's business records.[2] Exhibit 6 – Certification, at 1. Under penalty of perjury, he attested that he had "knowledge of the record keeping system used by [CTJ]; this includes how records are created and maintained." *Id.*

At trial, however, he appeared confused both by CTJ's record keeping systems and by the underlying documents themselves. For instance, Bartoletti made multiple inaccurate statements about CTJ's digital record keeping system. Though CTJ and Winney had worked together for ten years, CTJ provided only about a year and a half of emails, from around 2018 to 2019. Tr. 9/23/25 AM at 76. But on direct examination, Bartoletti testified that CTJ provided "approximately four years" of emails. *Id*. at 22–23. On cross examination, he was asked to confirm that the emails went back to 2018, not four years; he stated that he didn't "remember exactly in [sic] the span of dates." *Id*. at 76. On redirect, the government asked why CTJ had omitted "four prior years of emails"—

---

[2]    At trial, the defense attempted to admit the certification, and the Government objected. Tr. 9/23/25 AM at 64–66. The Court concluded that the certification would not be admitted until it had the chance to research the issue further. *Id*. at 73–74. The parties did not return to the issue, and the certification was not admitted.  As discussed below, however, such certificates are routinely admitted by courts.

when it had in fact omitted about nine years—and Bartoletti did not correct the prosecutor's misstatement. Tr. 9/23/25 PM at 42.

Nor did Bartoletti appear to understand why CTJ's record keeping had necessitated omitting emails. When asked, "[W]hat, if anything, did you do to double-check to make sure that all emails about the Winney Entities had been produced," he responded that he "checked with the IT department at [CTJ] and asked whether there was any way to access prior emails, and [ ] was told no. Because at a certain point, there had been a change in internet provider." Tr. 9/23/25 AM at 23.

## ARGUMENT

### I.  RULE 803(6) AND SECTION 3505 ARE INTERPRETED TOGETHER.

There are two chief ways to admit business records. Under Federal Rule of Evidence 803(6), a "record of an act, event, condition, opinion, or diagnosis" may be admitted despite the rule against hearsay, if: "(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business [or] organization . . . ; [and] (C) making the record was a regular practice of that activity." Fed. R. Evid. 803(6). "These conditions must be shown 'by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification.'" *United States v. Khatallah*, 278 F. Supp. 3d 1, 5 (D.D.C. 2017) (quoting Fed. R. Evid. 803(6)(D)). "Finally," and most relevant here, "the record is only admissible if the opponent to admission 'does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.'" *Id.* (quoting Fed. R. Evid. 803(6)(E)).

Echoing the Federal Rules, 18 U.S.C. § 3505 states that in a criminal proceeding, "a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests":

> such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters; (2) such record was kept in the course of a regularly conducted business activity: (3) the business activity made such a record as a regular practice; and (4) if such record is not the original, such record is a duplicate of the original.

18 U.S.C. § 3505(a)(1).

Such a certification suffices "unless the sources of information or the method or circumstances of preparation or circumstances of preparation indicate lack of trustworthiness." *Id.* Given these parallels between section 3505 and Rule 803(6), courts interpret the two provisions in tandem. *Khatallah*, 278 F. Supp. 3d at 7 (citing *United States v. Ross*, 33 F.3d 1507, 1515 (11th Cir. 1994)).

Although the government opposed admission of Bartoletti's original certificate at trial, and the Court indicated that the certificate was likely inadmissible, certifications under 803(6) and § 3505—not just the documents they certify—are admissible. *See United States v. Al-Imam*, 382 F. Supp. 3d 51, 59–60 (D.D.C. 2019) (holding that admitting § 3505 certificate does not violate the Confrontation Clause)(collecting cases from the Second, Fourth, Seventh, Eighth, Ninth, Tenth, and D.C. Circuits).

## II.    CTJ'S BUSINESS RECORDS ARE NOT TRUSTWORTHY.

CTJ's documents lack the reliability business records require. They are missing nearly a decade of information, they were altered at least once, and CTJ—as a cooperator facing financial ruin—had reason to falsify them further.

## A.    BUSINESS RECORDS ARE NOT TRUSTWORTHY WHEN THEY ARE INCONSISTENT, INCOMPLETE, ALTERED, OR PREPARED WITH A MOTIVE TO LIE.

Even when business records are properly certified, they are inadmissible if "the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6); 18 U.S.C. § 3505(a)(1). Records are not trustworthy when they were altered, *Ochoa v. Nuyen*, No. CV 12-2072 (RJL), 2020 WL 2065026, at *3 (D.D.C. Apr. 29, 2020); when they are inconsistent, *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1373 (Fed. Cir. 2021); and when they are missing substantial sections, *Gem Fin. Serv., Inc. v. City of New York*, No. 13CV1686RPKRER, 2022 WL 409618, at *11 (E.D.N.Y. Feb. 10, 2022). Records are also not trustworthy when they are "prepared primarily or exclusively for use in litigation." *United States v. Brown*, No. CR 22-170 (CKK), 2024 WL 4582977, at *3 (D.D.C. Oct. 25, 2024) (citing *U.S. ex. rel. Landis v. Tailwind Sports Corp.*, 292 F. Supp. 3d 211, 220 (D.D.C. 2017)).

Courts look askance at documents when there was "a motive to falsify the record." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (quoting *United States v. Freidin*, 849 F.2d 716, 719 (2d Cir. 1988)); *see also Kikalos v. United States*, 408 F.3d 900, 904 (7th Cir. 2005) (Posner, J.) ("[W]hen the record keeper, rather than being a clerical or professional employee, is a principal with a strong motive to falsify the records, the district judge may deem them [ ] unreliable."); *Landis*, 292 F. Supp. 3d at 220–21 ("The reports may not have been prepared in anticipation of litigation, but they were prepared with particular client and goal in mind, which raises similar concerns.") (citing *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258–59 (9th Cir. 1984)); *Monty v. U.S. Bank, N.A.*, 2015 WL 6441725, at *4 (D. Vt. Oct. 22, 2015) ("The purpose of the business-records exception is to ensure that documents were not created for personal purposes or in anticipation of any litigation so that the creator of the document had no motive to falsify.") (citation modified).

6

A "motive to falsify" can arise based on "[t]he relationship between a hearsay declarant and the party opposing the statement's admissibility." *In re Piazza*, No. 23-3061, 2024 WL 4973301, at *3 (3d Cir. Dec. 4, 2024) (citing *United States v. Casoni*, 950 F.2d 893, 911 (3d Cir. 1991)). Documents are thus unreliable when the declarant "had a motive to minimize [their own] criminal responsibility and maximize that of" the party opposing the statement's admission. *Casoni*, 950 F.2d at 910. As a result, documents produced by cooperators at a proffer session are suspect. *See id.*; *United States v. Jackson*, 636 F.3d 687, 693 (5th Cir. 2011) (refusing to admit drug ledger, in part because it was "produced . . . at a proffer session."); *cf. DIRECTV, Inc. v. Puccinelli*, 224 F.R.D. 677, 684 (D. Kan. 2004) (concluding that a custodian or records was biased because it "enter[ed] into [a] settlement[] that required [it] to cooperate with [the plaintiff] in exchange for leniency") (citation modified).

### B.    CTJ'S BUSINESS RECORDS ARE INCOMPLETE AND ALTERED.

CTJ's documents are missing years of relevant information, thus calling their reliability as business records into question. First, CTJ's records are missing any bills of lading from 2009 to 2013, this is despite the fact that the indictment alleges that bills of lading during this period referenced North Korea.

Second, CTJ provided about 18 months of emails, leaving out nearly nine years' worth. Though "[m]inor incompleteness of . . . files may go to the weight rather than the admissibility of . . . evidence," documents are not trustworthy when they are missing substantial portions. *Gem Fin. Serv., Inc.*, 2022 WL 409618, at *11 (quoting *United States v. Panza*, 750 F.2d 1141, 1151 (2d Cir. 1984) (internal quotation marks omitted)). More than minorly incomplete, CTJ's records of emails exclude far more than they include—nearly a decade of emails is missing. This omission throws the documents' reliability into doubt. *See id.*

This omission is especially troublesome because Bartoletti was unaware of this years-long gap and could not adequately explain it. Though CTJ provided about 18 months of emails, Bartoletti twice testified incorrectly that the cooperative had provided far more. Tr. 9/23/25 AM at 22–23; Tr. 9/23/25 PM at 42. When asked why CTJ had provided so little, he did not describe how CTJ archives or retains emails; instead, he offered a second-hand explanation from CTJ's IT department: that "there had been a change in internet provider." Tr. 9/23/25 AM at 23. Yet changing internet service providers does not necessarily erase historical email data, which is typically stored in an email server. And even when changing internet providers would erase historical email data, that data can be archived. *See* Whitson Gordon, *Switch From Your Internet Provider's Email to Something Better*, New York Times (Jan. 24, 2020), available at https://tinyurl.com/43rrbkbw; Tom Brook, *Can I Keep my Email Address if I change Broadband Provider?*, TechRadar (Feb. 14, 2024), available at https://tinyurl.com/4nmbzpdw. Because changing internet providers does not necessarily erase emails, Bartoletti's explanation is incomplete. His inadequate explanation heightens the suspicion surrounding the omitted emails. His lack of knowledge is such that he twice testified incorrectly under other, by an order of several years, as to the date range of emails that were produced under his own certification. It leaves no doubt that Bartoletti had no personal knowledge regarding how the emails were stored, but instead relied on others.

CTJ also had the documents altered. At trial, the government elicited testimony that Winney supplied the information in the bills of lading and that Winney altered that information to evade sanctions. Tr. 9/23/25 AM at 53; Tr. 9/24/25 AM at 71. But the government's investigation revealed that *CTJ* instructed Winney to change the bills of lading. This was revealed in a recorded call

between Mr. Jin and Agent Erick Tarango, who was posing undercover as a CTJ employee.[3] Exhibit 7 – Undercover Recording dated May 21, 2019, at 6. Agent Tarango stated that "the bill of lading uh, which [U/I] changed back in...what, what year? 2 years ago [U/I]. But that's only which modified...[U/I]...*Patricio [Lyons, a CTJ manager] instructed James [Han] to change the bill of lading from going to North Korea to going to Dalian [China]*." *Id*. (emphasis added). The fact that CTJ asked for business records to be altered undermines their trustworthiness. *See Ochoa*, 2020 WL 2065026, at *3.

There is good reason to think more documents were altered—CTJ and Bartoletti repeatedly attempted to obscure the cooperative's business in North Korea. At CTJ's initial meeting with representatives from the U.S. Attorney's Office, Bartoletti tried to deny CTJ's North Korean business, claiming the government had made a "mistake." Tr. 9/22/25 PM at 48–49.  He maintained this story even after the government confronted him with documents he signed, showing shipments of tobacco to North Korea. Ex. 1 at 4.  Later, at the grand jury and trial, Bartoletti presented testimony that was flatly contradicted by CTJ's records. He testified that the sales agreement between CTJ and Winney "died very quickly" and "never even got to the consideration by [CTJ'] lawyers, *See* ECF No. 182 at 4-6; but the contract was negotiated over months, and CTJ's lawyers reviewed it multiple times. At trial, he presented more false testimony: that the contract would only take effect if sanctions were lifted. But the contract was slated to start whether or not the sanctions ended.[4] CTJ likewise tried to hide its North Korean business. In 2022, the cooperative, through its

---

[3]    Based on this call, Mr. Jin has requested an evidentiary hearing. *See* Mot. to Compel, ECF No. 276. The need for an evidentiary hearing is underscored by the possibility that other business records were altered.

[4]    Bartoletti's repeated misstatements are also reason to discredit his certification if the government again relies on Bartoletti to admit CTJ's records. Courts are "not required to accept a fact as true simply because a witness swears to it." *United States v. Paniagua-Ramos*, 251 F.3d 242, 251 (1st Cir. 2001). They should be "wary of [a] declaration" when a company or its

lawyer, asked the government to endorse a letter to U.S. banks disclaiming CTJ's ties North Korea; the government refused because of CTJ's "extensive historical [North Korean] business." Ex. 5. This continued lack of honesty strongly suggests that other documents were changed.

### C.    CTJ WAS MOTIVATED TO FALSIFY THE RECORDS.

Indeed, CTJ's desire to obscure its North Korean business gave it ample "motive to falsify the record." *Kaiser*, 609 F.3d at 574 (quoting *Freidin*, F.2d at 719). At stake was the survival of the cooperative itself. When the government froze CTJ's U.S. dollar transactions, CTJ was facing financial default, with some $11 million at stake. See Ex. 1, at 2. CTJ produced these documents in response to that threat. This throws their reliability into doubt. *See Kikalos*, 408 F.3d at 904; *Landis*, 292 F. Supp. 3d at 220–21.

Deepening CTJ's motive to falsify documents was the threat of criminal prosecution. CTJ was a target of the government's investigation, and it avoided charges because it agreed to cooperate. *See* Ex. 3. That these documents were produced "in exchange for leniency" erodes their credibility. *DIRECTV, Inc.*, 224 F.R.D. at 684. That's because CTJ "had a motive to minimize [its] criminal responsibility and maximize that of" Winney. *Casoni*, 950 F.2d at 910. For example, CTJ represented that Winney changed the bills of lading of its own accord, when in reality CTJ directed it to make the change. Ex. 7, at 6. CTJ's status as a cooperator spoils the reliability of these documents. *See In re Piazza*, 2024 WL 4973301, at *3; *Jackson*, 636 F.3d at 693.

That the documents were incomplete, that they were altered, and that CTJ had multiple motives to alter them—all are factors discrediting the documents' trustworthiness as business records.

---

representative has a "history of dishonesty in court proceedings." *Dillon v. BMO Harris Bank, N.A.*, 173 F. Supp. 3d 258, 265 (M.D.N.C. 2016). Bartoletti's history of dishonesty, at the grand jury and trial, is a reason to reject any future declaration he offers.

### D.    BARTOLETTI'S FALSE CERTIFICATION ALSO UNDERMINES THE DOCUMENTS' CREDIBILITY.

Bartoletti misrepresented his knowledge of the records in his certification, which also throws their reliability into doubt.

While Rule 803(6) and section 3505 do "not require the certifying witness to have personal knowledge of the actual creation of the business record, [they do] demand that she be familiar with the relevant recordkeeping procedures." *United States v. Miller*, No. 18-CR-202 (ARR), 2018 WL 5729738, at *1 (E.D.N.Y. Nov. 2, 2018) (requiring an additional declaration "regarding [the witness's] knowledge of [the company's] bookkeeping procedures"). Bartoletti attested that he had such knowledge. In the certification, Bartoletti swore that he had "knowledge of the record keeping system used by [CTJ]; this includes how records are created and maintained." Ex. 6.

But, contrary to what he swore, Bartoletti did not understand "how [CTJ's] records [were] . . . maintained," particularly its digital records. *See id*. As noted, Bartoletti was given multiple opportunities to account for the period of emails produced, and he repeatedly provided inaccurate answers. When asked why CTJ failed to provide years of emails, he was unable to adequately explain the omission. He instead offered a truncated explanation from CTJ's IT department, that CTJ had switched internet providers. Tr. 9/23/25 AM at 23. This record clearly reflects a lack of knowledge as to the records Bartoletti certified, attesting under oath that: "I have knowledge of the record keeping system used by this business" and "I understand how these documents were created. Ex. 6. In fact, the email records constituted 2489 pages out of the 4004 total pages of the CTJ production. In other words, as to 62% of the records that he certified, Bartoletti lacked the knowledge required of a custodian.  Bartoletti's certification was thus false. His willingness to make a false statement under oath about any portion of the documents casts a shadow over the reliability of the remainder. Even if the falsity of Bartoletti's prior certification were the only issue

11

casting doubt on his credibility, that alone is sufficient to reject any further certifications he submits to the Court.

## CONCLUSION

For all of the foregoing reasons, the Court should exclude CTJ's business records.

Respectfully submitted,

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 79785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I served a copy of the foregoing motion via ECF which automatically sends a copy to all counsel of record.

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.