**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 23CR91-CKK |
| | ) | |
| GUANGHUA JIN. | ) | |

**DEFENDANT'S OMNIBUS REPLY IN SUPPORT OF HIS MOTIONS *IN LIMINE***

Mr. Jin replies to the government's Omnibus Opposition, ECF 301, in response to his various motions *in limine*. ECF 284-84, 287-89.

As a preliminary matter, the government asserts throughout its response that Mr. Jin's arguments should fail from the start because he does not present new facts that warrant reconsideration of the Court's previous orders. This overlooks that the events of the first trial constitute new, intervening facts. Moreover, the Court made clear that any challenges to the Court's prior written rulings should be styled as motions to reconsider, and undersigned counsel understands that the Court expressed it would be open to reconsider any oral rulings made during the trial. Many of the issues raised in the motions *in limine* are addressed to the Court's oral rulings during trial.

## I.    THE THOROUGHNESS AND GOOD FAITH OF THE GOVERNMENT'S INVESTIGATION ARE HIGHLY PROBATIVE. (ECF 288)

Mr. Jin is entitled to attack the thoroughness and good faith of the government's investigation.

The government's response asks the Court to hew to its previous Order, ECF No. 152, limiting Mr. Jin's attacks on the investigation to evidence related to CTJ's reliability or Mr. Jin's guilt. In support, the government claims that Mr. Jin must tie his attacks to discrete items of evidence and steer clear of impugning the government's choice to carelessly accept evidence or

willfully overlook issues.  ECF 301, at 2-3.  It further claims that Federal Rules of Evidence 401 and 403 tightly rein in Mr. Jin's attacks.  *See id*. at 2-4.  But the Court's original order was unduly narrow, and the government's proposed limitations find no support in the case law.

The Court's original order imposed restrictions absent in the case law.  When courts have allowed attacks on the investigation tied to the credibility of a witness or the reliability of inculpatory evidence, they have also allowed attacks on the investigation as a whole.  In *Kyles* itself, the Supreme Court noted that even if an unreliable informant did not serve as a witness, the defense could still attack "the reliability of the investigation" overall.  *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995); *id*. at 445 ("[The witnesses'] various statements would have raised opportunities to attack *not only* the probative value of crucial physical evidence and the circumstances in which it was found, *but the thoroughness and even the good faith of the investigation, as well*.) (emphasis added); *see also United States v. Quinn*, 537 F. Supp. 2d 99, 115 (D.D.C. 2008).  Likewise, in *Bowen*, the court held that in attacking the investigation for withholding exculpatory evidence, the defense could also "raise[] serious questions about the manner, quality, and thoroughness of the investigation that led to [his] arrest and trial."  *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986).

These cases framed attacks on the investigation broadly, without limiting that attack to specific witnesses or exhibits; other courts have similarly allowed for attacks on the investigation as a whole.  *See United States v. Jones*, No. 5:15-CR-324-F-1, 2016 WL 5818534, at *4 (E.D.N.C. Oct. 4, 2016) (collecting cases from the Second, Fifth, Ninth, and Tenth Circuits).

Defendants are allowed a wide berth to attack the investigation so that jurors can assess "the weight to be given to evidence"–any evidence–"produced by [an] investigation."  *United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000).  The government's argument that Mr. Jin

may only challenge specific pieces of evidence thus gets the law exactly backwards.  ECF No. 301 at 2-3.  "To tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information."  *Sager*, 227 F.3d at 1145.  Courts thus commit plain error when they prevent jurors from "grad[ing]" an investigation.  *Id.*

The case law also contradicts the government's position that Mr. Jin may not bring up its choice to carelessly accept, or willfully overlook, CTJ's problems as a cooperator.  ECF 301 at 3.  In *Kyles*, the Court held that the defense could attack "the fact that the police 'never even bothered to check [the informant's] story against known fact.'"  *United States v. Bagcho*, 151 F. Supp. 3d 60, 70 (D.D.C. 2015), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019) (quoting *Kyles*, 514 U.S. at 450-51).  On the chopping block were questions about whether investigators were "less than wholly candid or less than fully informed," and whether the investigation was "negligent in method and 'insufficiently probing' of the cooperators' credibility"–in other words, whether investigators were carelessly accepting or willfully blind.  *Id*. (quoting *Kyles*, 514 U.S. at 453-54).  Similarly, in *Bagcho*, the court held the government's choice to rely on an unreliable informant could have been framed as "organizational incompetence or uncritical readiness to accept [his] stories and suggestions," and the defense could have argued "that the [government] agents had *turned a blind eye*."  *Id*. at 71 (emphasis added); *see also Quinn*, 537 F. Supp. 2d at 115 ("[The defendant] could have portrayed [reliance on an unreliable cooperator] *as willful ignorance*.") (emphasis added).

Finally, the government stretches the Federal Rules of Evidence too far.  It fails to cite a single case excluding attacks on an investigation under 403.  Such cases are missing because the government's argument would prove too much.  Under the government's position, any attack on the decision to rely on an unreliable witness would be barred by Rule 403–a position belied by the

3

case law. *See Kyles*, 514 U.S. at 453-54; *Bagcho*, 151 F. Supp. 3d at 70; *Quinn*, 537 F. Supp. 2d at 115. Even where a court has acknowledged the limits imposed by Rule 403, it has concluded that attacks "on the integrity of an investigation" are allowed. *See Bagcho*, 151 F. Supp. 3d at 71 ("A judge has a great deal of discretion in limiting the scope of cross-examination under Rule 403 . . . , but a court would have likely permitted . . . [an] attack on the integrity of the investigation.").

The case for limiting evidence under Rules 401 or 403 is particularly weak here. As detailed in a contemporaneously filed Motion to Dismiss for Flagrant Government Misconduct, the government in this case was at least reckless or willfully blind in its investigation to CTJ's credibility problems. Mr. Jin is entitled to show the jury that the government turned a blind eye to these issues and is presenting evidence to the jury that it knows or should know to be false.

## II.     MR. JIN'S CROSS-EXAMINATION OF GOVERNMENT WITNESSES SHOULD NOT BE UNDULY RESTRICTED. (ECF 285)

The Court should allow Mr. Jin more latitude on cross-examination than it did at the first trial. Much of Mr. Jin's cross-examination was curtailed by the government's objections that his questions went beyond the scope of direct. *See* ECF 285, at 1-2. The government now argues that trial judges may "impose reasonable limits" on cross-examination and that cross-examination does not extend to "whatever [ ] the defendant might wish." ECF 301, at 4 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). These platitudes, while true, elide Mr. Jin's core contention: in the D.C. Circuit, "Rule 611(b) is to be given an expansive reading." *United States v. Johnson*, 859 F.2d 241 (D.C. Cir. 1988). As a result, only the most "marginally relevant" questions on cross-examination are properly excluded. *United States v. Cornell Foster*, 982 F.2d 551, 553 (D.C. Cir. 1993) (citing *Van Arsdall*, 475 U.S. at 678-79). At the next trial, then, the Court should treat

4

the government's 611(b) objections with the doubt they deserve and allow the lines of questioning it precluded at the first trial.  *See* ECF 285, at 2-3.

### III.    THE COURT SHOULD RECONSIDER ITS PRIOR LIMITATIONS ON BARTOLETTI'S CROSS-EXAMINATION. (ECF 284)

The Court should reconsider its order, ECF 220, excluding defense documents offered to impeach CTJ's credibility.

The government frames the issue too narrowly by arguing that the documents, which show the government released large sums of money to CTJ and declined to prosecute CTJ, cannot be used for impeachment purposes against Bartoletti.  For one, these documents show that CTJ itself was biased.  By admitting CTJ's business records and putting its representative on the stand, the government opens the door to challenge CTJ's own bias.  *Cf. United States v. Young-Bey*, 2024 WL 181262 at *3 (D.D.C. Jan 17, 2024); Fed. R. Evid. 806.

Even adopting the government's narrow view, these documents show Bartoletti's bias. Despite the government's claim that Bartoletti was "unfamiliar with [the benefits to CTJ,]" Bartoletti was aware of the circumstances the declination letter describes, whether or not he actually read the letter.  ECF 301, at 6.  Bartoletti knew that CTJ was spared from criminal prosecution because it chose to cooperate.  *See, e.g.*, Tr. 9/22/25 PM at 46 ("The administrative council made the decision that I would be the one designated to travel to be interviewed by the prosecutor."); Tr. 9/23/25 PM at 39-40 ("Well, yes. A few weeks after my return, the funds were released.").

More than knowing about the benefits to CTJ, those benefits "relate[d] to him" and establish his bias, though the government claims otherwise.  ECF 301, at 6.  Bartoletti wanted to avoid criminal prosecution, save CTJ, and keep his job.  *See United States v. Maynard*, 476 F.2d 1170, 1174 (D.C. Cir. 1973) ("[E]xternal facts from which may be inferred a specific bias . . . are

admissible to impeach a witness—e.g. facts which show a familial, employment or litigious relationship."); *Surgery Ctr. at 900 N. Michigan Ave., LLC v. Am. Physicians Assurance Corp., Inc.*, 317 F.R.D. 620, 625–26 (N.D. Ill. 2016) ("[T]he range of external circumstances from which probable bias and testimonial motivation may be inferred is . . . virtually infinite.").

Regardless, that Bartoletti denies knowledge of these documents is reason enough to cross-examine him about them.  The defense need not "take the answer of the witness"; instead, "bias may be shown by extrinsic evidence."  *United States v. Abel*, 469 U.S. 45, 52 (1984) (internal citation omitted); *see also Still v. K–Mart Corp.*, 865 F.2d 255, 1988 WL 131792 (4th Cir. 1988) ("Extrinsic evidence of bias or facts from which it may be inferred may be introduced *even after the witness has denied the bias or the facts*.") (emphasis added).

As a last ditch aside, the government wrongly asserts that these documents cannot be admitted because they cannot be authenticated.  But Bartoletti could authenticate emails and the declination letter based on the names and email addresses of the parties to the communication.  *See United States v. Safavian*, 435 F. Supp. 2d 36, 40 (D.D.C. 2006).  And regardless of whether Bartoletti has seen these documents, they can be used to show his bias.

Bartoletti was key to the government's investigation and as a government witness.  His importance to the government's case heightens the need for a fulsome cross-examination.  *See United States v. Foster*, 986 F.2d 541, 543 (D.C. Cir. 1993) ("[T]he more important the witness to the government's case, the more important the defendant's right, derived from the Confrontation Clause . . . to cross-examine the witness.").

## IV. THE COURT SHOULD EXCLUDE ANGLIN'S EXPERT TESTIMONY OR SUBJECT HIM TO VIGOROUS CROSS-EXAMINATION. (ECF 287)

The Court should exclude Anglin's expert testimony or at least allow Mr. Jin to cross-examine him more extensively.  As to whether his testimony should be admitted, the government

shields Anglin's testimony by mischaracterizing it, making it seem more limited than it was.  The government also ignores Anglin's inability to explain how he reached his expert conclusions.  Aside from its arguments about admissibility, the government does not meaningfully challenge Mr. Jin's right to cross-examination.

First, the government wrongly asserts that Anglin's expert testimony was confined to two "modest" opinions: that tobacco was still delivered to North Korea after the bills of lading were changed, and that "certain companies acted as front companies for North Korea."  ECF 301 at 7.[1]  But Anglin offered expert testimony that went beyond these points.  He was asked, "What weight or significance did you *in your expert opinion* place on the fact that Mr. Jin had in his email an account opening [bank] application[s]?" and responded, "It showed that Mr. Jin and the Winney Entities had connections to these banks."  Tr. 9/19/25 AM at 95 (emphasis added).  While related to front companies, this testimony went beyond merely identifying front companies by expounding on Mr. Jin's ostensible connection to North Korean banks.  Similarly, he offered his "expert opinion" that "100 percent" of the "$27 million in [Winney's] gross profit [was] associate[d] with North Korea."  Tr. 9/19/25 PM at 40.  Anglin's expert testimony thus went well beyond the areas identified in his expert notice.

Contrary to the government's aversions, his testimony was also grounded in "methodologies that apply to certified fraud examiners."  ECF 301 at 8.  Anglin testified to that

---

[1]     The government also mischaracterizes the defendant's position on the bills of lading, stating that "[e]ven in recent motions, [the defendant] acknowledges that the post-sanctions bills of lading were false."  ECF 301 at 7 n.5.  To the contrary, the bills of lading were factually true.  The tobacco was in fact delivered to Dalian, China.  That the tobacco was *eventually* transmitted to North Korea does not render the bills of lading false, not without resort to a theory of "misleading omission."  But a misleading omission requires malicious intent, and the defendant has never taken the position that omission of North Korea from the bills of lading was intended by Winney to deceive banks or to evade sanctions.  Indeed, the only "misleading omission" with respect to the bills of lading in this case is the government's omission of the fact that Lyons at CTJ instructed Han to change the bills of lading, a point discussed extensively elsewhere.

himself.  On cross-examination, he was asked whether "the expert analysis that you did in this case is your *certified fraud examiner experience, is that something you applied*?" and responded, "Yes." Tr. 9/18/25 PM at 26.  Though he disclaimed that he "strictly" followed CFE protocols–essentially admitting that he failed to reliably apply the methods he should have used–he went on to affirm that he used CFE standards.  *See id*. at 26-27.  In any case, explaining how exactly "CFE methodologies would apply" here is not Mr. Jin's burden, as the government asserts, ECF 301, at 8, but the government's.  *See D. H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC*, 526 F. Supp. 3d 1360, 1366–67 (N.D. Ga. 2021) ("The proponent of expert testimony always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address, the methodology by which the expert reached his conclusions is sufficiently reliable, and the testimony assists the trier of fact.") (internal citations and quotes omitted).

The government also argues that the "red flags" that underpinned Anglin's expert testimony were not "creations of Anglin's intuition" but "suspicious indicators used in the banking industry."  ECF 301, at 8.  That may be so.  The law still requires an expert to show his work. When, as here, an expert relies "primarily on experience," he must explain "how that experience leads to [their] conclusion," "why that experience is a sufficient basis for the opinion," and "how that experience is reliably applied to the facts."  Fed. R. Evid. 702, Advisory Comm. Notes, 2000 amend; *see also United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.").  The government's emphasis on Anglin's extensive experience–claiming he may be the most qualified accountant in the world on these matters–underlines the need to follow these requirements.  *See* ECF 301, at 7

8

("There may be no other accountant in the world with more experience in the investigation of North Korean money laundering, bank fraud, and sanctions evasion.").

Rather than describe a transparent and replicable methodology or explain why the data he assessed, viewed through the prism of his extensive experience, rose to the level of a "red flag," or how many "red flags" is sufficient to trigger a conclusion, Anglin offered muddled explanations of his reasoning: "[T]here are reasons why certain things happen that can be explained by different factors." Tr. 9/18/25 PM at 22-23, or, "There can be different instances and reasons for that." *Id.* at 24. A statement like "[t]here are reasons why certain things happen" does not allow the Court to assess "how [Anglin's] experience leads to [his] conclusion," let alone "why [his] experience is a sufficient basis for [his] opinion." Fed. R. Evid. 702, Advisory Comm. Notes, 2000 amend. The law requires more of experts. *See 24/7 Records v. Sony Music Entm't*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) (noting that expert testimony should be excluded when its methodology "cannot be tested, [ ] has no known rate of error, and [ ] is not subject to any particular standard or control."); *cf. Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998) ("[T]he expert must testify as to specific ... standards and must relate them directly to the defendant's conduct." (internal citation omitted)).

The government fails to mount a substantive argument about Anglin's cross-examination, claiming it does not know what statements are at issue. ECF 301, at 9. Because the government fails to respond, Mr. Jin recaps his arguments only briefly. *See Dialysis Patient Citizens v. Azar*, No. 20-CV-1664 (TSC), 2021 WL 184318, at *7 (D.D.C. Jan. 19, 2021) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.") (quoting *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp.2d 154, 159 (D.D.C. 2002)).

Mr. Jin seeks to open for cross-examination subjects that were foreclosed at the first trial: about Anglin's interactions with prosecutors, about documents he chose to overlook or put aside, and about his bias, as someone who investigated the case, wrote the complaint, and then testified as an expert witness. *See* ECF 287, at 3-6. Undergirding Mr. Jin's argument on these points is a straightforward proposition: experts are subject to "[v]igorous cross-examination." *United States v. Morrow*, No. CRIM.A.04-355CKK, 2005 WL 3159575, at *11 (D.D.C. Apr. 25, 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)).

Mr. Jin is entitled to ask Anglin about his bias, as well as his interactions with prosecutors. There is an "additional risk of bias" that Anglin might have "form[ed] [his] expert conclusions [based on his] own investigation," given he helped in the investigation, drafted the complaint, and then served as an expert. *United States v. Lopez-Medina*, 461 F.3d 724, 744 (6th Cir. 2006). For instance, when Anglin was investigating Winney, he was unsure of the "significance" of a blank bank application in Mr. Jin's email account; but when he testified at trial, he had somehow learned its "significance," that it showed a connection to North Korean banks. Exhibit 1 - Email from Anglin to Carlsen dated 5/22/20; Tr. 9/19/25 AM at 91-92. Anglin also testified–offered an expert opinion, no less–about the changes to the bills of lading, without mentioning that CTJ directed those changes. Tr. 9/18/25 PM at 88. His misleading testimony and prior inconsistent opinions are both evidence of his bias and ripe for cross-examination.

Mr. Jin is likewise entitled to ask Anglin about how he formed his opinions and whether he overlooked or discounted data, even if the government skips the topic in his direct testimony. *See Loc. 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*, 189 F.3d 473 (9th Cir. 1999) ("Every expert will make decisions as to which pieces of evidence to rely on; on cross-examination the opposing party is entitled to challenge why the expert seemingly ignored certain evidence."); *cf.*

*Bagcho*, 151 F. Supp. 3d at 70 (allowing attacks related to an investigation's willful blindness); *Quinn*, 537 F. Supp. 2d at 115 (same).

## V.    THE COURT SHOULD ADMIT OUT-OF-COURT STATEMENTS AS NON-HEARSAY. (ECF 289)

In accusing Mr. Jin of "lodg[ing] generalized attacks against the government" and its investigation, the government misses the relevance of the statements Mr. Jin seeks to admit. Mr. Jin is motivated to ensure that admissible evidence supporting his defense is actually admitted at trial, not thwarted by spurious objections. Had Mr. Jin been permitted to meaningfully confront the witnesses against him, it is likely the last trial would have resulted in an acquittal instead of a hung jury.

*Financial pressure and Mr. Jin's intent*. The statements about the financial pressure the government exerted on Mr. Jin and Han are relevant to Mr. Jin's *mens rea*. Even under financial strain, with over $200,000 at stake, they would not pay a bribe. Mr. Jin instead directed that all business be done in accordance with the law. This shows Mr. Jin did not act intentionally or willfully. Nor does Rule 403 bar admission. These statements are not meant to impugn the government's conduct; they are meant to show Mr. Jin's state of mind. *See United States v. Hayes*, 369 F.3d 564, 568 (D.C. Cir. 2004) (admitting defendant's statement to co-conspirator to "tell the truth" because it "indicates he did not think he did anything wrong, making it less likely that he had the specific intent required"); *see also United States v. Waters*, 627 F.3d 345, 358 (9th Cir. 2010) (admitting defendant's directive to "tell the truth").

The government separately insists that Mr. Jin identify specific out of court statements or explain their relevance. ECF 301, at 13. Mr. Jin has not done so, and will not do so here, because there are many such statements, and their relevance will depend on what evidence the government decides to introduce at trial. If anything, the government has been impeding Mr. Jin from

11

identifying the relevance of particular statements.  On January 19, 2026, Mr. Jin requested that the government identify the undercover calls it intends to introduce at his retrial.  Exhibit 2 - Email from E. Gorokhov to C Magnani *et al.* dated 1/19/26.  The government did not respond.[2]  Even now, the government does not commit to a definitive set of recordings that it seeks to introduce.  The statements necessary to provide context will depend entirely on the definitive universe of recordings, or the relevant parts of those recordings, that are admitted.  Mr. Jin is not required to present his detailed strategy to the government, especially when the government has failed to give him advance notice as he requested months ago, and during the first trial, repeatedly shifted its strategy regarding the extent of undercover recordings that would be played to the jury.

*Good faith of the investigation*.  Statements about the government's investigation and its investigators' actions are relevant because they affect the quality of evidence that the investigation produced.  As addressed in more detail above, *see* Section I., whether investigators were "negligent" or "insufficiently probing" affects the weight of the government's evidence.  *Bagcho*, 151 F. Supp. 3d at 70 (quoting *Kyles*, 514 U.S. at 453-54).  Whether investigators evinced "uncritical readiness" to trust cooperators or "turned a blind eye" to inconvenient facts likewise affects the weight of the government's evidence.  *Id*. at 71.  Any statements, from cooperators, investigators, or anyone else, that shows how agents responded are thus admissible as non-hearsay.

*Impeaching Bartoletti*.  Bartoletti's statements about the exclusivity contract conflict with the truth about the contract.  Nevertheless, the government continued to rely on him and the company he represents.  That is relevant to the good faith of its investigation.  *See id*.

---

[2]    The government's exhibit list filed on February 6, 2026 identified two calls on May 13, 2019, and then separate calls on May 15 and 21, 2019.  ECF 286.  Defense counsel is reluctant to rely on this list, given that the first trial team also identified a number of UC calls in its exhibit list but later presented only a significantly truncated portion (i.e., only one call).

For all of these reasons, Mr. Jin should not be prevented from meaningfully cross-examining witnesses on matters that affect their credibility, as he is permitted to do under the Sixth Amendment and Fed. R. Evid. 611(b).

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
DC Bar No. 979785
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

13

**CERTIFICATE OF SERVICE**

 I HEREBY CERTIFY that I served a copy of the foregoing motion via ECF which automatically sends a copy to all counsel of record.


            Respectfully submitted,

            By:/s/ Eugene Gorokhov
            Eugene Gorokhov, Esq.