**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No.: 23-CR-91-02 (CKK)** |
| | : | |
| **JIN GUANGHUA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**United States's Opposition to the Defendant's Motions to**
**Compel and Dismiss with Prejudice Related to Alleged Due Process Violations**

The United States respectfully submits this opposition to last week's discovery motions (ECF Nos. 308 (the "MTC") and 309 (the "MTD"), collectively the "Motions"). The Motions claim that the government violated the defendant's Due Process rights by suppressing exculpatory evidence and sponsoring false testimony. Supported only by speculation and invective, the Motions' attacks on opposing counsel are both unlikely to obtain relief for the defendant and professionally unbecoming—the Court should demand more.[1]

As in the lead-up to the last trial, these late-field Motions inject chaos into what could otherwise be an orderly re-trial process. In addition to the Motions, the defendant recently filed another motion claiming a "likely need for a mid-trial evidentiary hearing, if one is not held before trial" related to Special Agent Tarango, the need to "file additional motions which will call for an evidentiary hearing regarding issues arising from Mr. Bartoletti's retrial testimony," and "further

---

[1] *See* D.C. Bar Voluntary Standards for Civility in Professional Conduct (incorporated into the Local Rules) ("While lawyers have an obligation to represent clients zealously, we must also be mindful of our obligations to the administration of justice. . . . Our judicial system is a truth-seeking process designed to resolve human and societal problems in a rational, peaceful, and efficient manner and designed to be perceived as producing fair and just results. We must be careful to avoid actions or statements which undermine the system or the public's confidence in it. . . . Uncivil conduct of lawyers or judges impedes the fundamental goal of resolving disputes rationally, peacefully and efficiently.").

motions relating to *Napue* violations, *Brady* violations, and the destruction of evidence." ECF No. 311 at 3-4. The defendant also filed a supplement to his prior Jencks motion. ECF No. 312. During a status conference yesterday, the defendant threatened more motions if the government did not answer his interrogatories. Although the Motions fail on their merits, the Court should also deny them as untimely filed and order the defendant to show cause before filing additional motions.

In determining the appropriateness of such a remedy, the Court should consider the defendant's *repeated* requests for undercover materials.[2] He made this request of the prior team, moved to compel (ECF No. 57), and was denied by the Court (ECF No. 146). He then made the same request of undersigned counsel and filed two new motions asking for the same material (ECF Nos. 267 & 276—both denied, *see* ECF No. 315). The instant MTC asks again, claiming "the government's failure to produce even a single document related to the UC investigation strains credulity." ECF No. 308 at 6. Unsatisfied with the government's representation that it conducted a "diligent search," ECF No. 292 at 1, the defendant hired a retired FBI agent who does not purport to know about DHS policies and procedures but claims there "should" be documentation because such records are "essential" for "the defense" to evaluate the "thoroughness and good faith of the investigation." ECF No. 308-5, ¶ 10. Aside from the paid affiant's conclusion that the absence of such documentation "calls into question the thoroughness and good faith of the entire investigation," *id.* at ¶ 31, there is nothing new that would justify cause for the defendant taking this fourth bite at the apple in the leadup to trial.[3]

---

[2] Or Jencks material. ECF Nos. 182 (denied, *see* ECF No. 194), 273 (denied, ECF No. 315, opinion forthcoming) & 312 (denied, *id.*). Last night, the defendant also emailed the government to request that the government independently review the last trial team's Jencks production. This email came after the denial of his motion for the same relief. ECF No. 315 (denying ECF No. 267).

[3] The government does not believe there is a factual basis to justify judicial supervision of discovery. Nevertheless, the government stands ready to provide the Court, *ex parte*, with information that should assure it the government has not suppressed discoverable material.

I.    **THE MOTIONS' FACTUAL ALLEGATIONS LACK SUPPORT**

The constitutional violations alleged by the Motions boil down to a handful of conclusions that are both unsupported and immaterial.[4] *See* MTD §§ II(A)(a)-(g). This opposition addresses each in turn.

A.  **CTJ Instructed Han to Change the Bills of Lading**

In 2016, the United States imposed a near-total embargo on North Korea. Prior to the embargo, the bills of lading listed a North Korean company with a Pyongyang address (Korea Ryugyong) as the consignee. After the embargo, the bills of lading began listing companies with Chinese addresses as consignees. The government offers this change as evidence that the defendant and his co-conspirators knew about sanctions and conspired to defeat them. The defendant is correct that the force of this evidence would be dampened by evidence that removing North Korea from the bills of lading was CTJ's idea. That is, if it were CTJ's idea, it might suggest that Winney was just following the lead of its business partner, taking CTJ's direction on how to avoid sanctions. Since the IEEPA conspiracy is not even alleged to have begun until 2016, the practical import of this evidence is almost nil. It does not matter much whether the defendant got the idea to change consignees after reading a news article or after talking to CTJ. The only way that this could impact the charges would be if the defendant could persuade the jury that Winney agreed to changing the bills of lading without understanding that the purpose was to evade sanctions or mislead banks. That is, even if there was evidence of this (and there is none, as the forthcoming affidavit will make clear), it would not be material.

---

[4] In outlining these conclusions, the Motions also demonstrate the Court's wisdom in carefully regulating the defendant's proposed lines of cross-examination. Across over 35 pages of "Background," the defendant gives the closing argument he wishes to give to the jury. These types of arguments are properly barred because they have nothing to do with the charged offenses and implicate all of the Rule 403 factors.

In sum, while the origin of the idea to change consignees is relevant, it is not particularly important to the government's proof.  On the other hand, it is *very* important to the defendant's strategy of painting CTJ (a farming cooperative in rural Argentina) as sophisticated criminal masterminds.  The argument has been raised in other motions and implicates the risk that supporting evidence will mislead the jury, waste time, and unfairly prejudice the government by asking (even impliedly) the jury to weigh CTJ's relative culpability.

That this "fact" is the primary support for the MTD (and numerous other discovery motions) reveals the weakness of the defendant's claims.  This "fact" is based on an offhand comment Erick Tarango made on a recorded phone call with the defendant.  That is, the *only* evidence of the defendant's lead claim (captured in a recorded conversation produced to the defendant before the last trial) is that an undercover agent, posing as a fake person making up a fake story about a fake bribe, said "Patricio [Lyons at CTJ] instructed James [Han at Winney] to change the bill of lading from going to North Korea to going to Dalian."  As the government wrote in its opposition to the defendant's prior motion on this subject, ECF No. 276, the defendant's theory is "contradicted by undersigned counsel's efforts to search for the information imagined by the Motion.  After a diligent search, the government is unaware of additional information supporting defendant's claim, apart from the recorded call that was previously disclosed."  ECF No. 292 at 1.

Since the only support for this "fact" is a recording produced before trial, the MTD does not allege *Brady* violations here.  Instead, the defendant claims to believe that this "fact" so definitively proves his theory that he alleges a *Napue* violation for the government's failure to "correct" testimony the government believes is already correct.

**B. Bartoletti Lied about CTJ's North Korea Business**

The MTD alleges that Bartoletti lied during interviews and testimony. The defendant does not allege a discovery violation because his conclusions are based on evidence the government produced to the defendant prior to trial. Instead, he alleges prosecutorial misconduct, claiming the government "knowingly sponsored [] false testimony in judicial proceedings, and sought to hide it." MTD at 46. This argument, again, is unfounded and based on no new information. The MTD boldly declares Mr. Bartoletti to be a perjurer (and the government malign for knowing this and sponsoring false testimony), but the defendant declined the opportunity to take such big swings in front of the jury. During Bartoletti's cross-examination, the defendant left unchallenged testimony that Bartoletti was surprised to learn, in 2019, that CTJ had done business with North Korea. 9/23/25 PM 38:19-39:9. In closing, the defendant's only knock on Bartoletti was that his knowledge of Winney's business was limited. 9/25/25 AM at 76 ("Mr. Bartoletti expressly stated, you know, my knowledge of what was going on with sales is limited"), 113 ("Mr. Bartoletti had limited knowledge of these [exclusive agency agreement] negotiations. Mr. Bartoletti had limited knowledge about a lot of stuff. He was the finance guy"), 114 ("I'm not here to tell you that Mr. Bartoletti is dishonest."). That is, the defendant—with access to all the relevant discovery, including FD-302s and prior grand jury testimony—did not seem to believe Bartoletti was obviously a perjurer, which makes his complaint that the government should be sanctioned for sponsoring his testimony all the more absurd. Again, since this claim is based on disclosed information, the defendant alleges a *Napue* violation, claiming the government violated his Due Process rights in some amorphous way simply by calling Bartoletti (as opposed to other CTJ personnel) as a witness at trial.

### C. CTJ Tried to Commit Bank Fraud

In 2021, an attorney for CTJ asked the DOJ to endorse a draft letter that misleadingly claimed "CTJ has never transacted business with customers in the DPRK." The government did not produce that letter prior to the first trial. It did produce, however, emails showing that both Accountant Dawson Anglin and the former AUSA properly declined the request. The MTD hypothesizes that, in failing to produce it before the first trial, the government "made the conscious choice to continue hiding the letter." MTD at 46. There is nothing to support this hypothesis.

First, the letter is not discoverable under Rule 16, Jencks, or *Giglio*. The defendant claims it is exculpatory because it is arguably derogatory information about CTJ's lawyer and, therefore, constitutes suppressed *Brady*. The government disagrees, as there is no meaningful difference between the information that CTJ made the request and the letter itself. There is also no practical method for the defendant to admit such evidence, which is another reason it was not material.[5] Second, there is no indication Bartoletti ever saw the letter or had knowledge of CTJ's request. Third, the letter is an advocacy piece, written by CTJ's attorney and, while certainly misleading, may not be technically false. Fourth, the letter is from two years after the conspiracy ended. And fifth, the government located and produced it to the defendant 12 days after he requested it.

Since it was produced, the MTD does not allege a discovery violation. Instead, the defendant takes this example of the government doing the right thing—resisting CTJ's request to endorse a misleading letter—and claims that it "vividly and irrefutable illustrated the full extent of

---

[5] Although materiality is required to find a *Brady* violation, DOJ policy does not permit prosecutors to withhold exculpatory evidence on materiality grounds. By arguing that the evidence was not material, the government does not concede that it was exculpatory. That is, the prior team's decision to withhold the letter was consistent with both the law and DOJ policy.

the government's willful blindness to CTJ's criminality, and its willingness to look the other way at even the most egregious conduct in order to win Mr. Jin's conviction."  MTD at 46-47.

### D. The Government Falsely Attributed Carbuncle and Fully Max Payments to Winney

This allegation features another example of the government doing the right thing and the defendant playing "heads I win, tails you lose."  The MTD correctly claims that the government falsely attributed payments from two North Korean front companies—Carbuncle and Fully Max— to Winney, but this error was corrected in time for trial.  It is true that the error made its way into court documents, including the Indictment.  The defendant claims this mistake was the product of government eagerness to pin all of CTJ's North Korea transactions on Winney.  It appears more likely that the mistake was due to the government wrongly assuming that CTJ only produced Winney-related records when, it turns out, the production also included records related to CTJ's business with a company called Xin Xing, which also did business with North Korea.[6]  In any event, the mistake was immaterial—the Carbuncle and Fully Max payments summed to $593,370, or a little over 1% of the roughly $42M the government claims CTJ was paid for its tobacco sales to Winney.  The defendant does not claim otherwise; he does not allege any prejudice from this error.

The defendant not only overlooks the innocent explanation for the immaterial error, but also objects to the government *correcting* it, claiming the erroneously attributed payments were "surreptitiously removed" from the trial exhibit.  MTD at 48.  Nor did the defendant notify the

---

[6] The mistake was especially easy to make because both Carbuncle and Fully Max were associated with DHID, which is a sanctioned North Korean front company that paid Winney roughly $10.5M. The CTJ production does not appear to include all of its Xin Xing records; it appears that these few records were inadvertently produced by CTJ.

current team of this error or raise it before filing the MTD.[7]  Beyond not raising this, the defendant appears to complain that the government has not sought a superseding indictment to correct the error.  MTD at 37.  This is especially disappointing considering the discussion between counsel about amending the indictment.  The government asked if the defendant had a view regarding amending the indictment to expand the date range of the conspiracy (in light of jury questions about it during the last trial).  The defendant did not take a position, and the government did not move to amend or supersede.  During these discussions, the defendant did not raise the Carbuncle/Fully Max issue or any other potential falsities in the indictment.  To the extent the defendant moves to strike erroneous references, the government will not object.  The fact that he has neither so moved nor raised this with counsel suggests he understands its immateriality.

### E.  Bartoletti Lied in the Grand and Petit Juries

The defendant takes issue with Bartoletti's descriptions of CTJ's negotiation of an exclusive agency agreement with Winney—the agreement he declared Bartoletti "had limited knowledge of" during his closing argument.  Having wisely chosen not to squander his credibility with the jury by cross-examining Bartoletti about this, he complains that the government's failure to do so was a *Napue* violation.

### F.  Other Claims

The MTD also claims the government suppressed "errors in HSI's reporting of the undercover operation" and "allowed Bartoletti to misrepresent CTJ's cooperation agreement." MTD at 51.  The first is another example of Anglin detecting an error, alerting the prosecutor, and the government remedying it.  The government produced an email where Anglin said "I sent an e-

---

[7] Upon just realizing this issue, the government will have to correct a proposed trial exhibit that erroneously includes Carbuncle and Fully Max.

mail to HSI today to get clarification on a part in their UC meeting write up that I think was written incorrectly." ECF No. 308-44 at 2. The defendant theorizes that if Anglin expressed an opinion that something "was written incorrectly," it must be *Brady*.[8] It is true the government did not produce Anglin's emails to HSI identifying what he thought was written incorrectly. That is because they are not *Brady*, Jencks, or otherwise discoverable. To the extent the Court believes it would be helpful in any ruling denying the Motions (and the recently filed ECF No. 312), the government will make the documents available for *in camera* inspection. That said, the government does not believe there is a basis for such judicial oversight of the government's discovery obligations. The Court has already conducted *in camera* review of Anglin's Jencks and agreed that the government's redactions were appropriate. ECF No. 194. Simply put, there is no evidence that even suggests Anglin's emails about this topic are discoverable.

Finally, the MTD complains that Bartoletti did not "mention the fact that CTJ tried to coopt the government into lying to banks on its behalf," and that this "misleading omission is enough to violate *Napue*." MTD at 51. The defendant's citation for this proposition explains its narrowness: misleading omissions can offend *Napue* if "the effect of the witness's truthful answer was to falsely deny what they were being asked—whether a deal had been struck with the prosecution. For example, the testimony of a witness who asserts that no 'case' is pending against him and that his testimony is 'voluntary'—when in fact he had been promised immunity." *Cockrum by Welch v. Johnson*, 934 F. Supp. 1417, 1435 (E.D. Tex. 1996). This exception does not apply here. The defendant does not claim to have any basis that Bartoletti knew about CTJ's lawyer's efforts to get the government to send the letter in question. Putting aside whether Bartoletti even knew about the letter, the defendant cannot identify any testimony that even arguably compares to the examples

---

[8] The defendant recently claimed Anglin's response is also Jencks. ECF No. 312 at 2.

in *Cockrum*.  Importantly, Bartoletti did not have any type of immunity (unless you consider the safe passage letter) and testified that he was never concerned about being prosecuted.

## II.    THE MOTIONS' PROPOSED REMEDIES ARE UNSUPPORTED BY LAW

In the MTS, the defendant essentially demands a show cause hearing, where prosecutors would be required to 1) detail how they went about discharging their discovery obligations, 2) offer their legal analysis regarding the defendant's various discovery theories, and 3) "identify evidence that it has deleted or otherwise destroyed."  MTS at 1.  Beyond failing to establish a factual predicate that justifies such an extreme remedy, the MTS cites no legal authority for granting it.  This is not new.  Shortly after undersigned counsel entered appearances in the case, the defendant similarly asked the Court to intervene in the discovery process.  *See* ECF No. 267. In opposition, the government noted that "[t]he Motion cites a dozen cases about the government's discovery obligations, but none that support the requested relief, which asks the Court to direct the government *how* to discharge its discovery obligations."  ECF No. 274.  That motion was denied. ECF No. 315.  The government does not dispute the Court's authority to appropriately engage in discovery disputes.  The government merely notes that the defendant has failed to cite any cases where analogous facts have justified such intervention.

The MTD, on the other hand, is replete with relevant authority.  It cites a lot of cases but does not explain them.  Reading the defendant's cases (only one which features a dismissal that was not reversed) makes plain that the facts here are not even remotely comparable.

In *United States v. Bundy*, the court noted "Dismissal for a due-process violation requires the government's conduct to be so grossly shocking and outrageous as to violate the universal sense of justice.  The due process argument is usually raised in situations where law enforcement conduct involves extreme physical or mental brutality or where the crime is manufactured by the

government from whole cloth."  968 F.3d 1019, 1031 (9th Cir. 2020) (cleaned up).  The Ninth Circuit found no abuse of discretion in dismissing the indictment where the district court found, after numerous hearings following repeated failures to produce exculpatory material before trial, that *Brady* was violated.  *Id.* at 1026-28, 1031 ("the government withheld key evidence favorable to the defense until after trial was underway.").  *Bundy* was about an armed standoff between the Bureau of Land Management and Cliven Bundy, his sons, and their followers; the suppressed evidence was key because it undermined the government's claim that the defendant lied about being surrounded by snipers as a ploy to gather armed supporters.  *Id.* at 1032.  The government failed to produce, *inter alia*, FD-302s documenting heavily armed officers present around the Bundy property (including one in a "sniper" position) and log from the Tactical Operations Center, which included an entry about "snipers inserted."  *Id.* at 1033-35.  This evidence was produced long after the government insisted there were no snipers at trial and "even *removed a testifying defendant from the stand* because he made several references to snipers."  *Id.* (emphasis added). The facts in *Bundy*, where indisputably exculpatory material was disclosed well after trial began, do not compare favorably to the defendant, who only theorizes that *Brady* evidence exists about marginally relevant topics, unmoored to specific defenses and only vaguely supportive of his broad strategy of generally attacking the investigation.

His other D.D.C. and appellate cases are similarly unavailing: *Sutton* (D.D.C.) (denying motions for arrest of judgement and new trial), *Slough* (D.D.C.) (denying motion to dismiss), *Rivera-Rivera* (1st Cir.) (affirming denial of motion to dismiss for alleged *Brady* violations when prosecution produced exculpatory material on the eve of trial), *Wright* (3d Cir.) (reversing the district court's dismissal following two mistrials), *Darden* (denying appeal related to alleged grand jury misconduct), *Shelly* (reversing the district court's entry of judgment of acquittal after finding

the prosecutor violated an *in limine* ruling), and *Fernandez* (affirming denial of motion to dismiss for outrageous government conduct). The most comparable case is probably *Fernandez*, where "Appellants claim that the government engaged in outrageous conduct" by using a cooperator (Turscak) "as a confidential informant even as he continued to engage in illegal conduct" and discussed conspiring to murder a co-defendant (Martinez) with other gang members. 388 F.3d 1199, 1238-39 (9th Cir. 2004). The government was aware that Turscak spoke about conspiring to murder Martinez with other gang members, and there even appears to have been some evidence (but not enough to persuade the district court) that he attempted to kill Martinez. *Id.* Still, the Ninth Circuit found the government "was, at worst, negligent in its handling of Turscak as an informant." *Id.* Whatever complaints the defendant has about the government's dealings with Bartoletti and CTJ, they do not even rise to the "at worst, negligent" handling of the informant in *Fernandez*. In sum, the legal authority cited in the MTD collectively support the propositions that 1) district courts rarely grant the relief that defendant seeks, 2) when they do, they are often reversed, and 3) even assuming the MTD's allegations are all true, the defendant would not meet the standard.

### III.   THE FRIVOLOUS MOTIONS MUST STOP

After presiding over a trial plagued by disorder because of the need for last-minute briefing and evidentiary hearings, the Court set a scheduling Order to ensure the re-trial would avoid the same fate. ECF No. 270. This schedule, in addition to the fact that the Court had already written numerous Orders that would remain law of the case, *see* ECF No. 271, appeared to bring a sense of certainty to the trial and justified continuing it to March. Tr 1/15/26 ("Reasonable continuances will help ensure adequate trial preparation and, frankly, decisions made in advance so that the case proceeds with everybody knowing as much as possible what the decisions are."). The government

has noted it plans to present a nearly identical case. The defendant, who called no witnesses and admitted only a handful of exhibits in the last trial, has subpoenaed over a dozen witnesses and has hundreds of marked exhibits. Preserving flexibility is important if you go second (and hopefully he will file the *ex parte* supplement to his trial brief so that at least the Court is aware of his plans), but there is no justification for the steady drip of discovery motions.

This is a complex and document intensive case. To resolve it, the Court has called for a special panel of jurors who are available to sit for four weeks. To aid in that jury's understanding of the evidence (and avoid them having to sit in the jury room), the Court should reasonably intervene to ensure an organized and streamlined presentation of evidence that is not interrupted by last-minute litigation over issues that could have been raised in advance. Just yesterday, the defendant filed an expert witness disclosure. ECF No. 313. The Court ordered the government to respond by noon on Monday. Minute Order (Mar. 12, 2026). Federal Rule of Criminal Procedure 16(b)(1)(C)(ii) provides that "The court, by order or local rule, must set a time for the defendant to make the defendant's [expert] disclosures. The time must be sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence." The Court previously ordered expert disclosures in March in advance of the September 2025 trial. ECF No. 36. It is true that the scheduling order for the retrial, ECF No. 270, did not provide a deadline for expert disclosures, but that is because no party indicated that it would call additional experts. The defendant's late disclosure of an expert prejudices the government by requiring the government to respond quickly (and certainly before the government could reasonably be expected to do background research on the expert necessary to mount a potential *Daubert* challenge) during the leadup to trial.

The government has already had to ask the Court for an extension for a legally substantive filing due today (proposed jury instructions) because of the need to respond to these late-filed Motions. The defendant's intention, voiced both at the hearing yesterday and in ECF No. 311, to continue filing discovery motions and to call for discovery hearings throughout trial, appears calculated to prevent the government from effectively preparing for trial. This conclusion is especially evident when the defendant's motions are based on information that was available to him before the first trial. The government, the jury, and the Court will benefit from the imposition of reasonable restrictions on late-filed motions, including a requirement that the defendant show cause for the late filing before ordering the government to respond.

## IV.    CONCLUSION

The Court should deny the Motions.

The MTC seeks the same remedies as the defendant's previously denied discovery motions and is based on similar facts. Those facts do not justify the Court's intervention in the discovery process, and the government expects the forthcoming affidavit of Special Agent Tarango will further assure the Court that the government understands and takes seriously its discovery obligations. Across all of the defendant's discovery motions, he cites many cases that define what is or is not discoverable. He does not, however, cite a single case that suggests the Court must essentially hold a show cause hearing to investigate the government's discovery decisions, nor does he cite authority for his proposition that criminal defendants are essentially entitled to send interrogatories to the government.

The MTD is full of rhetorical flourish, but it does not even allege misconduct that comes close to meeting the standard set in the *Bundy* case, which is the only case it cites of a similar motion being sustained on appeal. The Court should also consider that rhetorical flourish as it

considers the defendant's pending motions to reconsider the Court's prior Rule 403 rulings denying his ability to introduce evidence that generally attacks the government and does not relate to the charged offenses.

Finally, the government encourages the Court to impose reasonable restrictions that prevent the defendant from using late filed motions as a trial tactic while still protecting his constitutional rights.  Having given the parties months to prepare for trial, and having agreed to a scheduling order that was calculated to ensure disputes were settled in advance, it would be a shame if the parties, the jury, and the Court were subjected to the same chaos that impacted the last trial.  The last trial ended with the worst possible outcome—a hung jury.  The government believes that an appropriate order will serve to improve both the presentation of evidence at trial and civility between the parties, both of which will increase the odds the jury will reach a verdict, one way or another, in the upcoming re-trial.

Respectfully submitted,

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL
FOR NATIONAL SECURITY

By:    */s/ Christopher Magnani*
Christopher Magnani (MD 1512160075)
Eli Ross (IL 6321411)
Trial Attorneys
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
Telephone: (202) 353-9261
Christopher.Magnani@usdoj.gov