**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No.: 23-CR-91-02 (CKK)** |
| | **:** | |
| **JIN GUANGHUA, et al.,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

**United States's Trial Brief**

The United States respectfully submits this memorandum in advance of the trial set to begin on March 24, 2026. This is a re-trial after the previous trial resulted in a hung jury. The government built its exhibit list, ECF No. 282, off the exhibit list from the prior trial and plans to present roughly the same evidence. The exhibit list references the old exhibit numbers for the convenience of the defendant and the Court, making it easy to identify "new" material. This memorandum proceeds by outlining the evidence in the order the government plans to present it to give the defendant and the Court advance notice in the hope of resolving disputes ahead of time.

I.      **JURY SELECTION AND PRELIMINARY INSTRUCTIONS**

The parties have yet to confer on voir dire. However, the government has reviewed the voir dire from the last trial and anticipates proposing only modest and non-controversial changes, if any. The government is unaware of any proposed defense changes.

Jury selection took approximately three days during the last trial, occurring on September 11, 12, and 15. The jury was not instructed until September 16. Since the re-trial begins during a three-day week, the parties proposed delaying the start of evidence until Monday, March 30. The government expects to select, impanel, charge, and give openings to the jury between March 24 and March 26, before discharging the jury until the following Monday, March 30.

## II.    OPENING STATEMENTS

### A.  The Government's

The government's opening statement will likely be supported by PowerPoint, which it will share with the Court and the defendant in advance.  During the September trial, there was a dispute regarding whether the government could preview exhibits to which the defendant objected. 9/15/25 AM 139:7-152:14.  In addition to previewing exhibits, the government may also display illustrative aids, which may be shown to the jury subject to a modified Rule 403 analysis.  *See* Rule 107(a).[1]

The government's opening statement will likely mention that the United States imposed sanctions on North Korea to prevent it from funding its weapons programs.  To the extent "weapons of mass destruction" are mentioned, it will be limited to explaining that FTB and KKBC were individually sanctioned under sanctions targeting WMD proliferators.  In short, the government will comply with the relevant Order on opening statements.  *See* ECF No. 198.

### B.  The Defendant's

During the previous trial, the defendant's opening statement began by referencing the defendant's wife and children.  9/16/25 AM at 148:14-15.  The government objects to him doing so again.  Counsel may not testify in opening, which is why lawyers are only permitted to reference facts they have a good faith basis to believe will be admitted at trial.  Putting aside whether such evidence would be excludable under Rules 402 or 403, defense counsel does not have a good faith basis that he will even offer such evidence.  The government raised this with the defendant, who

---

[1] Illustrative aids may be presented when "the aid's utility in assisting comprehension is not substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time."  Rule 107(a).  Illustrative aids are not evidence.  Rule 107(b). They may only be used during jury deliberations if the parties agree or "the court, for good cause, orders otherwise."  *Id.*

responded "we believe that the fact that he lived with wife and children is relevant to the email searches, since the evidence only showed that a particular account performed certain searches or accessed certain web articles, the existence of third parties that could have performed these acts in Mr. Jin's place would tend to diminish the probative value of the government's evidence." The government agrees that this is an appropriate basis for the defendant to introduce evidence that he lived with his family. However, to ensure the defendant actually intends to use this evidence for this proper purpose—to suggest that the defendant's wife or "two young daughters" conducted the web searches on sanctions—the Court should require the defendant to say so in opening. That is, the defendant should not be permitted to proffer a facially acceptable basis for admission out of the jury's earshot but then use the "evidence" only for the improper purpose of garnering sympathy for the defendant.

Second, to the extent that the defendant has a good faith basis to admit this evidence, he should be required to explain that to the jury by, for example, saying that he believes his client will testify. In conferring with the defendant, he said "we believe that at least some of the agents who investigated this case should be aware of Mr. Jin's family background, so even if he does not testify, that evidence could be elicited on cross-examination." The government does not believe this constitutes a good faith basis that the defense will be able to admit this evidence. Similarly, the government wants to raise now that it does not believe the defendant even has a good faith basis to ask that question of any government witness. To the extent the defendant is planning to ask, e.g. "isn't it true the defendant lived at home with his wife and children?" he should have to clear it with the Court in advance and explain his basis for believing a specific witness will know the answer.[2]

_____

[2] He will also have to overcome the relevance hurdles discussed in the previous paragraph.

The defendant's opening in the last trial also featured objectionable remarks about UN sanctions. 9/16/25 AM at 158:15-160:6. This commentary was inconsistent with the Court's prior rulings on the relevance of UN sanctions. ECF No. 152 at 16-20 (denying defendant's motion to admit UN sanctions law). As the Court wrote in its Order, "the Court shall not admit Jin's proffered evidence of foreign law unless Jin first presents evidence that he was aware of the foreign laws at issue at the time his alleged conduct took place." *Id.* at 17. The defendant's commentary about UN sanctions were not objected to during his opening but earned judicial rebuke immediately afterward. 9/16/25 AM at 166:19. In conferring with the defendant on the propriety of discussing UN sanctions, the defendant correctly points out that it may be impossible to sanitize the existence of UN sanctions from this trial. That said, the government objects to the defendant bringing focus on those sanctions, particularly by attempting to explain their legal nuances. Such evidence is out of bounds given the prior written Order, which the defendant has not challenged. *See* ECF No. 271 ("The Court's prior written rulings are law of the case. If either party wants the Court to reconsider a prior written ruling . . . that party must file a motion for reconsideration.").

## III.    GOVERNMENT'S CASE-IN-CHIEF

The government plans on calling its witnesses in roughly the order presented here.[3]

### A. Emily Williams (OFAC Enforcement)

Emily Williams is a Senior Enforcement Officer with the U.S. Department of Treasury Office of Foreign Assets Control. Like the first trial, the government will offer Ms. Williams as an expert on the U.S. sanctions program and ask her to explain generally how a sanctions program

---

[3] The defendant has also subpoenaed all of the government's witnesses. To the extent the defendant can proffer a proper basis to call any of these witnesses in his case, the government will note where known scheduling conflicts may justify the defendant calling such witnesses during the government's case-in-chief.

works. (*See* Expert Notice, ECF No. 41). She will walk through the relevant statutes and executive orders in place that provide OFAC the authority to issue sanctions against individuals, entities, and countries, and promulgate regulations in that regard. She will discuss prohibitions, exemptions, and authorizations, including licenses, involved in a sanctions program. Ms. Williams will also discuss the U.S. sanctions program in place against North Korea since 2009. To do so, she will explain the various statutes and Executive Orders relevant to North Korea and how those statutes and Executive Orders have empowered the Secretary of Treasury to promulgate the North Korea Sanctions Regulations.

On her direct examination, the government will offer exhibits 500-505 into evidence. These exhibits show official OFAC designations for Specially Designated Nationals for entities and individuals relevant to this prosecution, including the authority by which those designations were made. These exhibits were admitted in the last trial without objection. The government may also move to admit a OFAC license history check, exhibit 506, during Ms. Williams' direct examination, which shows that OFAC never granted the defendant, or his entities, a license relevant to his business transactions with North Korea. The government does not intend on offering Exhibits 507-513.

In the previous trial, over the government's objection, the defense attempted to use the North Korean Sanctions Regulations and Weapons of Mass Destruction Program Regulations as a demonstrative exhibit with Ms. Williams. The Court prohibited the defense from doing so, but, instead, would permit the defense to refresh Ms. Williams recollection, if necessary. Trial Tr. 9/24/25 AM at 85:11. Additionally, while the defense did not explore UN sanctions with Ms. Williams at the first trial, the government would also object to any line of questions involving UN

sanctions with Ms. Williams for the reasons articulated above, specifically the Court's prior ruling. ECF No. 152 at 16-20 (denying defendant's motion to admit UN sanctions law).

    *i.*       *Illustrative Aids (Rule 107)*

The government plans on using an illustrative aid during Williams's testimony.  Exhibit 64. This illustrative aid will assist Ms. Williams walk through the various sanctions program in place against North Korea.  The illustrative aid references, and Ms. Williams will discuss, Executive Order 13382 "Blocking Property of *Weapons of Mass Destruction* and Proliferators and Their Supporters" and the "*Weapons of Mass Destruction* Proliferators Sanctions Regulations (WMDPSR)." (emphasis added).  However, in line with the Court's prior ruling, the Government will only elicit testimony involving, "[G]eneral descriptions for the impetus of these executive orders."  *See* ECF No. 171 at 9.  The government will not, "[E]licit testimony about the specific details of those weapons programs, including specific weapons tests or other specific actions in furtherance of weapons programs." *Id.*

Illustrative aids are only permitted to be given to the jury if the parties agree or the Court finds "good cause."  Rule 107(b).  The parties do not agree so the jury could only access the aids if the Court finds "good cause."  In a complex trial about a multi-layered sanctions regime that changed over time, the government believes there is "good cause" to permit the jury to use Exhibit 64 during its deliberations.  The defendant disagrees.

The government is not aware of relevant authority on what determines "good cause," but the Committee Notes on for this new rule are instructive.  The notes reveal a desire to distinguish between illustrative aids, which are intended to aid the jury in *understanding* evidence, and substantive evidence, which is offered to *prove* a disputed fact.  Therefore, the notes command that, when courts allow such aids to be used in deliberations, they "must upon request instruct the

jury that the illustrative aid is not evidence and cannot be considered as proof of any fact." The notes explain two concerns related to giving illustrative aids to the jury (apart from the general concerns already addressed in Rule 107(a), which provide the gating requirement for even showing aids at all). The first concern is that the "aid might appear to be substantive evidence of a disputed event." The second is "the risk that the jury may unduly emphasize the testimony of a witness with whom it was used, or otherwise misinterpret the import, usefulness, and purpose of the illustrative aid." The government believes there is "good cause" to provide illustrative aids to the jury if both of the Advisory Committee's concerns are accommodated. The government submits that illustrative aids will not implicate those concerns when: 1) in addition to the required instruction, they are additionally marked as, for example "Illustrative Aid – Not Evidence," or something similar and 2) the illustrative aids does not relate to a disputed facts. Under these circumstances, the government believes it would be appropriate (and certainly not an abuse of discretion) for the Court to find "good cause" to present illustrative aids to the jury for their deliberations.

### B. Erick Tarango (Undercover Agent)

Erick Tarango is a Special Agent at the Department of Homeland Security's Homeland Security Investigations and was one of the undercover agents who worked on this case. As in the last trial, Tarango will generally explain undercover law enforcement operations and his involvement in this case. He will also authenticate and admit several undercover exhibits.

### i.    *Preliminary Issues*

The government is calling Tarango at the beginning of the government's case-in-chief because he has an important personal conflict that requires him to return to Colorado on Tuesday,

March 31.[4]  Due to political controversy about and potential jury bias toward the Department of Homeland Security, the government will not identify Tarango's employing agency during direct examination (and will ask the Court to preclude the defendant from doing so during cross-examination under Rules 402 and 403).  The defendant objects to this proposal: "The thoroughness and integrity of the UC operation is an important defense issue, and we don't want to dance around the identity of the agency that conducted this operation on cross-examination."  By objecting to this proposal, the defendant reveals there is no limit to his desire to attack the government, including by relying on improper biases jurors may harbor (the types of biases that would justify for-cause strikes during jury selection).

    *ii.*      *Undercover Exhibits*

During scheduling-related discussions with the defendant, the government indicated it would admit the following exhibits through Tarango (previous exhibit number in parentheses):

- Exhibit 401/401_T (405/405T) – May 13, 2019 Second Call between Gonzalez and Han;

- Exhibit 407 (502) – June 11, 2019 Email from Han to Gonzalez (No Subject); and

- Exhibit 408 (512) – June 21, 2019 Email from Han to Gonzalez (Subject: VISIT).

Exhibit 401 is important to introduce the relationship between Tarango (playing the role of Roberto Gonzalez) and Han; Exhibit 407 ties the defendant to his gmail account; and Exhibit 408 corroborates Tarango's testimony that he met the defendant in person, which serves as his basis for identifying the defendant in court.  Exhibits 401(_T) and 502 were admitted at the last trial.

---

[4] This was addressed at a hearing yesterday.  The transcript is not available, but the government estimated about 30 minutes of direct examination and the defendant did not express concern about concluding cross-examination by March 31.  The government also believes that the defense is amenable to the Court's suggest that, to the extent the defendant needs to call Tarango in their case-in-chief, they may do so immediately after the government passes the witness (reserving Rule 29 rights).

*iii.*      *Exhibits 404 and 404_T*

The government is awaiting an *in limine* ruling from the Court about whether its present intention to admit a May 21, 2019, recorded call with the defendant will "open the door" to the defendant's desire to introduce a broad array of other recorded calls, which the Court previously deemed inadmissible.  *See* ECF Nos. 192 & 200.

In this call, the defendant repeatedly and specifically denied doing business with North Korea to a person whom he believed was a representative of CTJ.[5]  The fact that, in May 2019, the defendant believed it was important to deny having historically sent CTJ's tobacco to North Korea is probative of at least two important facts.  First, that the defendant knew transacting with North Korea was illegal.  Second, that the defendant believed Winney had to hide from CTJ that it was ultimately sending its tobacco to North Korea.

The first fact is classic consciousness of guilt evidence.  The fact these statements were made 51 days after the end of the conspiracy makes this evidence less relevant than it would have been if such statements were made during the course of the conspiracy, which continued until "in or around March 2019."  *See* Sept. 18, 2025 Memorandum Opinion & Order, ECF No. 210 at 4.[6]

---

[5] *See* Exhibit 404_T, ECF No. 301-5, at pp. 3 ("We don't do business with North Korea"), 5 ("That's [the fact that bills of lading mentioned North Korean buyers] not true"), 6 ("our goods were sent to a third party, a domestic customer of ours.  We don't know who they sell to"), 8-9 ("the payment has nothing to do with North Korea"), 9 ("No, the bank is just guessing. Let me interrupt you. The bank is just guessing. We haven't had any trade with North Korea since the UN sanctions have been implemented"), 11 ("we currently don't have any transactions with North Korea. All our contracts and documents have been provided to the bank, and they are all genuine"), 12 ("I need to reiterate that it might have happened 10 years ago, but ever since the UN sanctions on North Korea, we haven't done any business with them"), 21 ("10 years ago, we weren't directly involved with North Korea. It might have been an intermediate company that had something to do with them").

[6] That Order also noted that the indictment charged the defendant with unlawful conduct through September 2019 and concluded, in the context of admitting emails, that the passage of time goes more to weight than admissibility.  *Id.* at 5.

Nevertheless, the defendant's lies are still highly probative of the most disputed issue in this trial, as it is unlikely that the defendant, after sending tobacco to North Korea for a decade, only learned of the illegality of his business within those 51 days. The second fact is important in rebutting the defendant's efforts to paint CTJ as the flagrant sanctions violator that cut a deal with the government and cannot be trusted. For example, the defendant has repeatedly theorized (based on an off-hand comment an undercover agent made in his undercover capacity) that it was CTJ's idea to change the consignees on their bills of lading. *See, e.g.*, ECF No. 276, 286, 309. The strength of this proposed line of attack is substantially undercut by the fact that the defendant believed, even in May 2019, that he had to lie *to CTJ* about having delivered their tobacco to North Korea for years.

The defendant has argued that his proposed undercover exhibits are required to show "context" for the defendant's lies in Exhibit 404. Since this was the very first interaction between the defendant and the undercover, the defendant has a tough row to hoe. Context arguments would be more persuasive if the defendant sought to introduce things that pre-dated the government's evidence. It is hard to imagine how, for example, things that happened in the July meeting provide necessary context for this May phone call where the defendant consistently lied about his historical North Korea business.

### iv. Translations (Rule 104(b))

The defendant speaks Chinese in Exhibit 404, which is an audio recording. Exhibit 404_T is a transcript of that recording with an associated translation of the Chinese portions. The admissibility of any translated exhibits depends on the accuracy of the translations. The government will not try to establish accuracy by admitting testimonial certificates of accuracy. *See* ECF No. 176. The government intends on establishing the accuracy of the translations either

through live testimony or stipulation.  At present, the parties have been unable to agree on a stipulation regarding the translations, which were admitted without objection at the last trial.[7]

The government hopes to call the translators early to establish the accuracy of the translated exhibits the government will admit later in the trial.  That said, due to scheduling challenges, including Tarango's need to return to Colorado on Tuesday, he will likely testify before any translator.

When the relevance of evidence depends on a fact, the "court may admit the proposed evidence on the condition that the proof [of the fact] be introduced later."  Rule 104(b).  Therefore, if the Court rules that Exhibit 404 may be admitted without "opening the door," the government will ask that the corresponding translation, Exhibit 404_T, be admitted under Rule 104(b).  The government will be sure that the subsequent translator witnesses testify that Exhibit 404_T is an accurate translation.

### C.  Matthew Charles (Supervisory Special Agent)

Matthew Charles is a Supervisory Special Agent in the FBI's Washington Field Office. Charles has previously worked on investigations involving North Korea, but he has had no prior involvement in this case.  Charles will describe how the FBI conducts North Korea investigations generally before describing the evidence obtained in this case, staffing the role filled by Special Agents Benjamin Whitley and Kate Zimmerly at the last trial.[8]  Charles's descriptions of North

---

[7] The defendant did not cross-examine the translators at the last trial, 9/17/25 AM at 21:25; 9/17/25 PM at 107:1, except to attempt to have the Chinese translator introduce information relevant to the defendant's case-in-chief.  9/25/25 AM at 130:18-132:13.  The government would likely lodge similar objections to any future attempt to introduce defense evidence through government translators.  The defendant has the right to insist the government call live witnesses, but the government will seek to ensure that right is not abused to obtain free translation services from the government's witnesses.

[8] The change in presenters is due in part to the government's desire to use a local witness, as Special Agents Whitley and Zimmerly are based in Texas and Colorado, respectively.

Korea investigations will help the jury understand the limitations of such investigations by explaining, for example, that the FBI cannot conduct interviews, searches, or arrests in North Korea or China. He will explain the importance of Electronic Communications Privacy Act ("ECPA") warrants (and their limitations, including the inability to search North Korean and Chinese accounts) and how that process necessarily builds document intensive cases. He will then introduce and explain the documents obtained in this case.[9]

Charles will be the primary (if not sole) sponsor of the evidence in the 100 series of the government's exhibit list. *See* ECF No. 282. This evidence was obtained from ECPA search warrants of the defendants' various email and iCloud accounts. The parties agree that the evidence is authentic, and the government has promised to introduce it through a law enforcement witness. *See* Evidentiary Stipulation #5, ECF No. 293. Charles will also discuss some of the CTJ records in the 200 series, admitting them either under 18 U.S.C. § 3505 (motion pending) or Rule 104(b). Charles may also introduce other evidence subject to stipulations, including the identification documents of the defendants (Evidentiary Stipulation #6, ECF No. 293), maps of the relevant places (Evidentiary Stipulation #2, ECF No. 277), Winney business records (*id.*), ECPA subscriber records (*id.*), Sim's search/browsing history (*id.*), bank records (First Evidentiary Stipulation, ECF No. 264), and/or summaries (Evidentiary Stipulations #3 and #4, ECF No. 293).

    i.    *Rule 1006*

Charles will offer exhibits that summarize the search/browsing history of defendants Jin (Exhibit 41) and Sim (Exhibit 42). The voluminous records summarized by Exhibits 41 and 42 are voluminous. Jin's translated search history is 82 pages. Exhibit 117_T. Sim's is 745 pages.

---

[9] Many of these documents have associated translations. The government plans to call the translators before Charles but will ask the Court to admit the translations (which are the same as the ones used in the last trial) under Rule 104(b) if the translator testimony is delayed.

Exhibit 185. The parties dispute the appropriateness of Exhibits 41 and 42 because they are *selective* summaries. That is, they do not summarize every search in their corresponding underlying records. Given the prior agreement to redact pornographic search history to admit the searched in the last trial, it seems the defendant accepts that summaries do not have to be complete. That said, the defendant objects to these summaries and said he will raise it in his trial brief. The government notes that while summaries must be "accurate and nonprejudicial," there is no requirement that they be complete. *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014).[10] Culling out searches that are not relevant to issues in the case (like pornographic searches) does not render the summaries inaccurate or prejudicial. To the extent the defendant proposes additions to the summary, the government would agree to adding additional relevant searches currently excluded from Exhibits 41 and 42.

### D. Bank Witnesses[11]

The government will call three bank witness in this trial, each offering similar testimony concerning how their respective banks ensure they comply with anti-money laundering, "know your customer" ("KYC"), and sanctions rules. They will discuss the risks of violating sanctions and doing business with the DPRK, including reputational risk, and financial and criminal exposure. Additionally, they will testify about their internal policy reasons for not doing business

---

[10] Charles did not create these summaries but, in order to authenticate them, he will compare their contents to the underlying records. Although *Fahnbulleh* says summaries "should" be introduced by the person who prepared them, this is not a requirement, as this "should" in *Fahnbulleh* follows four "musts," which outline the four elements for admitting a Rule 1006 summary.

[11] The bank witnesses are from out of town and will not have particularly long or controversial testimony. For these reasons, the government will call them throughout the trial during times that accommodate the witnesses' schedule and the available blocks of time. That is, while we have otherwise organized this trial brief in the order we hope to call witnesses, we make no representations or even offer best estimates for when we might call these bank witnesses.

with the DPRK given the associated risks. Additionally, each bank witness will testify to distinct topics and exhibits as described below:

### i. Antje Self – J.P. Morgan Chase

Perhaps the shortest testimony of the three bank witness is Ms. Antje Self, the vice-president of Global Sanctions Operations for J.P. Morgan.  Ms. Self will offer a general overview of J.P. Morgan's sanctions compliance and how J.P. Morgan screens for transactions that may violate U.S. sanctions.  Specifically, Ms. Self will describe the additional inquiries J.P. Morgan will ask a remitting bank once a correspondent banking transaction is flagged as a potential sanctions violation.  After this colloquy, the government will admit exhibit 261, an email between co-conspirator Han and CTJ employee Patricio Lyons, where Mr. Han emails Mr. Lyons several questions similar to those J.P. Morgan would ask when a correspondent transaction is flagged for a sanctions violation.

### ii. Heather Epstein – Deutsche Bank ("DB")

The DB witness who testified at the last trial is no longer employed by the bank.  Instead, the government will call Heather Epstein, a Managing Director in DB's Anti-Financial Crime Department.  Ms. Epstein will describe correspondent banking and describe DB's role as a correspondent bank.  Ms. Epstein will also discuss DB's sanctions and compliance program and how DB filters for correspondent banking transactions that may violate U.S. sanctions.  In this regard, Ms. Epstein will describe DB's filtering program and how that program screens for individuals and entities that have been designated by OFAC.  By way of example, Ms. Epstein will walk the jury through DB's filtering program using several SDN's in this case (Korea Kwangson Banking Corporation, Foreign Trade Bank, and Dandong Honxiang Development Co. Ltd.) as an example.  Ms. Epstein will also discuss DB's anti-money laundering program. The government

will admit and use Exhibit 311, an Excel spreadsheet of DB's transactions, to help the jury understand how money flows through a correspondent banking transaction, including those that involve the defendant's company Winney.[12]

### iii. James Cousins – Standard Charter Bank ("SCB")

Mr. James Cousins is the head of U.S. Sanctions Management and the OFAC reporting team for SCB. He will offer the most in-depth testimony of all the bank witnesses, specific to SCB's anti-money laundering practices, sanctions compliance program – including the applicable screening protocols and "Know Your Customer" practices that SCB employs to combat sanctions violations – and SCB's practices regarding North Korea. As SCB was the correspondent bank used in the substantive IEEPA counts in the indictment (Indictment, Counts 3-6), the government will elicit testimony from Mr. Cousin's on the process of correspondent banking and the specific transactions at issue. To do so, the government will admit and reference Exhibit 325, an Excel spreadsheet of transactions records from SCB, which is admissible. *See* ECF No. 264. The government will also use government Exhibit 60 as an illustrative aid to help Mr. Cousins narrate the correspondent banking process to the jury. The government has not decided whether it will seek to provide this Rule 107 aid to the jury. Compared to the Emily Williams aid, this one is more of a classic "demonstrative" and is less objective.

### E. Chloe Huang (Undercover Agent)

Chloe Huang currently works at the Fish and Wildlife Service but she was formerly an HSI undercover agent who worked with Tarango. For the reasons described in Section B above, we plan on avoiding testimony that Huang worked for the Department of Homeland Security. As in

---

[12] The parties stipulated to the admissibility of bank records, including Exhibit 311. *See* First Evidentiary Stipulation, ECF No. 264,

the last trial, Huang will testify that she worked as Tarango's translator and business associate as part of the undercover operation. She will explain that she met the defendant in Argentina and will identify him in court. The defense did not object to this in-court identification in the first trial.

### F. Fernando Bartoletti (CTJ Business and Finance Manager)[13]

Fernando Bartoletti is the business and finance manager for CTJ and previously served in various accounting roles since starting with the company in 2004. Mr. Bartoletti will explain the structure and role of CTJ and will orient the jury to the "cut rag" tobacco process, from harvest, through export, to cigarette manufacturing. As part of this explanation, the government will use illustrative aids (Exhibits 63 and 65) to explain how bills of lading and export invoices are used in the shipping process.

Following a general exposition of CTJ and its business practices, Mr. Bartoletti will discuss the roles various banks – specifically Banco de Nacion Argentina and Banco Marco – play in their business. Mr. Bartoletti will also generally describe the business relationship between CTJ and Winney. Mr. Bartoletti will describe his interactions with the defendant and co-defendant Han in his role as the finance manager and will testify to the general billing and payment records between CTJ and Winney.

Mr. Bartoletti will then explain how he became involved in this case. He will explain what happened after CTJ learned that certain wires for the tobacco CTJ sold to Winney were frozen by the banks. He will walk the jury through the steps CTJ took in response to these freezes, including compiling records to provide to prosecutors in Washington D.C.

---

[13] Bartoletti is not subject to compulsory process because he lives in Argentina. He is appearing voluntarily but must return to Argentina on April 2. Depending on how quickly the trial moves (and what the Court decides regarding the admissibility of CTJ records under section 3505), the government may need to call Bartoletti earlier—perhaps even before Charles.

Following his testimony involving his participation in this case, like the last trial, Mr. Bartoletti will describe CTJ's accounting practices as applied to payments made by the Winney entities. To begin, the government will move to admit and walk Mr. Bartoletti through various accounting spreadsheets or "ledgers" to help the jury understand how CTJ kept records of the invoices, and outstanding balances, for the tobacco they sold to Winney. Specifically, the government will focus on Exhibit 238, previously admitted without objection, which shows payments to CTJ by non-Winney entities that were making payments on invoices for the tobacco CTJ sold to Winney.

Next, Mr. Bartoletti will explain the concerns banks raised in response to payments by entities that were not listed on export invoices and bills of lading as the purchasers of the tobacco. Mr. Bartoletti will discuss how Winney sought to justify these concerns and the paperwork Winney provided to CTJ, which CTJ in turn provided to the banks, to assuage concerns over this complicated payment structure. These "payment notices" submitted by co-defendant Han to CTJ attempted to clarify the discrepancy between the purchasers of the tobacco and the payors submitting the wires, which, as Mr. Bartoletti will explain, was an uncommon practice in his experience with the company and a cause of concern for the banks. These "payment notices" are currently listed as Exhibits 215.1, 215.2, 215.3, 215.4 215.5, 234, 244, 248, and 252.

In the first trial, the government admitted over 4,000 pages of CTJ records without objection by defense. Tr. 9/23/25 AM at 25:7-12. In the re-trial, the government has created separate exhibits for distinct documents and organized them chronologically in the "200 series." The only exception is Exhibit 299, which consists of 1,513 pages of CTJ records. The government does not plan to admit this exhibit but, pending the § 3505 motion, may ask Bartoletti to authenticate it. The first 1,513 pages of CTJ records comprise of the non-email production the

government received from CTJ (e.g., contracts, invoices, bills of lading, etc.).  Although we have endeavored to extract the relevant pages into new "200 series" exhibits, we are noticing Exhibit 299 in an abundance of caution in case we create new exhibits in the future.

### G. Dawson Anglin (Forensic Accountant)

Dawson Anglin's testimony will match the testimony he gave at the last trial.  Anglin is a forensic accountant and will explain the work he did analyzing the relevant bank and CTJ records.  That analysis will show the overall volume of relevant commerce and the defendant's estimated profits.  He will also testify to the two opinions he gave at the last trial: 1) that Winney continued shipping tobacco to North Korea through 2019 and 2) that North Korea used front companies to pay both Winney and CTJ for the tobacco.  These opinions will be supported by the fact that one of the defendant's employees emailed the defendant applications to open bank accounts at the sanctioned North Korean banks, FTB and KKBC.

The only notable change is the inclusion of numerous Rule 1006 summaries he created.  These consist of summaries of bank records (Exhibits 10-22 and 61), Winney records (30-31), records obtained from the ECPA warrants (43-45),[14] and CTJ records (50-55).  With the exception of Exhibit 61, all of the bank summaries are newly created.

### iii.    Summaries of Bank Records

Exhibits 10-19 are admissible per Evidentiary Stipulation #3.  ECF No. 293.  The parties dispute only the relevance of Exhibits 20-22.  *See* ECF No. 314.[15]  Exhibits 20-22 summarize wire

---

[14] Exhibit 41 and 42 have been discussed *supra* in § III(C)(i).  Exhibit 40 is a summary of emails that was admitted in the last trial as Exhibit 150A.  9/17/25 PM 11:8.  The government does not yet know if it will admit Exhibit 40 (prior Exhibit 150A).

[15] Given that Exhibits 20-22 are newly disputed, the government intends to add the underlying bank records to the exhibit list.  The underlying bank records for Exhibits 10-19 are already on the exhibit list and are admissible per the parties' First Evidentiary Stipulation.  ECF No. 264.

records involving defendants Jin and Qin.  On December 27, 2017, for example, defendant Qin wired $479,912 in a single day from a personal account in China to a personal account in the United Arab Emirates.  Defendant Jin transferred $3M from a personal account in China to a personal account in the UAE between November 29, 2017 and April 17, 2018 ($2.76M of this was transferred in just 36 days).  The summaries also include some other transfers, including from the United Kingdom to China and from China to an unknown location.[16]  On August 29, 2018, the defendant wired $1M from his personal account in UAE to another personal account in Australia.

Evidence of the defendant's extensive U.S. dollar wealth is relevant because it provides motive for the charged activities—personal profit.  During the first trial, the defendant strenuously objected to Anglin's profit analysis, even suggesting that Winney may have lost money because the available bank records show that Winney paid CTJ more than it received.  The defendant also tried to introduce evidence from a Winney spreadsheet listing employees' salaries, which showed that the defendant's salary was meager.[17]  This wire evidence suggest that, whatever his salary, the defendant's profits as the 50% owner of Winney were so significant that the jury might understand why the defendant was willing to take on the risks he did in selling product to North Korea.

Exhibit 61 is a summary that was introduced at the last trial as Exhibit 353.  This summarizes some of the information already summarized in Exhibit 12 but does so in a graphical format.  On its face, it appears to be more of a classic "demonstrative" exhibit because it uses a

---

[16] Some of the unknown destination transfers were sent from Jin to other people with the same surname and have notes that they were for tuition payments at American institutions.

[17] While preparing this filing, the government noticed that this untranslated exhibit is not on its exhibit list.  If the government adds it, it may either seek to obtain a translation before trial or, as in the last trial, ask the translator to testify about it.  The value of the exhibit is that it is another example that shows Winney was a large and well-organized company.  The monthly overtime report lists 34 distinct employees and tracks their hours and reason for overtime, as well as things like pension contributions, taxes, unemployment insurance, etc.

graph to visually demonstrate information (the dates of the first and last wires from each front company), but the government believes it qualifies as a Rule 1006 summary because it meets all of the requirements: it summarizes 1) voluminous records, 2) that are admissible, 3) available for inspection, and 4) the summary is non-prejudicial. *Fahnbulleh*, 752 F.3d at 479. In many cases, a visual representation might fail the fourth element, but here the visual representation is a graph of objective information. The graph is on a linear scale and is not distorted in any way.

### iv.    Summaries of Winney and CTJ Records

Exhibits 30, 31, and 50-55 are accurate summaries of various records. The parties dispute the admissibility of the underlying records but agree that, if the Court finds the underlying records admissible, these exhibits will be admissible under Rule 1006. *See* Evidentiary Stipulation #4, ECF No. 293. The defendant's objections to the CTJ records are well-briefed. The government understands the defendant's objection to the Winney records relates to his Fourth Amendment challenge to the warrant that obtained them.

### v.    Summaries of other Search Warrant Evidence

The government is unsure whether it will use Exhibits 43-45, which were previously admitted as Exhibits 351E, 354A, and 354B. Regardless of whether these qualify as Rule 1006 summaries, which was disputed at the prior trial, 9/18/25 PM at 50:23-24, they are helpful compilations that pull email evidence from different sources and assemble them by topic. For example, Exhibit 43 displays various documents that indicate the defendants' ownership of the relevant Winney entities with pages like this:



The government is not aware of any prohibition on admitting compilations like these. Admission satisfies the rules of evidence if the proponent can establish the requisite foundation for authentication, relevance, and non-hearsay. Doing so is especially simple here, when the exhibits are comprised of already admitted documents, *i.e.* documents for which the requisite foundation has already been established. For example, if Anglin testified that the image above was a compilation he made of documents that have already been deemed admissible, the government is unaware of any reason the defendant might object.

Second, there is the question about the inclusion of the red boxes or arrows that identify specific things in the documents. The page from Exhibit 43 above uses red boxes to show the defendant's name, signature, and company name across the various documents. Here is another example (from Exhibit 45), which uses an arrow:



The arrow is helpful because, in one page, which is part of a compilation of other relevant documents related to the same topic, it shows both the Korean handwritten text and the translation, which is on a separate exhibit.  The government is unaware of any legitimate basis to exclude such boxes and arrows when the person who added them can explain them on the stand and is subject to cross-examination.  It is not uncommon in street crime trials, for example, for witnesses to mark things on exhibits, like maps, in front of the jury.  Adding the boxes and arrows ahead of time is preferable both because it saves time at trial and also gives fuller notice to opposing counsel.

As the Court noted during the last trial, "I don't have a problem because if they were sitting here and marked it, we would allow them to have it go back as long as the witness had actually done it. So he has to adopt the markings."  9/18/25 PM at 50:18-21.

### IV.    THE DEFENDANT'S CASE-IN-CHIEF

### A. Defense Witnesses

On February 19, 2025, the defendant asked the government to accept service of 13 subpoenas for current or former government employees of the following agencies:

- FBI: Benjamin Whitley, Joy Gallante, Cody Rehrer, Elena Gresick, Nicholas Carlsen, Shawn Healy, **Matthew Charles**, and **Dawson Anglin**;

- DHS: Thomas Tamsi, Kate Zimmerly, **Chloe Huang**, and **Erick Tarango**; and

- OFAC: **Emily Williams**.[18]

In connection with the subpoenas, the defendant sent the government a *Touhy* letter and the government put the defendant in contact with the relevant officials at FBI, DHS, and OFAC. The defendant's letter does not describe what testimony he hopes to elicit from each witness. Instead, it says only that the testimony "would not require disclosure of classified information, sensitive investigative techniques, or the identify of confidential sources."

This is inadequate. *See* 28 C.F.R. 16.23(c) ("If oral testimony is sought by a demand in a case or matter in which the United States is a party, an affidavit, or, if that is not feasible, a statement by the party seeking the testimony or by the party's attorney setting forth a summary of the testimony sought must be furnished to the Department attorney handling the case or matter"); *cf. United States v. Bertoli,* 854 F. Supp. 975, 1080 (D.N.J. 1994) ("The right of compulsory process does not, therefore, entitle a defendant to subpoena witnesses whose testimony would be collateral, rather than material, to the issues in the case") (cleaned up); *see also United States v. North*, 910 F.2d 843, 890-91 (subpoena properly quashed where testimony sought would have been

---

[18] The government plans on calling the bolded witnesses and does not object to the defendant re-calling them during his case if necessary. Elena Gresick is not an anticipated witness but, as the case agent, will be in D.C. and available during the trial.

"unhelpful" to defense).  Oliver North appealed his conviction on certain counts, *inter alia*, because the court prevented him from subpoenaing President Ronald Reagan.  *North*, 910 F.2d at 888.  At trial, the district court asked North to file "a succinct particularized statement of facts defendant desires to elicit from President Reagan" *ex parte* and under seal.  *Id.*  After considering North's proffer and other evidence, the district court concluded there "has been no showing that President Reagan's appearance is necessary to assure Lt. Col. North a fair trial."  *Id.* at 889. Despite the extremely high profile and consequential nature of the circumstances in *North*, the D.C. Circuit's analysis was standard fare, starting from the principle that the defendant's constitutional right to call witnesses only extends to testimony that is "material and favorable" or "relevant and material" to the defense.  *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) and *Washington v. Texas*, 388 U.S. 14, 23 (1973), respectively).  Whether the defendant subpoenas the President or a dozen federal agents, the test is the same: guided by the appropriate standard on review, the Court must ask "whether the defendant suffers actual prejudice from his inability to obtain compulsory process."  *Id.*[19,20]

The defendant's scattershot approach deserves judicial scrutiny.  The defendant will have the opportunity to cross-examine all of the government's witnesses and, as discussed at yesterday's conference, appears amenable to conducting any necessary direct examination "out of order" (and without waiving any Rule 29 rights) to facilitate the witnesses' return home.  However, the government asks the Court to determine whether the remaining witnesses are genuinely important

---

[19] The government could not determine whether North proffer, which was initially submitted *ex parte* and under seal, is part of the public record.  However, the D.C. Circuit's in-depth analysis suggests that the proffer must have been robust.  The Court should similarly require the defendant to make robust proffers so the Court can evaluate the propriety of his subpoenas.

[20] The only procedure the D.C. Circuit appeared to disapprove of is the failure to let North view some of the evidence it considered in making its determination.  That consideration is not relevant here.

to the defendant's case.  The government would not typically question the defendant seeking to call relevant federal employees in a criminal trial, but this appears to be a repeat of a tactic employed during the last trial, where the defendant insisted on having the retired case agent fly to D.C. to be available but then never called her.  He did not call anybody in the last trial.  Strategies surely change but, as the government represented it would present a nearly identical case, it is hard to imagine that the defendant will call 13 witnesses.  Therefore, unless the defendant explains— either in his trial brief or *ex parte* supplement—what he wants to ask these witnesses, there will be no way to evaluate whether he is abusing his right to compulsory process to either harass the witnesses, question witnesses on matters that are "collateral, rather than material, to the issues in the case," or engage in questioning that is excluded by the Court's Rule 403 rulings.[21]

It is worth noting that this trial will occur during a common holiday time and, while the government did not reach out to the defendant's subpoenaed witnesses (undersigned counsel does not know many of them), one of them called to say he/she had a pre-paid vacation planned.  This person understands that being a witness in a case involves personal sacrifice but also does not know (nor does the government) what the defendant might possibly want to ask that is relevant to the trial.  The government seeks Court involvement to ensure the defendant does not insist on flying a dozen people to D.C. only to argue later that the one person who did not show up was his most essential witness.  Asking the defendant to explain, *ex parte*, the need for each witness will help prevent that type of tactic and ensure the witnesses are not disrupted for no reason.

---

[21] The government suspects the subject of the defendant's examination of these witnesses will depend on his pending request for the Court to reconsider prior rulings that restricted his ability to question witnesses about matters of marginal relevance.  The Court correctly restricted the defendant's ability to introduce evidence that attacks the government or investigation in general terms.  *See* ECF No. 301 (citing the Court's written Order, ECF No. 152).

## B. Undercover Recordings

The government believes the Court properly restricted the defendant's efforts to introduce undercover recordings. *See* ECF No. 301 (citing the Court's written Orders, ECF Nos. 192 & 200). If the defendant testifies, however, the government is unlikely to object to the admission of non-hearsay evidence from the undercover recordings.

Similarly, while many of these issues are the subject of the defendant's various motions to reconsider, and the government relies on the respective Motions in Opposition at ECF No. 299, 298, & 301, the government highlights several orders in the first trial concerning the defendant's effort to introduce potentially inadmissible testimony and evidence.

Specifically, the Court required the defense to proffer evidence prior to introducing evidence or eliciting testimony concerning government entrapment, foreign law, or relative culpability of CTJ or the government's decision not to prosecute CTJ. ECF No. 152 at 9-19. The Court also prohibited the Defense from arguing: (1) Any impact, or lack thereof, the banks may have faced by processing the subject transactions; (2) That international wire transfers do not involve exports of financial services from the United States or do not involve the movement of funds "to," "from," or "through" the United States; (3) That the defendant cannot be convicted unless he or an associate personally directed a transaction through a U.S. bank; or (4) Evidence about the delays in his trial or the length of his pretrial detention. ECF No. 152 at 14-16.

Additionally, the Court prohibited the defendant from cross-examining FBI forensic account Dawson Anglin on selective prosecution or how the government exercises discretion in charging and prosecuting a case.[22] The government would similarly object to such evidence if

---

[22] However, the Court permitted the defense to ask Mr. Anglin bias questions, such as whether he worked closely with the prosecutors in this case. Trial Tr. 9/18/25 AM at 131-135.

introduced during the defendant's case-in-chief by, for example, calling Anglin as a defense witness.

### C. Other Defense Exhibits

Subject to the Court's forthcoming ruling on the admissibility of evidence relating to the undercover operation (defendant's Motion at ECF No. 289, govt's Memorandum in Opposition at ECF No. 301), the defense has listed approximately 19 "freeze letters" on the proposed exhibit list. These "freeze letters" relate to letters submitted to various correspondent banks by former AUSA Zia Faruqui to freeze payments by the defendant and associated front companies to CTJ for various tobacco purchases. The government objects to the admissibility of these "freeze letters" since they are not probative of the elements of any of the charged crimes.  To the extent the Court finds the exhibits have marginal relevance, it should exclude them under Rule 403.

### V.    CLOSING ARGUMENTS

Similar to the opening statements, the government's closing statement will likely be supported by PowerPoint, which it will share with the Court and the defendant in advance. Contingent on the Court's pretrial ruling and the presentation of evidence at trial, the government will move through closing by orientating the jury to various chapters to help the jury compartmentalize the evidence in this case.

### VI.    LAW OF THE CASE

Aside from the information and orders already addressed herein, the following is a selection of additional Court Orders from the first trial:

### C. Co-Conspirator Statements, Fed R. Evid. 801(d)(2)(E)

In the first trial, the Court concluded that the Government had introduced "substantial

independent evidence sufficient to support the existence of a conspiracy and the defendant's participation therein." (Internal citation and quotes omitted).  ECF No. 222.  In this order, the judge listed five independent factors supporting this conclusion: (1) Emails and attachments recovered from two email accounts linked to the defendant's co-defendant Han Linlin; (2) Independent evidence regarding the defendant's co-defendant Qin Guoming; (3) The defendant's email account showing the defendant as the general manager of Winney and Winney employees reporting significant details about his business to him; (4) Evidence from co-defendant Sim Hyon-Sop supporting a connection between SIM and Winney; and (5) The undercover operation where co-defendant Han Linlin made references, and provided details, regarding his "boss" who is the defendant. *Id.* at 2-3.

### D.  Agent/Employee Statements, Fed R. Evid. 801(d)(2)(D)

In the first trial, the Court found the government established by a preponderance of the evidence that the following individuals are agents of the defendant based on their work with the Winney business: Yu Huiyan, Cheng Huiyan, "Chupa Chups," and co-defendant Han Linlin. Accordingly, The Court permitted the government to offer statements of these individuals under Fed R. Evid. 801(d)(2)(D) subject to the requirements of the other rules of evidence. Trial Tr. 9/16/25 PM at 33:11.

### E.  Expert Testimony

The Court permitted Dawson Anglin, to testify as an expert on, "issues related to North Korean banks' history or pattern of using front companies to conduct transactions prohibited by economic sanctions regimes, so long as his testimony remains in the scope of his expert notice." ECF No. 170.  Accordingly, the Court qualified Anglin, "in the area of forensic accounting, including the analyses of banking records, identifying front companies and other money laundering

techniques and patterns of the same used as related to North Korean trade." Trial Tr. 9/18/25 PM at 28:11-14.

### F. 403 Objection Involving 2017 Trump/Kim Summit

The Court took judicial notice on the 2017 meeting between President Trump and North Korean Chairman Kim Jong-Un over the defense's 403 objection. The Court found the meeting was relevant to Mr. Bartoletti's testimony that from CTJ's perspective, the exclusive agency agreement negotiations were prospective and done in anticipation that certain sanctions may be lifted in the future. Trial Tr. 9/24/25 PM at 3:10.

### G. Evidence Postdating the Charged Conspiracy

The government listed a few dozen exhibits on the exhibit list following the end of the charged conspiracy in March 2019. These exhibits generally consist of: (1) A collection of emails and records obtained from the co-defendants Google accounts (Exhibits 110-116, 146-148, and 150-156); (2) Emails provided by CTJ between co-defendant Han Linlin and Patricio Lyons in the spring of 2019 (Exhibits 242-261); and (3) records and emails that were part of the undercover operation beginning in May 2019 (Exhibits 401, 404, 407, and 408).[23]

As it pertains to evidence collected during the undercover operation in May and June 2019, the government relies on its Omnibus Opposition to the Defense's Remaining Evidentiary Motions (ECF No. 301 at 9-13). Briefly, the government posits that the introduction of undercover evidence should not change the Court's original Order at ECF No. 192. Any anticipated admissibility of these specific exhibits will depend on the Court's forthcoming Order.

---

[23] The government's intent on introducing Exhibit 404 will depend on whether the Court affirms or amends its prior order on the admissibility of the later undercover recordings. *See supra* section III(B)(iii). The remaining undercover exhibits were cut during a conference about Tarango's availability to accommodate the defendant's request for more certainty regarding which exhibits would be used to help the defendant estimate his length of cross-examination.

For the remaining exhibits postdating the charged conspiracy, the Government relies on the Court's original Order at ECF No. 210.  The Court previously concluded that co-defendant Han's emails postdating the charged conspiracy "have sufficient probative value to be admitted into evidence."[24]  While this order exclusively dealt with co-defendant Han's post-march 2019 correspondence, the government submits that the previous Court's analyses is equally, if not more, applicable to the defendant's emails (Exhibit 110-116) and Han's emails to Patricio Lyons (Exhibits 242-261) that postdate the charged conspiracy.  This post-March 2019 evidence also shows that the defendant and "his co-defendants [] continu[ed] an unlawful course of conduct through at least September 2019." ECF 210 at 4.  Like the last trial, the defendant had "ample notice of the Government's plans to offer these exhibits in support of its theories regarding the manner and means of the charged conspiracies" and had "ample notice of the substantive allegations that these exhibits are offered to support, dating back to the unsealing of the indictment in this case." *Id.*

## H.  Unresolved Issues Pending Litigation

The government does not intend to relitigate arguments contained in the various parties' briefings currently before this Court.  However, for ease of reference, the government succinctly lists the following Court orders from the first trial that the government put forward in the opposition papers that should remain unchanged:

---

[24] The Court's original Order permitted the government to move those portions of former Exhibit 111 that postdated the charged conspiracy into evidence.  Former Exhibit 111 was a compilation of different email exchanges involving co-defendant Han.  For ease of reference, for the retrial, the government has listed each email as a specific exhibit number and co-defendant Han's emails postdating the charged conspiracy are now listed as government exhibits 146-148 and 150-156.

*i.   CTJ Business Records (ECF No. 298)*

The government admitted CTJ business records in the previous trial without objection. Subject to a Court order to the contrary, the government *intends to admit the CTJ business records at the retrial under 18 U.S.C. § 3505.*

*ii.   Emails From the Google Search Warrants (ECF No. 299):*

In the September 2025 trial, the Court admitted emails and attachments of co-conspirators and various Winney employees, finding they were, "[O]ne, prepared by the agent within the scope of the relevant agency relationship. Two, adopted by the agent as the agent's own statement within the scope of the relevant agency relationship. And/or three, prepared by someone else who was also acting as an agent of Mr. Jin within the scope of the relevant agency relationship." Trial Tr. 9/18/15 AM at 11.

*iii.   Scope of Cross Examination (ECF No. 301):*

1. CTJ: The Court "carefully limit[ed] the extent to which [the defendant] may inquire into the details of the Government's investigation of CTJ." ECF No. 152 at 11. The Court limited this cross examination to "situations in which failures in the Government's investigation may have caused it to miss important evidence that would be highly exculpatory to the Defendant," *id.,* and where impeachment would bear on "CTJ's credibility and the reliability of the evidence of [the defendant's] own culpability." *Id.* at 13.

2. Fernando Bartoletti: The Court previously ruled that if Bartoletti knew of the contents of the safe passage letter at the time of his travel to the United States for the grand jury proceedings, then the safe passage letter was admissible since it was probative of bias. However, the Court excluded the declination letter on 403 grounds based on his lack of personal knowledge of its contents. Specifically, the Court observed, "if Mr. Bartoletti has no knowledge of the

contents of the letter at the relevant times, the letter had minimal probative value as evidence of

potential bias." ECF No. 220.

Respectfully submitted,

JOHN A. EISENBERG
ASSISTANT ATTORNEY GENERAL
FOR NATIONAL SECURITY

By:    */s/ Christopher Magnani*
Christopher Magnani (MD 1512160075)
Eli Ross (IL 6321411)
Trial Attorneys
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
Telephone: (202) 353-9261
Christopher.Magnani@usdoj.gov