**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| **v.** | } | **Criminal No. 23-CR-91-CKK** |
| | } | |
| **GUANGHUA JIN,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| _____ | } | |

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION**
**TO MOTION TO DISMISS FOR FLAGRANT MISCONDUCT**

Defendant Guanghua Jin, through counsel, respectfully submits this reply to the Government's Opposition to Defendant's Motion to Dismiss for Flagrant Misconduct. ECF 316.

**INTRODUCTION**

The Government's Opposition fails on the merits and reveals additional misconduct.

Lacking an adequate explanation for its flagrant misconduct, the government resorts to the familiar stratagem of attacking the opponent, instead of the argument.  The first paragraph of the Opposition invokes the Rules of Professional Conduct (without identifying how Mr. Jin breached those rules), and the next paragraph decries the "chaos" caused by the Defendant's filing of the instant Motion.  ECF 316 at 1.  These attacks fail in their attempt to obscure the frailty of the government's response.

Perhaps more important than the government's failing arguments, new evidence of government misconduct continues to emerge.  The Government's Opposition reveals for the first time that FoA Dawson Anglin, one of the two architects behind the false allegations linking Winney to Carbuncle: (1) concealed the false allegations about Carbuncle from the new trial team,

1

(2) sought to reintroduce the false allegations for the retrial, and (3) planned to testify falsely about the same.[1]

The full scope of the government's misconduct has yet to be revealed, as it continues to withhold documentation from the undercover investigation, to suppress the facts and evidence regarding the undercover investigation, and to rebuff requests for *Brady/Giglio* information.  Even on this record, however, there is sufficient evidence of flagrant misconduct that the Court would be acting well within its discretion to dismiss this case with prejudice.  The Court should grant the Motion.

ARGUMENT

## I.    THE GOVERNMENT'S TIMELINESS OBJECTION LACKS MERIT.

Although the Court invited the government to address the timeliness of the Motion to Dismiss, the government barely responded: asserting in a single sentence that "the Court should also deny [the Motion] as untimely filed and order the defendant to show cause before filing additional motions." ECF 316 at 2.  The government's complaint about timeliness appears directed primarily at Mr. Jin's motions to compel exculpatory and impeaching information, arguing that there is no new information warranting disclosure of the undercover materials. *Id.*  The argument as to timeliness lacks merit.

Mr. Jin's motions to compel were prompted by recent discovery of the extent of materials suppressed from the first trial.  That discovery was hindered precisely because the government redacted so much information that it was difficult to see even what was suppressed.  Further, as the Court recognized at the March 13 hearing, the discovery motions were prompted by a new

---

[1]    FoA Anglin's misconduct and the appropriate remedy–at a minimum requiring complete exclusion of his testimony–will be addressed in the appropriate section of this Reply.

appreciation for certain evidence that the government buried in its "disclosures." This includes not just the identity of who changed the bills of lading, but also the full extent of the government's misconduct vis-a-vis the Carbuncle and Fully Max transactions, discussed in more detail in a later section of this brief. New details about the misconduct emerged just last Friday, when the government filed its Response.

Similarly, the Motion to Dismiss was premised not just on *Brady* violations that occurred before the first trial, or *Napue* violations that occurred during trial. A substantial part of the Motion to Dismiss was predicated on the government's *on-going* misconduct. The Motion to Dismiss did not even mention, because the Defendant did not know, the newly disclosed misconduct that the first trial team had failed to inform the second trial team of the falsity of the Carbuncle and Fully Max transactions, and that FoA Anglin–who knew that the allegations were false–was nonetheless prepared to testify to these false allegations on retrial.

The government also ignores the difficulty for the defense, and the Court, to appreciate the full scale of the government's misconduct in a case such as this. In *United States v. Aguilar*, the district court, under remarkably similar circumstances, observed that

> [in] a fast-moving case that requires numerous rulings, often the judge will miss the proverbial forest for the trees. That is what occurred here…it was difficult to step back and look into whether what was going on reflected not isolated acts but a pattern of invidious conduct….it did not fully comprehend how the various pieces fit together. And fit together they do. The Government has acknowledged making many "mistakes," as it characterizes them. "Many" indeed. So many in fact, and so varied, and occurring over so lengthy a period (between 2008 and 2011) that they add up to an unusual and extreme picture of a prosecution gone badly awry. To paraphrase what former Senator Everett Dirksen supposedly said, "a few mistakes here and a few mistakes there and pretty soon you're talking misconduct."

831 F. Supp. 2d 1180, 1185 (C.D. Cal. 2011).

Last but not least, the government also ignores the many instances where it has been the beneficiary of the Court's good graces in extending deadlines or permitting the government to

proceed when the government was clearly unprepared. *Cf. Damus v. Nielsen*, 328 F.R.D. 1, 6 (D.D.C. 2018) (noting "discovery must be a two-way street") (quoting *Wardius v. Oregon*, 412 U.S. 470, 475 (1973)). This includes, for example, when the government was permitted to file an expert notice for Anglin well beyond the deadline for expert disclosures. Or when the government was permitted to introduce Rule 404(b) evidence despite never having filed such a notice. Or when the government was permitted to proceed with extracted pages from masses of documents at trial, when those documents were clearly not intended to be presented as individual exhibits at trial.

Here, the Mr. Jin has sought to promptly bring to the Court's attention all relevant issues that could have been reasonably anticipated prior to the filing deadline for pretrial motions on February 13, 2026. *See* ECF 284 through 291 - Various defense motions filed on February 13, 2026. Indeed, Mr. Jin filed some of the pretrial motions, and responded to the government's motions, well in advance of the February 13, 2026, deadline. *See* ECF 265, 267, 268, 269, 273, 275, 276. It would be unjust for the Court to deny the later motions without considering the motions on their merits. *See United States v. Trump*, No. 23-CV-257 (TSC), 2023 WL 6538491, at *2 (D.D.C. Oct. 6, 2023) ("'At any time before trial, the court may extend or reset the deadline for pretrial motions.' The court's discretion to do so is broad.") (quoting Fed. R. Crim. P. 12(c)(2)); *Cf. Bullock v. Brennan*, No. CV 13-1543 (RDM), 2016 WL 107910, at *5 (D.D.C. Jan. 8, 2016), *aff'd*, No. 16-5022, 2016 WL 3545470 (D.C. Cir. June 13, 2016) (discussing the "judicial system's strong presumption in favor of adjudications on the merits") (quoting *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995)).

II.    **ONE JURY HAS ALREADY REFUSED TO CONVICT MR. JIN. EVIDENCE UNDERMINING THE CREDIBILITY OF THE KEY WITNESS, OR OF THE GOOD FAITH OF THE GOVERNMENT'S INVESTIGATION, WOULD CREATE (AT LEAST) A REASONABLE PROBABILITY OF A NEW TRIAL.**

4

A *Brady* violation is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015) (quoting S*trickler v. Greene*, 527 U.S. 263, 280 (1999)). That standard "does not require a showing that it is more likely than not that the defendant would have been acquitted had the evidence been disclosed. Instead, a probability reaches the level of reasonable when it is high enough to undermine confidence in the verdict." *Id.* (cleaned up).

The standard for materiality in *Napue* violation is even lower: not a reasonable probability, but whether "the evidence 'could in any reasonable likelihood have affected the judgment of the jury.'" *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019) (quotation and alteration omitted); *see also id.* at 1093 n.1 (distinguishing *Brady* standard from *Napue* standard).

> The reasonable likelihood standard does not require the defendant to show that he more likely than not would have been acquitted absent the false statements. Rather, the defendant need show only that the false testimony undermines confidence in the verdict. Thus, even if the false testimony *may* not have affected the jury's verdict, it is material if the evidence reasonably *could* have affected the verdict. As the Supreme Court's explication makes clear, the reasonable likelihood standard is outcome-driven—that is, the relevant question is whether the false testimony could have altered the outcome of the case. This standard is quite easily satisfied.

*Id.* at 1092-93.

The government's arguments that the evidence at issue is not material ignores the history of this case. One jury has already refused to convict Mr. Jin on either count, after deliberating for over four days. Courts have found narrower decisions to be significant in the materiality analysis. *See Robinson*, 68 F.4th at 1349 ("[T]he jury deliberated for two-and-a-half days …. This may at least suggest that some jurors verged on a conclusion that the government had not proven some count or counts beyond a reasonable doubt."); *Leka v. Portunondo*, 257 F.3d 89, 107 (2d Cir.

2001) ("After two days of deliberation, the jury reported that it was hung. In light of … [that fact], it is easy to conclude that the government's evidentiary suppression undermines confidence in the outcome of this trial." (quotation and alteration omitted)); *Fatai v. Ramos*, No. 19-cv-603-DKW-WRP, 2023 WL 2392707, at *18 ("[E]ven with the suppression of this evidence, his second trial still ended in a hung jury with three jurors declining to convict. Thus, there is a reasonable probability that the result of the proceeding would have been different if [the government] had disclosed the evidence Fatai claims existed …."); *Moon v. Davis*, No. LA CV08-08327 JAK, 2018 WL 6356978, at *23 (C.D. Cal. May 1, 2018)("Petitioner has also made a prima facie showing of prejudice. … The jury deliberated for several days …. The trial court clerk later advised counsel that there was a hung jury. … Therefore, the absence of evidence that could have been deemed favorable to Petitioner, may be deemed material ….").

The Supreme Court has specifically held that, "[a]fter [the defendant's] first trial … ended in a hung jury," evidence undermining the strength of the investigation is material. *Kyles v. Whitley*, 514 U.S. 419, 421, 445-49 (1995). And courts frequently recognize evidence impeaching the key witness – here, CTJ – is material. *Ausby*, 916 F.3d at 1094 (citing authority)(*Napue*); *see, e.g.*, *Leka*, 257 F.2d at 106 (*Brady*)("It is likely that [the suppressed evidence] would have had seismic impact, … because [it]would have furnished the defense with promising lines of inquiry for the cross-examination of [the two key witnesses].").

III.    **THE GOVERNMENT VIOLATED *BRADY* AND *NAPUE* IN RELATION TO THE CARBUNCLE AND FULLY MAX TRANSACTIONS, AND WAS POISED TO COMMIT EVEN MORE DUE PROCESS VIOLATIONS RELATED TO THIS SUBJECT ON RETRIAL.**

While candidly admitting that the Carbuncle and Fully Max transactions were false attributions, the government minimizes the first trial team's conduct and breezily asserts that any misconduct was immaterial. ECF 316 at 7. But the inclusion of false transactions in the indictment

was not a mere accounting error, and their removal at trial was not an instance of the government doing the right thing.  The government knowingly employed false allegations against Winney, got cold feet at trial, and made a concerted effort to bury this fact.

At the outset, the government's Response lets slip an "offhand remark" that shows the misconduct was more far reaching than previously assumed.  Indeed, it is ongoing.  The government states in its Response that "[it] will have to correct a proposed trial exhibit that erroneously includes Carbuncle and Fully Max."  ECF 316 at 8 n.7.  The trial exhibit in question is Exhibit 16, a newly created exhibit authored by Anglin in February 2026 for the retrial.  Giving the new trial team the benefit of the doubt, that this new exhibit includes Carbuncle and Fully Max says two things.  First, no one from the first trial team, including Anglin, informed the new trial team of the inclusion of false allegations surrounding Carbuncle and Fully Max.  Second, Anglin planned to testify about false allegations that he knew were abandoned at the first trial.

To appreciate the seriousness of the government's misconduct, it is worth a review of the relevant facts:

- In 2022, at AUSA Seifert's suggestion, Anglin added six transactions involving Carbuncle/Fully Max to the criminal complaint.  As the only forensic accountant on the team, Anglin knew or should have known about the absence of evidence tying these transactions to Winney.

- FBI Agent Joy Gallante, without verifying Anglin's work, signed on to the false allegations under oath in the criminal complaint. ECF 1–Criminal Complaint;

- Anglin testified at length about these transactions to the grand jury, repeating the false allegation that these were Winney related transactions;

- The indictment then prominently featured the false allegations. ECF 13–Indictment;

- The government maintained the false allegations until minutes before Anglin took the stand on September 18, 2025.  ECF 309 at 28-29.

7

- Without notice to the defense, Anglin and AUSA Seifert quietly removed the Carbuncle and Fully Max transactions from Exhibit 355 in the minutes leading up to his testimony. See ECF 309 at 29, n.9 (reflecting the last version of the exhibit was uploaded at 1:43 PM); Tr. 9/18/25 PM (noting that the court session when Anglin took the stand began at 2:08 PM);

- The government said nothing about the removal of the Carbuncle and Fully Max transactions either during trial or after trial;

- After a new trial team was appointed, neither AUSA Seifert nor Anglin revealed the facts of these false allegations to the new trial team;

- In February 2026, five months after the first trial, Anglin prepared a new exhibit in which he deliberately re-inserted most of the Carbuncle and Fully Max transactions (which the government concedes are false). Exhibit 1 – Government Proposed Trial Exhibit 16, with metadata;

- Evidently, Anglin planned to testify about the Carbuncle and Fully Max transactions as part of his retrial testimony. This is despite knowing that the transactions are unrelated, given that Anglin was one of the two people involved in originally removing these transactions.

The government also distorts the truth of what occurred by claiming that this was an error "corrected in time for trial." First, it was not corrected "in time for trial." It was changed *during trial*, *moments before Anglin took the stand*, without notice to the defense or the Court, and only after the defense explained that the proposed cross of Anglin involved showing that his analysis was "garbage in, garbage out." While *Brady* violations do not require bad faith, the conduct here was certainly an instance of bad faith.

Second, the first trial team did an incomplete job of "correcting" the false allegations. The Carbuncle and Fully Max transactions were, in fact, presented as evidence at the first trial. Anglin testified at the first trial that he created a 15-page spreadsheet that he used as a "master spreadsheet of all the records [Anglin] reviewed." Tr. 9/18/25 PM at 36. Anglin testified that the "master spreadsheet" included only transactions "related to this specific case," Tr. 9/18/25 PM at 33, by

which he meant the "master spreadsheet" included only transactions "related to Winney or the entities related to Winney." *Id.* at 34 ("We might have queried a bank for transactions related to, for example, CTJ or the cooperative. And a bank might not have processed any transactions that related to Winney…and so I would not include that record."). The "master spreadsheet" was admitted as Government Exhibit 352. The "master spreadsheet" included the Carbuncle and Fully Max transactions. *See* Exhibit 2 - Government Exhibit 352 from first trial (Carbuncle transactions appear on pages 2 and 4; Fully Max transactions appear on page 2).

To be clear, the primary misconduct here is not the introduction of evidence containing false allegations at trial, although that certainly is misconduct. The primary misconduct is that the government knew these allegations were false, tried to conceal from the defense the fact that it had made false allegations, and appeared poised to reintroduce the same false allegations on retrial.

## A. AUSA Seifert did the wrong thing by quietly changing the exhibit during trial, and then failing to inform the new trial team.

The government employs the familiar refrain that the removal of Carbuncle and Fully Max transactions at trial was an instance of AUSA Seifert "doing the right thing." ECF 309 at 7. ("This allegation features another example of the government doing the right thing"). Far from it.

"Doing the right thing" would have entailed AUSA Seifert and FoA Anglin candidly informing Mr. Jin, and this Court, that the indictment contained false allegations which the government was abandoning. *See United States v. Quinn*, 537 F. Supp. 2d 99, 116 (D.D.C. 2008) (finding *Brady* violation where prosecutors failed to disclose that it would not call a witness due to concerns about the witness's credibility); *see also Banks v. Dretke*, 540 U.S. 668, 675–76 (2004) ("When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight.").

9

What the government did instead was to silently remove those false allegations–which, had they been exposed on cross-examination, would have irreparably damaged Anglin's credibility and seriously harmed the government's case–and stayed quiet about the affair so that no one would ever find out. *Cf. United States v. Aguilar*, 831 F. Supp. 2d 1180, 1198 (C.D. Cal. 2011) (finding that the government failed to meaningfully disclose information that a payment was attributable to a different party where "the claimed disclosure was so indirect, incomplete and buried as to fall far below what disclosure would entail"); *see also United States v. Nejad*, 487 F. Supp. 3d 206, 220 (S.D.N.Y. 2020) ("No responsible Government lawyer should strategize how to 'bury' a document that was not, but should have been, previously disclosed to the defense. A responsible Government lawyer should—at a minimum—forthrightly and truthfully reveal late disclosures to the defense.")

"Doing the right thing" would have entailed AUSA Seifert or Dawson Anglin informing the new trial team that the indictment featured false allegations against Winney, and should not be included in any evidence presented at retrial.

What FoA Anglin did instead was to add the abandoned allegations into a new trial exhibit, apparently without informing the new trial team. Evidently, FoA Anglin had planned to testify at retrial that Carbuncle and Fully Max were Winney-related transactions, knowing that such testimony would be false.

The government did not "do the right thing" in this instance.

**B. The *Brady* violation was material.**

The government asserts that falsely alleging Winney's connection to two purported DHID front companies was no big deal. The government portrays this as an accounting error, amounting to only 1% of payments. ECF 316 at 7. But the jury is not evaluating Anglin's accounting accuracy

10

at trial.  The materiality of the Carbuncle and Fully Max allegations cannot be judged by the relative size of the payments.

What matters is what this "mistake" says about Anglin, a key witness, and the lead prosecutor that he worked closely with.

What matters is that the government's purported "expert witness," the only forensic accountant on the prosecution team and the architect of the charges against Mr. Jin, ascribed transactions to Winney without evidence and testified to the same under oath.

What matters is that other FBI agents, including the lead case agent for much of the investigation, submitted a false sworn affidavit on the basis of the forensic accountant's "work."

What matters is that the only apparent reason for the forensic accountant to falsely ascribe transactions to Winey was because the lead prosecutor suggested it.

What matters is that the government eventually acknowledged that these allegations were false but deliberately chose to not tell the defense (or the new trial team).

In other words, this was more than just the investigation being sloppy, or careless.  It was the forensic accountant being hopelessly biased, and willing to place his imprimatur on false allegations at the mere suggestion of a prosecutor.  These facts would have been devastating to Anglin's credibility–not "immaterial," as the government claims. Of course, there is also the matter that AUSA Seifert was inextricably involved in this series of events, and took steps to conceal them.  *Aguilar*, 831 F. Supp. 2d at 1209.

The government's claim that this was an "immaterial mistake" is one of many manifestations that the government has not come to grips with the grave due process violations it has committed.

**C.  The *Brady* and *Napue* violations are ongoing.**

11

The government argues that the false allegations were not "the product of government eagerness to pin all of CTJ's North Korea transactions on Winney," but rather a "mistake." Assuming, *arguendo*, that the inclusion of the Carbuncle transactions was initially the product of a mistake, the subsequent cover-up, and Anglin's planned reintroduction of these false allegations, was certainly no mistake.

As described earlier, AUSA Seifert and FoA Anglin's removal of the Carbuncle transactions minutes before Anglin's testimony, and their failure to inform the defense of this change, could not have been a mistake. Likewise, the fact that Anglin re-inserted the false allegations back into the evidence, apparently without telling the new trial team, could not have been a mistake. The key facts are as follows:

- Government Exhibit 16, titled "U.S. Correspondent Bank Wire Transfers Sent to CTJ by Winney and Entities Paying on Winney's Behalf," lists each of the false Carbuncle and Fully Max transactions. Ex. 1.

- This exhibit was newly created by Anglin on February 6, 2026, almost five months after the first trial.



- When Anglin created Exhibit 16, he knew that Carbuncle and Fully Max were removed from Government Exhibit 355 during the first trial.  He was involved in it.  Anglin sponsored Exhibit 355 at trial and testified under oath to its accuracy.  He was not surprised by the modified version of Exhibit 355 with Carbuncle and Fully Max removed.

- Neither Anglin nor AUSA Seifert informed the new trial team that the Carbuncle and Fully Max allegations were false.

- The new trial team failed to meaningfully review the record and seek exculpatory information from AUSA Seifert and Anglin while preparing for retrial.

The fact that Anglin may have concealed this information from the new prosecution team does not absolve the government.  *Cf. Mims v. City of Chicago*, 155 F.4th 970, 975 (7th Cir. 2025) ("The prosecutor's broad duty of disclosure does not shield the police from all responsibility under *Brady*, however. If police officers conceal exculpatory evidence from the prosecution, their actions can form the basis of a due process violation.").

The government, entirely unbothered by all of this, does not even try to explain why Anglin resurrected the allegations he knew to be false in the exhibit.  Instead, the real problem it sees here is inconvenience. ECF 316 at 8 n.7.  In recent days, the government has claimed several times that the Court should not supervise its compliance with *Brady*, or that it should be allowed to make secret *ex parte* submissions to the Court.  But again, the government's conduct must be subject to the adversarial process, and to public scrutiny. *United States v. Blankenship*, No. 3:14-CR-124, 2015 WL 4561458, at *8 (E.D. Tenn. July 29, 2015)  ("[T]he American system of criminal justice is premised on the belief that truth is best achieved in an adversarial system, in which each side determines and presents its best case.") (citing *Herring v. New York,* 422 U.S. 853, 862 (1975); *United States v. Stevens*, No. CRIM. 08-231 EGS, 2008 WL 8743218, at *9 (D.D.C. Dec. 19, 2008) (denying the government request to seal documents which ultimately led to the dismissal of

prosecution based on the government's intentional *Brady* violations). The new revelations of serious misconduct only broaden the scope of the inquiry that must be conducted.

**D. If the Court does not dismiss with prejudice, it should preclude Anglin's testimony.**

The government's intransigence, lack of remorse, and steadfast refusal to accept responsibility for the severity of its misconduct warrants strong sanctions.[2] Short of dismissal, the Court should consider: (1) excluding entirely Anglin's testimony during the government's case in chief; and (2) permitting the defense to call Anglin during the defense case, and to cross-examine Anglin regarding his role in introducing, concealing, and attempting to reintroduce false allegations against Winney.

Exclusion of Anglin's testimony is warranted given Anglin's role in adding the false allegations in the complaint, maintaining the false allegations through the grand jury, participating in the cover-up during trial–albeit imperfectly, concealing this from the new trial team, and reintroducing false allegations into exhibits for the retrial. The only step left is for Mr. Anglin to commit perjury on retrial. The Court should not permit that opportunity. *See United States v. Passarelli*, 935 F.2d 1288, 1991 WL 105469 at *3 (4th Cir. 1991) (unpublished table decision) (holding that trial court "can properly exercise its discretion to exclude [a witness] in order to prevent false testimony" if the witness violated sequestration order and there is evidence that the witness shaped testimony to match other witnesses); *Nosewicz v. Janosko*, 857 Fed. Appx. 465, 470 (10th Cir. 2021) ("A party who discovers false testimony before trial has several options. For example, the party can move *in limine* to exclude the false testimony, present evidence of falsity

---

[2]    On March 15, 2026, the defense requested from the government "all communications of Dawson Anglin with the prosecution team regarding the Carbuncle and Fully Max transactions, and all other exculpatory and impeaching communications involving Anglin." The government has not yet responded. The defense anticipates needing to file another Motion to Compel in relation to this request shortly.

to the jury to impeach the witness, or…move for a continuance or for additional discovery."); *see also United States v. Struckman,* 611 F.3d 560, 571 (9th Cir. 2010) (affirming district court's decision to "exclude[] evidence attributed to [informant]"); *United States v. Frazier,* 203 F. Supp. 3d 1128, 1134 (W.D. Wash. 2016)("[T]he proper remedy here is exclusion and suppression of all evidence derived from [the government's informant].").  And even if there is some uncertainty that Anglin is unwilling to tell the truth, his recent actions show that he is simply too biased–too invested in winning–that he is unable to tell the truth.

Exclusion of Anglin's testimony is also necessary given that the defense cannot adequately cross-examine Anglin.  Were Anglin permitted to testify, any impeachment of Anglin would be incomplete without cross-examination about his conduct leading up to and including his testimony at the first trial.  Yet such cross-examination would inform the jury that there had been a prior trial–something which is unfairly prejudicial to Mr. Jin.

The D.C. Circuit has made clear that exclusion of a party's witness may be an appropriate sanction even in cases where a party did not act in bad faith.  *United States v. Johnson*, 970 F.2d 907, 911 (D.C. Cir. 1992)("we agree with those circuits that have treated bad faith as an important factor but not a prerequisite to exclusion.").  Thus, the *Johnson* Court upheld the exclusion of two alibi witnesses for the defendant's failure to comply with Rule 12.1(a), despite a finding that the attorney for the defendant acted in good faith.  *Id.*; *See also United States v. Pancholi*, 148 F.4th 382, 392 (6th Cir. 2025)(holding that discovery violation need not be willful to justify exclusion of witness as a sanction).

Here, the government plainly did not act in good faith.  Furthermore, its misconduct was far more serious than the failure to produce an alibi notice in *Johnson*.  Accordingly, in the event

15

that this Court does not dismiss with prejudice, exclusion of Anglin's testimony is an appropriate sanction.

Independent of any sanctions for Anglin's testimony, if the Court does not dismiss outright, it should hold an evidentiary hearing to address the *Brady* and *Napue* violations in connection with this episode. Anglin should be required to testify, under oath, the precise circumstances under which Carbuncle and Fully Max were initially added to the complaint, the circumstances which it was removed from the government's trial exhibits at the first trial (but not Exhibit 352), and why it was re-inserted into Exhibit 16 for the retrial.

## IV.  THE GOVERNMENT'S PRESENTATION OF FALSE TESTIMONY AS TO BARTOLETTI VIOLATED DUE PROCESS, AND MERITS DISMISSAL WITH PREJUDICE.

The presentation of false or misleading testimony violates due process. That violation does not depend on whether the witness intentionally lied or misled the jury, or even whether the witness was mistaken. The violation hinges entirely on whether the government knew–or just should have known–that the witness's testimony was false or misleading. "[T]he wrong of knowing use by prosecutors of *perjured* testimony is . . . misnamed—it is knowing use of *false* testimony. It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false." *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (emphasis added and in original).

Applying this same principle, the Fourth Circuit has held that "[e]vidence may be false either because it is perjured or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true." *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967). It does not matter whether "the testimony of [ ] witnesses . . . [is] perjured"; it is enough if "their mistake . . . [is] due to their lack of perception." *Id*.

16

In fact, a prosecutor still violates due process when they only suspect that the evidence is false but choose not to investigate. That is because willful blindness is no less culpable than actual knowledge. The principle is illustrated in *Drake v. Portuondo*, where the Second Circuit found that the prosecution violated due process because the prosecutor called a psychologist with fabricated credentials to testify about a fictitious psychological condition. 553 F.3d 230, 235-236 (2nd Cir. 2009). Analyzing the prosecutor's conduct, the Second Circuit noted that "[a]lthough [the prosecutor] had never heard of [the condition] until [the psychologist] mentioned it, he did not contact any other mental health professional to inquire about the concept" and "did not ask [the psychologist] about his credentials until [the psychologist] arrived in New York the night before his trial testimony." *Id.* at 243.

The *Drake* court held the prosecution committed due process violations not just because of its willful blindness, but also because it used misleading-but-true testimony. The prosecutor knew that "the sum of [the witness's] scholarship was one unpublished paper." *Id*. at 244. "[A]ware that [the witness] was not a published scholar, [the prosecutor] trimmed the question to inquire only as to papers [the witness] had 'written,' as opposed to 'published.'" *Id*. Because the question was "plainly crafted . . . to achieve literal accuracy while conveying [a] false impression," the court held the prosecutor violated due process. *Id.* at 243.

These cases make clear that the government cannot deflect responsibility for Bartoletti's misleading testimony by retreating to its familiar refrain that Bartoletti lacked personal knowledge. Even assuming that Bartoletti simply stated his personal beliefs or relied on his limited personal knowledge, the prosecution knew better. For instance, Bartoletti testified that he and CTJ were unaware of CTJ's business in North Korea. But the government knew this was misleading or false: it earlier denied CTJ's request for a letter stating that CTJ had never done business with North

Korea because the government was aware of CTJ's "extensive historical DPRK business." *See* ECF 309 at 10. Similarly, Bartoletti claimed the exclusivity contract was rejected out of hand, but the government for years possessed emails showing that CTJ negotiated the exclusivity agreement with Winney over five months, that CTJ's board agreed to it "in principle," and that CTJ's lawyers reviewed and edited the contract, more than once. *Id*. at 13.

Knowing that Bartoletti's testimony was, if not false and contradictory, then at least misleading and mistaken, the government called him to testify regardless, and failed to correct his testimony. If the government was unaware his testimony was false or misleading, it should have known–it possessed documents proving as much. Either way, the prosecutor's conduct violated due process.

Rather than defend Bartoletti's testimony or their own choice not to correct his testimony, the government attempts to blame Mr. Jin for not confronting Bartoletti more vigorously on cross-examination, or for not calling him a liar in closing argument. ECF 316 at 5 ("In closing, the defendant's only knock on Bartoletti was that his knowledge of Winney's business was limited."). But the defense chose a more diplomatic approach. The Court admitted the relevant CTJ documents that contradicted Bartoletti's account, and defense counsel encouraged the jurors to compare the CTJ documents to Bartoletti's account. Tr. 9/25/25 AM at 110. ("And the story you heard from Mr. Bartoletti is…That's the story. Now I'm going to ask you to look at those emails, very, very carefully.") The jurors were intelligent people. That defense counsel allowed jurors to reach the logical conclusion about Bartoletti's testimony does not absolve the government of its constitutional duty.

## V.    THE GOVERNMENT VIOLATED *BRADY* AND *NAPUE* IN RELATION TO THE BILLS OF LADING

### A.  The government violated *Brady* and *Napue*

At the outset, the Court should note that the government mischaracterizes the defendant's motion by stating that "the MTD does not allege *Brady* violations" with respect to the bills of lading issue. ECF 316 at 4. In fact, in the very first section of the Argument in Mr. Jin's Motion argued that the government committed both *Brady* and *Napue* violations with respect to the bills of lading. *See* ECF 309 at 39 ("The government employed various means to suppress this information, and then to mislead the jury about it."). In the Background section of Mr. Jin's Motion, there was also an entire section dedicated to the *Brady* violation. *See* ECF 309 at 23-24 (Section entitled: "The government suppressed CTJ's role in changing the bills of lading."). The government's ongoing suppression of information related to the bills of lading is the subject of a pending *Brady* motion. Recognizing, however, that the resolution of the *Brady* claim requires the Court to examine the nature and extent of suppressed evidence which remains undisclosed, we focus in this Reply on the *Napue* violation.

As to the *Napue* violation, the government concedes that evidence that CTJ directed the changes would have a "dampening" effect, but argues that it is immaterial and that further, it would be unfairly prejudicial. The government grossly understates the probative force of this evidence. Moreover, as Mr. Jin has not only stated, but actually proved during the first trial, he does not intend to make a relative culpability argument. Like the first trial team, the new trial team presents this bogeyman as a means to prevent Mr. Jin from defending the case as he is entitled to under the Sixth Amendment.

### B. The suppressed evidence was material.

In 2016, the bills of lading began to list a Chinese consignee instead of a North Korean consignee. Did Winney make this change? Or was it CTJ? Previously, the government tried to pin the blame on Winney, arguing that Winney originated the change. Now, the government

argues that this is in fact immaterial. That it really did not matter whose idea it was to remove North Korea. ECF 316 at 3 ("[E]ven if there was evidence [that Lyons instructed Han to change the bills of lading]...it would not be material."). According to the government, if it was Winney's idea, that proves that Winney intended to evade sanctions. But if it was CTJ's idea, a jury would still presume that Winney understood the purpose of the change was to evade sanctions. *Id.* ("The only way that this could impact the charges would be if the defendant could persuade the jury that Winney agreed to changing the bills of lading without understanding that the purpose was to evade sanctions or mislead banks.").

The government labors under the misapprehension that Mr. Jin has to persuade the jury of an innocent explanation for the change. *See id.* The government has it backwards. Mr. Jin does not have to persuade the jury of anything. To the contrary, the jury begins with the presumption that Mr. Jin is innocent: that the bills of lading were changed for a benign purpose, or Mr. Jin did not understand the purpose for the change. It is the government that must persuade the jury that Winney agreed to this change for a malicious purpose, and it must do so beyond a reasonable doubt. *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt").

In the context of a *Brady* violation, evidence is material if there is a reasonable probability of a different outcome. *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 892 (D.C. Cir. 1999) ("[T]here must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."). For a *Napue* violation, false testimony is material if it "in any reasonable likelihood could have affected the judgment of the jury," and "requires the beneficiary of the constitutional error to prove beyond a reasonable

doubt that the error complained of did not contribute to the verdict obtained." *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (internal quotations omitted).

That materiality standard is amply met here. The changes to the bills of lading were a central feature of the government's case. They were specifically charged in the indictment. The government referred to them almost immediately in opening, alleging that Mr. Jin lied not just to banks, but also "lied to shipping companies" to run his business. Tr. 9/16/25 AM at 128. The government argued that without the alterations to the bills of lading, "[Mr. Jin] would not have been able to do his business at all," Tr. 9/16/25 AM at 129, because "the shipping companies moving the tobacco" would have refused to deliver, and "nobody was willing to do business to help North Korea." *Id.* The government never called any witnesses from the shipping companies.[3]

Later in its opening, the government again emphasized the bills of lading, specifically identifying "Mr. Han and Winney" as the party "that directed CTJ who the tobacco was for and where to ship it to," *Id.* at 135, and that "after the additional sanctions…kicked in, in 2016, they omitted the North Korean customers from the paperwork." *Id.* at 135. The bills of lading were then brought up a third time when the government stated, "Before 2016….the shipping records for the tobacco sales listed North Korea…But after 2016 when countrywide sanctions kicked in, references to North Korea were removed and instead, it just said 'China.'" *Id.* at 140.

The government's case would have looked far different if the truth regarding the bills of lading had been presented. For example, if the government had stated in its opening that CTJ

---

[3]    The Defendant would object to similar claims in the opening for the retrial. The government may have a good faith basis to state that U.S. banks would have refused to process the transactions, but unless competent witnesses testify about the policies of shipping companies and other industries, it cannot assert broad claims about how "nobody was willing to do business to help North Korea." This is particularly prejudicial given that: (1) U.S. banks apparently had policies to decline North Korea related transactions well before 2016, and (2) shipping companies appeared content to ship tobacco with a North Korean consignee, and there is no evidence that they changed policies after 2016 as a result of U.S. sanctions.

began changing the bills of lading in 2016. Or, for example, if the government elicited testimony that Patricio Lyons instructed Han to change the bills of lading in 2016. There is a reasonable probability that a different outcome would have resulted from the first trial if the truth had been revealed. That is, there is a reasonable probability that all twelve jurors, rather than six, would have voted to acquit on all charges.

The government's own actions certainly reflect that the identity of the party changing the bills of lading was material. As detailed in the Reply in Support of Motion to Compel Production of Brady relating to the bills of lading, ECF 294, the government (via Anglin, AUSA Seifert, and HSI) communicated specifically about this call, and AUSA Seifert then took care to redact those communications. ECF 294 at 4. And while the indictment largely tracks the complaint that Anglin drafted, the references to a discussion of the bills of lading were specifically removed. If the statement about bills of lading was simply a lie told by Tarango as part of his undercover ruse, like the demand for bribes, it is difficult to imagine why the government went to such lengths to sanitize any reference to it. And the government has never denied, despite multiple opportunities, that the relevant redacted references are pertinent to this very issue.

The district court in *United States v. Quinn* found suppressed evidence was material under nearly analogous circumstances. 537 F. Supp. 2d 99, 109 (D.D.C. 2008). In *Quinn*, the government suppressed evidence that its key cooperator had lied about certain facts. *Id.* Here, as in *Quinn,* the suppressed "information would have helped to corroborate [Winney's] position that [CTJ] was culpable and had implicated [Winney] to protect [itself], that [Winney] believed indirect [sales of tobacco] to [North Korea] were legal based upon the fact that [its supplier], who was supposed to be knowledgeable in international trade regulations, had approved such transactions, and that the government's investigation had been misdirected by a dishonest informant." *Id.*

22

**C. Significant evidence supports the fact that Lyons instructed Winney to change the bills of lading.**

After interviewing Bartoletti and Lyons in order to educate himself on the course of dealings to believably play his role, Agent Tarango specifically stated to Mr. Jin that Lyons told Han to change the bills of lading. The government's response obliquely suggests, but does not outright state, that this statement was a fabrication by Tarango. ECF 316 at 4. ("This 'fact' is based on an offhand comment Erick Tarango made on a recorded phone call with the defendant."). That the government communicates this theory in such a roundabout fashion should give the Court pause. After all, if Agent Tarango's statement was in fact a contrivance, the government could simply say so, supported perhaps by an affidavit from Agent Tarango, or contemporaneous documentation of the same, to resolve this aspect of Mr. Jin's motion in the government's favor. There is nothing that would prevent the government from doing so. During the first trial, for example, the government made no secret of the fact that Agent Tarango's demand for a bribe was simply a ruse employed for the undercover operation. *See* Tr. 9/22/25 PM at 5 ("Q: Is this a ruse? A: It's a ruse. It's all an undercover ruse.")

Instead of saying clearly that Agent Tarango will testify that he never received information suggesting that Lyons instructed Han to change the bills of lading, the government chooses peculiar language and claims there is "no evidence" that it happened. The government claims it could not find documentation of it. The government wants to communicate all further information on its search in secret, away from the prying eyes of the defense. The ambiguous, non-committal phrasing, combined with the persistent efforts to keep Agent Tarango off the record, while saying as little as possible, quite transparently shows the fine line that the government walks.

The government also incorrectly assumes that the "only evidence" that Lyons instructed Han to change the bills of lading was Agent Tarango's statement. Agent Tarango's statement may

23

have been the only *direct* evidence of it (pending the outcome of the defendant's *Brady* motions). But there was also *circumstantial* evidence introduced at trial, apart from Agent Tarango's statement, to suggest that this is in fact what occurred. Though ordinarily the party to argue the importance of circumstantial evidence, here the government conveniently ignores its existence.

For one thing, Lyons' leading role in changing the bills of lading would be consistent with the relative size and sophistication of the parties. Bartoletti previously estimated that sales to Winney represented only 7% of CTJ's revenue. Exhibit 3 - 2022 302 at 4 ("Ultimately, Winney's business only comprised of approximately seven to eight percent of CTJ's total business and they paid prices similar to other customers."). Meanwhile, Winney's payments to CTJ appeared to account for the vast majority of its expenditures, even according to the government's own charts. Compare Exhibit 4 - Gov't Retrial Exhibit 17 - U.S. Correspondent Bank Wire Transfers Sent to CTJ by Winney and Entities Paying on Winney's Behalf (showing approximately $42 million in outgoing wire transfers to CTJ) *and* Exhibit 5 - Gov't Retrial Exhibit 18 - U.S. Correspondent Bank Wire Transfers from Winney to Non-CTJ Entities (showing approximately $12 million in outgoing wire transfers to non-CTJ entities).

CTJ was also far more sophisticated. It had its own lawyers in Argentina, and had the resources to retain a U.S. law firm with over 400 lawyers to negotiate with the DOJ.[4] CTJ was apparently able to convince this law firm, after two years of representation, that it had never done business with North Korea, and to seek DOJ's endorsement of this claim. CTJ was even able to negotiate the swift release of millions of dollars in frozen funds while its finance manager told bald-faced lies to prosecutors and agents. If CTJ was capable of all this, it could certainly direct

---

[4]https://www.mvalaw.com/careers-working-at-mva#:~:text=Moore%20&%20Van%20Allen%20is%20a%20full%2Dservice,spirit%20*%20A%20commitment%20to%20client%20service

24

changes to bills of lading, especially given its "extensive historical DPRK business."  The government's attempt to portray CTJ as a group of rural farmers too ignorant to be capable of sophisticated schemes is almost offensive, if not for the fact that it reflects the government's persistent and intractable bias.  *See* ECF 316 at 4 ("...it is very important to the defendant's strategy of painting CTJ (a farming cooperative in rural Argentina) as sophisticated criminal masterminds.").

For another thing, Agent Tarango's interactions with Han during the undercover operation also corroborate CTJ's leading role in changing the bills of lading.  When Agent Tarango directed Han to submit a new contract, change the payor, and select a new port of destination, Han complied with relatively few questions.  Han's passive response is consistent with CTJ being the party that historically led activities requiring changes to documentation.  Conversely, if Winney had directed changes to the bills of lading, then one would have expected Han to have taken a more proactive approach during his interactions with Agent Tarango by, for example, *sua sponte* raising the idea of creating new contracts or using new payors.

Third, the details of Tarango's statement are also largely consistent with the facts.  For example, the bills of lading in fact reflected that the destination was Dalian, and the changes in fact did start "a few years ago" in 2016.  Likewise, Lyons was in fact the person with primary responsibility for CTJ's sales relationship to Winney during this time period, and so if anyone at CTJ would have instructed Winney to change the bills of lading, that person would have been likely Lyons.  And Han would have been the recipient of such an instruction, as borne out in the by the emails CTJ produced.

Last but not least, the government's efforts to conceal the documentation and prevent testimony around this issue certainly support an inference that it is true.  As noted above, the

government has strenuously sought to avoid Agent Tarango being required to submit an affidavit. Twice–in the span of an hour–the government beseeched the Court to reverse course on that decision. The government has also bizarrely, and without any legal basis, repeatedly offered an *ex parte* declaration detailing its efforts to search for exculpatory information.[5] *See Blankenship*, 2015 WL 4561458, at *8).   That is, the government has gone to great lengths to avoid disclosure of documentation, instead of simply having its agent testify (or submit an affidavit) that his statement was a contrivance.  This suggests that Agent Tarango in fact did learn of Lyons' role during his investigation.

In sum, there is evidence to support the claim that CTJ (and not Winney) changed the bills of lading.  The reason there is not more direct evidence of the claim is because the government continues to suppress that evidence.  The government knowingly presented false testimony to the contrary, and suppressed evidence contradicting that testimony.  Therefore, it has violated both *Brady* and *Napue*, and those violations continue.

## VI.   THE GOVERNMENT VIOLATED *BRADY* AND *NAPUE* BY FAILING TO DISCLOSE THE LETTER FROM CTJ'S ATTORNEY (THE "PERALTA LETTER").

On September 1, 2025, the government produced an email from Dawson Anglin to others, redacted entirely but for one sentence:  "They" (whoever "they" are) "have extensive historical DPRK business."  ECF 309-43.  On September 9, two days before trial began, it disclosed the full version of the email.  The email revealed that the government could not "agree to this letter the way it is written," but could "help them" (now revealed as CTJ) to "know who they should talk to

---

[5]   As explained multiple times, the claim is meaningless because it does not actually address what occurred and why there is no documentation.  Yet, even after the Court recognized this problem, and has ordered an under oath disclosure from Agent Tarango regarding the documentation, the government persists in refusing to speak transparently about this issue.

at the bank." ECF 309-21.  Only after trial, in response to specific requests and follow-up by the defense, did the government produce the letter itself.

The government concedes that the letter, drafted by CTJ's attorney, was "misleading." (In fact, it was outright false.)  The government concedes that it was not provided to Mr. Jin before trial, but only recently, because Mr. Jin asked for it.  Yet, the government seeks to escape the inescapable conclusion that the government violated Mr. Jin's due process rights – intentionally and in bad faith – by contending that the letter was not material.

First, the government misrepresents Mr. Jin's position.  He never claimed that the letter "is exculpatory because it is arguably derogatory information about CTJ's lawyer."  ECF 316 at 6.  His clear position has been that the letter demonstrates "CTJ not only wanted to tell a lie to a bank, it wanted that lie to come from the government."  ECF 309 at 11.  Furthermore, while the letter may have been "written by CTJ's attorney," that alone does not make it an "advocacy piece."  ECF 316 at 6.  The letter makes outright false statements that it asks another party to present as facts. That is not advocacy, it is fraud.

Furthermore, the lawyer who sent the letter represented CTJ throughout the course of the DOJ investigation and managed CTJ's production of records.  If he truly believed that CTJ never did business with North Korea, this blatant (and probably intentional) misunderstanding throws the trustworthiness of CTJ's records into serious doubt.  (The government does not explain its bizarre suggestion that evidence of fraud during a government investigation, which necessarily takes place after the charged offenses, is somehow invalidated by occurring "two years after the [alleged] conspiracy ended."  ECF 316 at 6.)

Second, the government argues that the letter was effectively produced before trial.  It was not.  Disclosure of the letter's very existence is questionable, given that the relevant email was

27

disclosed with many other documents shortly before trial.  *See United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015)(finding suppression of evidence that "[t]he prosecutor waited over eight months until the eve of trial to reveal"); *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002)("'When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired.' … Although the Bradford memo was produced before trial, the defense was not in a position to read it, identify its usefulness, and use it." (quoting *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001)).  Regardless, the government does not deny suppression of the letter itself, which calls for dismissal with prejudice or another serious sanction. *See* ECF 309 at 10-11, 51-52.  While the unredacted email may "reveal that CTJ made [a] request," it does not reveal "the CTJ made the request."  ECF 316 at 6.  The email reveals that the government could not agree to a letter, but not what that letter stated or what "agree to" meant. Only upon seeing the letter could the defense learn that CTJ had asked the government to outright lie to banks on its behalf.

In any event, the government's argument is foreclosed by *United States v. Robinson*, 68 F.4th 1340 (D.C. Cir. 2023).  There, the defendant received an exculpatory report that provided him with "all [the] relevant information" that was in another, suppressed report.  *Id*.  The D.C. Circuit reversed the denial of a *Brady* motion, explaining that "[t]he prejudice to the defendant here occurs not from the lack of information contained in the [suppressed] Report, *but from the inability to provide the more convincing source corroborating the information contained therein.*" *Id.* at 1350 (emphasis added).

The government contends that the letter "may not be technically false," but only "misleading." ECF 316 at 6.  It is not clear that this distinction actually matters.  *See United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019)("The government commits a *Napue* violation

when the government introduces false *or misleading* testimony or allows it to go uncorrected." (emphasis added)(quotation omitted)); *see also Quinn*, 537 F. Supp. 2d at 110 (where the government did not act diligently to identify the specific false statement of its cooperator, "the failure to pinpoint a precise statement that would support a false statement charge was due to the lack of timely investigation by the government-an action that "constituted a breach of the government's 'duty to search' for *Brady* information" and "the government cannot shield itself from its *Brady* obligations by willful ignorance or failure to investigate.") (citing *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 897 (D.C. Cir. 1999)); *Tassin v. Cain*, 517 F.3d 770, 773-76 (5th Cir. 2008)(finding *Napue* and *Brady* violation where government witness testified that no promise of leniency had been made but prosecution had encouraged her to expect leniency).

That issue is academic, however, because the letter is clearly false:

> [T]he Department of Justice has determined that CTJ has never transacted business with customers in the DPRK. … This is to confirm that neither the Department of Justice nor OFAC has cause to believe that CTJ is engaged in any prohibited transactions subject to OFAC sanctions and, in particular, with trade to or from the DPRK.

ECF 309-20.  The DOJ had never made any such determination and had ample cause to believe that CTJ had engaged in such transactions.  The government's refusal to admit that these statements are false – technically and otherwise – raises concerns about its representations to the defense and even the Court.

Similarly, the government argues that Bartoletti's omission of the solicited bank fraud is not material because it is merely misleading.  ECF 316 at 9-10.  Similarly, this argument must be rejected based on its overly narrow interpretation of *Napue*.  The government's speculation that Bartoletti never "saw the letter or had knowledge of CTJ's request," ECF 316 at 6, is simply

29

irrelevant.  *See* ECF 309 at 35-36.  The government can violate *Napue* through a witness's "confusion or mistake."  *United States v. Wilson*, 720 F. Supp. 2d 51, 71 (D.D.C. 2010)(citing authority).  What matters is whether "*the government* knew or should have known that the testimony was false."  *Ausby*, 916 F.3d at 1092 (emphasis added)(quoting *United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015) (per curiam)).

The government also argues the letter is immaterial because "[t]here is [] no practical method for the defendant to admit such evidence."  The government does not explain why the letter is inadmissible and, in any event, materiality is not conditioned on admissibility.  *United States v. Saffarinia*, 424 F. Supp. 3d 46, 91 (D.D.C. 2020)("items may still be material and favorable under *Brady* if not admissible themselves so long as they could lead to admissible evidence.")(cleaned up).  Even assuming that the letter is inadmissible and would not lead to additional evidence, the "practical method" to use the letter is straightforward.  Any witness with knowledge can be questioned about the underlying facts, which are relevant to multiple lines of defense.  FoA Anglin, for example, could be questioned about his reliance on evidence produced by a company that he knew had done business with North Korea and then asked the U.S. government to lie about it.

Lastly, at least as to materiality, the government states that it located and produced the letter after Mr. Jin requested it.  But Mr. Jin had already requested *all* material exculpatory evidence.  Under *Brady*, the government must honor such a request, not refuse to disclose material that is not requested specifically.  *See United States v. Kelly*, 790 F.3d 130, 136 n.3 (D.C. Cir. 1986)(under *United States v. Bagley*, disclosure is required for all evidence that creates a "reasonable probability" of a different outcome, regardless of "the specificity of the defendant's request for the material").  The defendant submitted a broad *Brady* request in February 2025.

Exhibit 6 – Letter from E. Gorokhov to AUSA Wasserman dated 2/17/25.  Moreover, in March 2025, the defense requested "any information regarding [CTJ] or its any of its employees' dishonesty in its contacts with the government, and any evidence of [CTJ's] knowing violations of law." Exhibit 7 -  Letter from E. Gorokhov to AUSA Wasserman dated 3/4/25.  It then requested a broad range of documents relating to CTJ and the undercover investigation.  Exhibit 8 – Letter from Letter from E. Gorokhov to AUSA Wasserman dated 4/3/25.  The need for a request more specific than those undermines rather than supports the government's request.  What other material exculpatory evidence has not been disclosed?  The prosecution cannot say "none," because it cannot answer the question at all.  For example, as a result of complete inattention to its Brady obligations, the government was preparing to resurrect the false charges on Mr. Jin's retrial.

Beyond disputing materiality, the government argues that there is no evidence that it made the conscious choice to hide a letter that it not only twice withheld but redacted the accompaniment to.  It does not explain how it could accidentally redact an email and remove its attachment (twice), but lauds itself for "doing the right thing" by declining to sign the letter.  Mr. Jin agrees that the government made the correct decision not to enter into a bank fraud conspiracy with CTJ.  This is expected of any citizen.  But prosecutors have other duties, including the duty to seek out the truth *See, e .g.*, *United States v. Hernandez*, No. 2:23-CR-00113-CDS-NJK, 2025 WL 266721, at *2 (D. Nev. Jan. 22, 2025), *reconsideration denied,* 2025 WL 3688105 (D. Nev. Dec. 19, 2025) ("The prosecutor's duty to seek the truth and vindicate the demands of justice distinguishes his role from that of ordinary trial counsel. As the United States' representative, the prosecutor may not assume 'the role of an architect of a proceeding that does not comport with standards of justice.'") (quoting *Brady v. Maryland*, 373 U.S. 83, 88 (1963)).

31

Doing the *right* thing would mean seeking out and then disclosing the facts that led to this troubling incident. Instead, the government put Mr. Jin "through a severe ordeal. Charges were filed against [him] as a result of a sloppy, incomplete and notably over-zealous investigation, an investigation that was so flawed that the Government's lawyers [now try] to prevent inquiry into it." *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1209 (C.D. Cal. 2011). And the government *continues* to do the wrong thing by intentionally withholding the exculpatory communications, documents, and underlying facts showing these failures. This information goes to the heart of the thoroughness, reliability and good faith of the investigation, and thus to the heart of Mr. Jin's defense. Yet, the government never even bothered to respond to specific defense requests for this information.

## VII.    THE GOVERNMENT CONCEDES NUMEROUS POINTS

The government completely fails to address the following arguments:

- It violated *Napue* by presenting Dawson Anglin's misleading testimony to the petit and grand jurors, ECF 309 at 25, 29–30;

- It violated *Brady* by removing the Carbuncle evidence without alerting the defense, ECF 309 at 44;

- It violated *Brady* by redacting all but one sentence from the email exchange about the Peralta letter, ECF 309 at 55;

- If not documentation of the undercover operation exists, that is just as much a violation as withholding documents, ECF 309 at 24–25;

- Even if dismissal is inappropriate, a wide range of other remedies should be imposed, ECF 309 at 57–61.

The Court should deem those arguments waived.  *United States v. Cabrera*, 796 F. Supp. 3d 660, 664 (S.D. Cal. 2025)("Generally, a party waives argument when it fails to respond to an argument made to the court.").

## VIII.    DISMISSAL WITH PREJUDICE IS WARRANTED.

Based on these violations, the Court should dismiss the indictment.  Closer attention to just one of the cases the government attempts to distinguish confirms this conclusion.  In *Bundy*, the court affirmed the dismissal for several reasons, two relevant here.  First, the court found that lesser remedies were inadequate because the *Brady* material disclosed after the first trial "not only would . . . affect the *defendants*' strategy, it might well [ ] alter[] the *prosecution's* strategy." *United States v. Bundy*, 968 F.3d 1019, 1044 (9th Cir. 2020) (citation omitted).  "Having tried out its case and identified problem areas, the government could [ ] correct[] those problems in a retrial."  *Id*. (citation modified).  The same is true here.  Now that the government has disclosed (some but not all of) the withheld *Brady* material, it can shore up its case on retrial in response– circumscribing Bartoletti's misleading testimony, explaining away the significance of the Peralta letter or the bills of lading, or finally removing the unsubstantiated Carbuncle allegations from the indictment.  As in *Bundy*, "starting over [ ] would [ ] give[] the government an opportunity to strengthen its case at [Mr. Jin's] expense."  *Id*.

The *Bundy* court affirmed dismissal for another reason relevant here: "the prosecutor's 'unwillingness to take responsibility for his conduct,' . . . support[s] the district court's decision to dismiss an indictment with prejudice."  *Id*. (quoting *United States v. Chapman*, 5245 F.3d 1073, 1088 (9th Cir. 2008)).  Rather than own up to its mistakes, the government downplays them.  It denies the materiality of the bills of lading.  *See* ECF 316 at 3.  It claims that its failure to produce the Peralta letter is excused because it disclosed the emails about the letter; but the government

33

leaves out that the emails were redacted down to a sentence and that the letter revealed that CTJ asked the government to explicitly lie on its behalf. *Id*. at 6. It asserts that including the false Carbuncle allegation was "innocent," *see id*. at 7-8, but fails to mention that just last month Anglin inserted the false allegation back into the evidence. In short, *Bundy* supports dismissal.

As do Mr. Jin's other cases. For instance, in *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1182 (C.D. Cal. 2011), the court dismissed the indictment for reasons that closely parallel this case. Just as the government in *Aguilar* "allowed a key FBI agent to testify untruthfully before the grand jury," the government here allowed Anglin (and Bartoletti) to testify misleadingly, if not falsely, before the grand jury and the petit jury. *Id*. Just as the government in *Aguilar* "inserted material falsehoods into affidavits," the government here inserted falsehoods about Carbuncle into the indictment, and seemed intent to present them at the retrial. *Id.* And just as the government in *Aguilar* "recklessly failed to comply with its discovery obligations," the government here is continuing to commit due process violations, as detailed above. *See id*. The government rightly points out that "district courts rarely grant the relief that defendant seeks," ECF 316 at 12, but that is because prosecutorial misconduct on the scale presented here is likewise rare.

Past dismissal, the government does not meaningfully engage with Mr. Jin's requests for alternative relief. If the Court determines that dismissal is not warranted, it has a wide range of tools at its disposal and should use them: excluding or limiting Anglin's and Bartoletti's testimony, excluding documents like CTJ's business records or those obtained from the undercover operation, and giving adverse inference instructions. *See* ECF 309 at 57-58. At the very least, the Court should hold a hearing on the issue. *See United States v. Koubriti*, 297 F. Supp. 2d 955, 958 n.1 (E.D. Mich. 2004) (noting that the court previously held a hearing about just one withheld *Brady* document).

34

## CONCLUSION

The Court should grant the Motion and dismiss the indictment with prejudice.


Respectfully submitted,


By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

**CERTIFICATE OF SERVICE**

 A copy of the foregoing motion was filed via ECF, which automatically sends a copy to all counsel

of record.


Respectfully submitted,

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, D.C. 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com
